UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                               :

WELLS FARGO BANK, N.A.,               :
                               :

               Plaintiff.          :
                               :

              -v-               :        22 Civ. 8606 (JPC)
                               :

THE UNITED STATES LIFE INSURANCE    :     OPINION AND ORDER
COMPANY IN THE CITY OF NEW YORK,    :
                               :

               Defendant.     :
                               :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      The late Catherine Cohen lived a long and remarkable life.  She was raised in the St.

Stanislaus Orphanage in Nanticoke, Pennsylvania and received little education.  In her early

adulthood, Catherine worked in a factory in Brooklyn to support the war effort during World

War II.  She eventually moved to Florida, and friends and family recall her as "one of a kind," "the

sweetest human soul," someone who "always had a smile on her face and an upbeat attitude," and

someone who enjoyed "making everyone laugh."  Catherine unfortunately passed away on October

21, 2021, at the ripe old age of 100.  Or 101, depending on whom you ask.  You see, throughout

her life, Catherine professed being born on May 10, 1921.  But upon her passing—and because

she carried millions of dollars of life insurance with a maturity date just weeks after her death—

her insurer has questioned whether Catherine was truly born on that day.  That skepticism has

prompted this litigation.

      Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo"), as the Securities Intermediary, is the

owner and beneficiary of a life insurance policy Catherine purchased from Defendant The United

States Life Insurance Company in the City of New York ("US Life").  After Catherine's death,

Wells Fargo attempted to collect on the policy.  US Life refused, claiming that, at the time the

policy was issued, Catherine had falsely represented her birthday as May 10, 1921, when in fact she was born on January 29, 1920.  Wells Fargo then brought the instant action for breach of contract.  The parties now cross-move for summary judgment, with US Life seeking a no-liability finding in its favor and Wells Fargo seeking to preclude certain defenses.  Each party further moves to exclude certain proffered expert testimony of its adversary.

Wells Fargo and US Life have accumulated a significant volume of evidence concerning Catherine Cohen's life, with their counsel forcefully arguing that either May 10, 1921, or January 29, 1920, is her true date of birth.  But if ever there was an archetype for a genuine dispute of material fact, it is here.  The Court therefore denies US Life's motion for summary judgment.  Wells Fargo's partial motion for summary judgment concerning US Life's defenses is granted in part and denied it in part.  Most significantly, under the undisputed facts, US Life lacks a legal basis to assert either of its pleaded reformation defenses and those defenses accordingly are precluded.  As to the expert motions, the Court grants in part and denies in part Wells Fargo's motion to exclude the testimony of Roger Joslyn; grants in part and denies in part US Life's motion to exclude the rebuttal testimony of Kathleen Hinckley; grants in part and denies in part US Life's motion to exclude the testimony of Stanley Shelley; grants in part and denies in part Wells Fargo's motion to exclude the testimony of Suhas Sarathy; grants US Life's motion to exclude the testimony of Laura Dambier; and grants Wells Fargo's motion to exclude the testimony of Barbara Mueller.

## I.  Background[1]

### A.    Factual Background

In 2005, US Life issued a life insurance policy (the "Policy") insuring the life of Catherine

---

[1]  The facts throughout this Opinion and Order are mainly drawn from the parties' statements and counterstatements of undisputed material facts under Local Civil Rule 56.1(a), Dkt.

Cohen.  US Life 56.1 Stmt. ¶ 1; Wells Fargo 56.1 Stmt. ¶ 1; *see* Loterstein Second Decl., Exh. 1

("Policy").  The Policy went into effect on November 8, 2005, provides for a "Death Benefit

Amount" of $9.8 million, and lists a maturity date of November 8, 2021 (the "Maturity Date").

Policy at 2; *see* US Life 56.1 Stmt. ¶ 16.  Certain provisions of the Policy are particularly relevant

in this litigation.  The Policy's "Payment of Proceeds" provision states: "The death benefit less

debt will be paid to the beneficiary upon receipt of due proof of death of the insured before the

maturity date."   Policy at 7.   The Policy's "Misstatement of Age or Sex" provision (the

---

92-1 ("US Life 56.1 Stmt."); Dkt. 102 (Wells Fargo's counterstatement); Dkt. 121-1 (US Life's
reply statement under Rule 56.1); Dkt. 96-1 ("Wells Fargo 56.1 Stmt."); Dkt. 110-1 (US Life's
counterstatement under Rule 56.1), and the declarations filed by the parties with attached exhibits,
Dkt. 90 ("Loterstein First Decl."); Dkt. 93 ("Loterstein Second Decl."); Dkt. 96-2 ("Failla First
Decl."); Dkt. 98 ("Failla Second Decl."); Dkt. 100 ("Failla Third Decl."); Dkt. 103 ("Failla Fourth
Decl."); Dkt. 105 ("Herrmann Decl."); Dkt. 107 ("Herrmann Second Decl.").  Unless otherwise
noted, the Court cites only to a party's statement of undisputed material facts when the opposing
party does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to
add its own "spin" on the fact or otherwise disputes the inferences drawn from it.  Among the
exhibits filed by the parties were transcript excerpts from depositions of Marie Levitt, Stanley
Shelley, Roger Joslyn, and Laura Dambier.  Those deposition transcripts are referred to herein as
follows: (1) Loterstein Second Decl., Exh. 7, and Failla Fourth Decl., Exh. 47, collectively as
"Marie Dep. Tr."; (2) Failla Second Decl., Exh. 6, and Loterstein First Decl., Exh. F, collectively
as "Shelley Dep. Tr."; (3) Herrmann Decl., Exh. A, as "Joslyn Dep. Tr."; and (4) Loterstein First
Decl., Exh. C, as "Dambier Dep. Tr."

On December 13, 2024, US Life moved to strike Wells Fargo's Rule 56.1(b)
counterstatement, Dkt. 102, as violative of the Court's Local Rules. Dkt. 111.  The Court declined
to strike the counterstatement at that time, but noted that it would "consider the parties'
submissions concerning Defendant's challenge to that statement when resolving the parties'
motions for summary judgment," and would disregard any portion of either party's Rule 56.1
statement that exceeded the proper scope for such a statement.  Dkt. 113.  In considering the
parties' summary judgment motions, the Court has now concluded that Wells Fargo's
counterstatement went beyond the proper scope authorized in Local Rule 56.1(b).  "The purpose
of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing
district courts from the need to hunt through voluminous records without guidance from the
parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  In responding to US Life's
eleven-page Rule 56.1 statement, Dkt. 92-1, Wells Fargo filed a 143-page counterstatement, along
with sixteen pages of additional facts, Dkt. 102.  That submission, along with the Court's
reluctance to strike the document in the middle of briefing, no doubt triggered a forty-page reply
statement from US Life, Dkt. 121-1.  This resulted in Rule 56.1 submissions that needlessly
complicated the adjudication of the summary judgment motions and hardly advanced the intended
purpose of such statements.

"Misstatement of Age Provision") reads: "If the insured's age or sex has been misstated, we will adjust the death benefit to reflect the amount at risk that would have been provided by the most recent monthly deduction made and the most recent cost of insurance rate for the insured's correct age and sex." *Id.* at 12.

The Policy further provides that "[a]ge or attained age means age nearest birthday at the beginning of a policy year," with each new "policy year" beginning on November 8. *Id.* at 2, 7. The Policy incorporates Catherine's "original application" as part of the "entire contract." *Id.* at 12. In that application, dated December 7, 2005, Catherine twice identified her date of birth as May 10, 1921, and identified her age at the time as eighty-four years old. *Id.* at WF_000552, WF_000555, WF_000556. Accordingly, Catherine's attained age at the time the Policy was issued was eighty-four. *See id.* at 2; US Life 56.1 Stmt. ¶ 10.

In May 2011, Wells Fargo became the sole owner and beneficiary of the Policy. Wells Fargo 56.1 Stmt. ¶ 7; US Life 56.1 Stmt. ¶ 2. From that point through Catherine's death on October 21, 2021, Wells Fargo timely remitted all premium payments owed under the Policy. Wells Fargo 56.1 Stmt. ¶¶ 8, 10. On November 9, 2021, Wells Fargo submitted a claim to US Life for the Policy's Death Benefit Amount and provided Catherine's death certificate. *Id.* ¶ 11; *see* Failla Fourth Decl., Exhs. 62 ("Death Certificate"), 63 ("Claim").

On June 30, 2022, US Life denied Wells Fargo's claim for the Death Benefit Amount. Wells Fargo 56.1 Stmt. ¶ 12; *see* Failla First Decl., Exh. 6 ("Denial Letter"). US Life's denial letter explained that the death certificate showed Catherine's date of birth as January 29, 1920, rather than May 10, 1921, and that US Life understood that Catherine's obituary likewise identified her date of birth as January 29, 1920. Denial Letter at 1; *see* Death Certificate. The denial letter also noted Wells Fargo's purported failure to provide a copy of Catherine's birth certificate or passport, and concluded that "[b]ased upon a date of birth of January 29, 1920, the policy matured

on November 8, 2019, when [Catherine] reached the attained age of 100."  Denial Letter at 1; *see* US Life 56.1 Stmt. ¶ 14 ("If Ms. Cohen had been born on January 29, 1920, she would have reached an attained age of 100 on November 8, 2019.").  US Life maintains that it "intended to set the Policy's maturity date not on the specific date of November 8, 2021, but instead on the policy anniversary when Ms. Cohen would reach the attained aged of 100, based on her true date of birth." US Life 56.1 Stmt. ¶ 15.  Therefore, US Life denied Wells Fargo's claim because "[b]ased upon a date of birth of January 29, 1920, the policy matured on November 8, 2019," so Wells Fargo was not entitled to the full Death Benefit Amount.  Denial Letter at 1-2.

**B.    Procedural History**

Wells Fargo initiated this action on October 10, 2022, Dkt. 1, and filed an Amended Complaint on October 17, 2022, Dkt. 11.[2]  The Amended Complaint brings a single claim for breach of contract.  *Id.* ¶¶ 67-73.  US Life answered the Amended Complaint on December 15, 2022.  Dkt. 15.  The Court subsequently granted US Life leave to file an Amended Answer, *see Wells Fargo Bank, N.A. v. U.S. Life Ins. Co. in City of New York*, No. 22 Civ. 8606 (JPC), 2023 WL 3091676, at *4-5 (S.D.N.Y. Apr. 26, 2023), which US Life filed on May 1, 2023, Dkt. 37 ("Amended Answer").  The Amended Answer pleads eight affirmative defenses, including two defenses asserting that US Life is entitled to reform the Policy.  *See id.* at 15-16 ¶ 21.  Discovery in this matter closed on August 16, 2024.  Dkt. 73.

On October 23, 2024, the parties filed motions for summary judgment and to exclude certain testimony of the other party's proffered experts under *Daubert v. Merrell Dow*

---

[2] US Life previously had filed a complaint against Wells Fargo concerning these same facts and seeking a declaratory judgment that it is responsible only for "the cash value as of the true maturity date of November 8, 2019, plus a reimbursement of back premiums paid after that date." *See The U.S. Life Ins. Co. in the City of New York v. Wells Fargo Bank, N.A.*, No. 22 Civ. 5621 (JPC) (S.D.N.Y.), Dkt. 1 at 10.  That action was voluntarily dismissed on October 12, 2022, *id.*, Dkt. 20, two days after this action was initiated.

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Dkts. 78 ("Sarathy *Daubert* Motion"), 79 (Hinckley *Daubert* motion), 83 ("Mueller *Daubert* Motion"), 86 ("Joslyn *Daubert* Motion"), 88 ("Dambier & Shelley *Daubert* Motion"), 92 ("US Life SJ Motion"), 96 ("Wells Fargo SJ Motion").   The parties filed oppositions on December 9, 2024.  *See* Dkts. 97 ("Hinckley *Daubert* Opp."), 99 ("Dambier & Shelley *Daubert* Opp."), 101 ("Opp. to US Life SJ Motion"), 104 ("Joslyn *Daubert* Opp."), 106 ("Sarathy *Daubert* Opp."), 108 (Mueller *Daubert* opposition), 110 ("Opp. to Wells Fargo SJ Motion").  Replies were filed on January 8, 2025. *See* Dkts. 114 (Mueller *Daubert* reply), 115 ("Sarathy *Daubert* Reply"), 116 ("Joslyn *Daubert* Reply"), 118 ("Hinckley *Daubert* Reply"), 120 ("Dambier & Shelley *Daubert* Reply"), 121 ("US Life SJ Reply"), 123 ("Wells Fargo SJ Reply").  The Court heard oral argument on the parties' motions on July 2, 2025.  Dkt. 129 ("Tr.")

## II.  Motions for Summary Judgment

US Life has moved for summary judgment seeking a no-liability ruling in its favor, while Wells Fargo has moved for partial summary judgment as to certain of US Life's defenses.  Because a genuine dispute of material fact exists as to the actual date of Catherine Cohen's birth, US Life's motion is denied.  As to the affirmative defenses, the Court holds that the Policy's Misstatement of Age Provision forecloses US Life's ability to assert a reformation defense.  The Court also concludes that whether US Life may adjust the death benefit to $0 under the Misstatement of Age Provision is an issue for the jury to resolve.  Accordingly, Wells Fargo's summary judgment motion is granted in part and denied in part.

### A.    Legal Standard

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Mhany Mgmt., Inc. v. Cnty. of*

*Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In conducting this review, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party."  *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'"  *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted).  The non-movant must present more than a "scintilla of evidence" to survive summary judgment.  *Anderson*, 477 U.S. at 252. "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks omitted).

Generally, a court evaluates each cross-motion for summary judgment independently of the other, considering the facts in the light most favorable to the non-moving party.  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  But if a "motion and cross-motion seek a determination of the same issues," as is the case with regard to US Life's affirmative defenses, "the Court may consider them together."  *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d

217, 223 (S.D.N.Y. 2019).

**B.     A Genuine Dispute of Material Fact Exists as to Catherine Cohen's True Date of Birth**

A threshold issue with respect to US Life's summary judgment motion is whether US Life has established the absence of a genuine dispute of material fact that Catherine was born on January 29, 1920, or, for that matter, on some other date on which she would have had an attained age under the Policy of 100 years or older when she passed away.  *See* Tr. at 3:22-4:10 (US Life agreeing that it must succeed on this issue to prevail on its summary judgment motion).  If US Life passes that threshold, it may then be entitled to summary judgment based on its affirmative defenses of reformation or its alternative defense regarding the application of the Policy's Misstatement of Age Provision.  *See* US Life SJ Motion at 12-25.  Otherwise, this case must proceed to trial.

Under New York law,[3] Catherine's birthday as stated in the Policy—*i.e.*, May 10, 1921—is presumed to be correct, and US Life must adduce sufficient evidence to rebut that presumption. *Goell v. U.S. Life Ins. Co. in City of New York*, 40 N.Y.S.2d 779, 780 (1st Dep't 1943) ("The cases are clear that the plaintiff has the advantage of a presumption that the age stated in the policy is the true age.  This presumption stands until rebutted by evidence which may fairly satisfy the jury that the insured was in fact of some other age which would preclude plaintiff's right to any recovery."); *see* US Life SJ Reply at 1 (acknowledging this standard but arguing that US Life has rebutted the presumption).  Combined with the "exacting standard for summary judgment," *Kellner v. First Unum Life Ins. Co.*, 589 F. Supp. 2d 291, 313 (S.D.N.Y. 2008), US Life's motion faces an uphill battle from the start.

---

[3] The parties apply New York law in their briefs, and therefore New York law governs the instant dispute.  *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)).

US Life has not presented sufficient evidence to rebut as a matter of law the presumed accuracy of the stated May 10, 1921, birthday and to show the absence of a material fact that Catherine was in fact born on either January 29, 1920, or some other date that would have resulted in an attained age of 100 years or older at the time of her death.  To the contrary, discovery has unearthed mixed evidence regarding Catherine's true date of birth.

Wells Fargo points not only to the Policy, but also to a collection of documents and other testimony which favor a determination that Catherine was born in May 1921.  Catherine's original application for a Social Security number, signed on March 4, 1940, represented that she was born on May 5, 1921.  *See* Failla Fourth Decl., Exh. 37.  Catherine's affidavit for her marriage license, completed in 1944, listed her date of birth as May 10, 1921.  Failla Fourth Decl., Exh. 38.  Similarly reflecting a birthday of May 10, 1921, are Catherine's 1970 and 2007 passport applications, Failla Fourth Decl., Exh. 39, a New York voter registration form from 1984, Failla Fourth Decl., Exh. 40, a New York Department of Motor Vehicles abstract from 1994, Failla Fourth Decl., Exh. 41, Catherine's Florida identification card, Failla Fourth Decl., Exh. 42, and the Florida driver's license Catherine was using at the time of her death, Failla Fourth Decl., Exh. 44.

In addition to these records, Catherine signed a notarized affidavit in 2010, attesting under penalty of perjury that her date of birth was May 10, 1921.  Failla Fourth Decl., Exh. 43 ("Catherine Affidavit").  Catherine's older siblings also swore out affidavits when they were still alive, declaring that May 10, 1921, was Catherine's birthday.  Catherine's older sister executed a birth affidavit in support of Catherine's 1970 passport application, swearing under criminal penalty that May 10, 1921, was Catherine's birthday.  *See* Failla Fourth Decl., Exh. 39 at DOS_0008.  Catherine's older brother swore under oath in an affidavit, dated March 11, 1943, that May 10, 1921, was Catherine's birthday as well.  *See* Failla Fourth Decl., Exh. 45.  Wells Fargo persuasively reasons that Catherine's older siblings were perhaps "the people who had the best

knowledge regarding her date of birth," particularly given the circumstances of Catherine's life. Opp. to US Life SJ Motion at 15.  While US Life responds that neither affidavit was drafted "to prove [Catherine's] birthdate," US Life SJ Reply at 3 n.3, the fact remains that these immediate family members, who would have been alive at the time of Catherine's birth (albeit at a young age), swore in affidavits that she was born on May 10, 1921.

Indeed, US Life does not contest that throughout her life, Catherine consistently identified May 10, 1921, as her date of birth.  US Life's argument instead boils down to insisting that Catherine, her siblings, and the identification documents discussed above were simply incorrect. According to US Life, this evidence merely shows that Catherine "embraced" May 10, 1921, as her birthday.  US Life SJ Reply at 2-3.  US Life maintains that the best reading of the evidence, however, is that Catherine was actually born on January 29, 1920, and that May 10, 1921, was a day chosen by her older sister in the St. Stanislaus Orphanage because it coincided with Mother's Day.  *See* US Life SJ Motion at 1-2.

To its credit, US Life has marshalled a fair amount of evidence in support of that position. First, US Life points to affidavits sworn by Catherine's daughters, Carol Cohen and Marie Levitt. *Id.* at 7-8; *see* Loterstein Second Decl., Exhs. 15 ("Carol Affidavit"), 16 ("Marie Affidavit").  In each affidavit, the affiant represented that Catherine was born on January 29, 1920; that Catherine and her siblings did not know Catherine's actual birthday and so Catherine's older sister picked May 10, 1921, which fell on Mother's Day, as her birthday; that Catherine used the May 10, 1921, date of birth for much of her life; and that the family came to believe January 29, 1920, to be her correct date of birth after reviewing a baptismal certificate from the St. Stanislaus Orphanage.  *See* Carol Affidavit ¶¶ 1-8; Marie Affidavit ¶¶ 1-8.  Marie further testified at her deposition that her mother, Catherine, was the person who told her the story about the birthday being assigned in the orphanage by an older sibling.  Marie Dep. Tr. at 20:1-21:21; *see* US Life SJ Motion at 8.  And

Carol told a separate insurance company in connection with the collection of a different death benefit that Catherine's birthday was January 29, 1920, repeating largely the same story as in her affidavit.  Loterstein Second Decl., Exh. 31 at PRINCIPAL LIFE 001258;[4] *see* US Life SJ Motion at 11-12.

 While US Life places much emphasis on these statements from Catherine's daughters, *see* US Life SJ Motion at 7-8, 11-12; US Life SJ Reply at 1-2, other statements from these women in the record are equivocal regarding Catherine's birthday.  For example, Marie also testified that she made the statement in her affidavit because she "wanted this annoyance to be out of [her] life," and that she does not actually know when her mother was born.  Marie Dep. Tr. at 76:17-77:18; *see id.* at 75:10-11 ("It is correct to say that I don't know exactly when my mother was born."); *id.* at 78:22-23 ("[W]e don't know her real date of birth as evidenced by all this.").  And when Carol was pressed on her prior statements, she too retracted her confidence that her mother was born on January 29, 1920, and, like Marie, maintained that she does not actually know her mother's birthday.  In a declaration intended to "correct and clarify" her earlier affidavit,[5] Carol stated under

---

 [4] This exhibit, which is titled "Transaction Information" and appears to be an activity log from Principal Life Insurance Company for the death claim for Catherine's policy, reveals that, on December 2, 2021, Carol told a representative of that company the following:

> [Carol] knew [Catherine's date of birth] was incorrect in our system - she stated insured was born 1/29/1920 but grew up in an orphanage and they would "assign birthdays" to the kids so she was assigned 5/10/1921.  The family never called in to change our records to reflect the correct date.  There is no actual birth certificate, but she will look to see what records she has to send in that shows true birthday - she said the baptismal cert and medicare/soc security has the correct date.  She requested we email her the info as well.

Loterstein Second Decl., Exh. 31 at PRINCIPAL LIFE 001258.

 [5] Carol offered the following explanation of the need to correct her prior affidavit:

> I acknowledge that I signed an affidavit in July 2023 about my mother and her date of birth.  That affidavit was prepared by the attorneys for U.S. Life, and I was not involved in drafting it.  The affidavit contains a couple of statements I need to correct.

penalty of perjury that her prior statement that Catherine was born on January 29, 1920, was "not accurate" and that "[t]he truth is I do not know when my mother was born and have no personal knowledge of her birthdate."  Failla Fourth Decl., Exh. 46 ¶¶ 2, 9; *see also id.* ¶ 3 ("Throughout her life, my mother recognized and celebrated her birthday on May 10 and told anyone who asked that she was born on May 10, 1921.  My mother never told me she was born on any other day."). Given this shifting record, the earlier statements by Catherine's daughters are hardly a silver bullet, but rather create questions of credibility and how to weigh their conflicting statements, which are properly for the jury to resolve at trial.

US Life next points to a collection of records originating from the St. Stanislaus Orphanage.  US Life SJ Motion at 8-9; *see* Loterstein Second Decl., Exh. 19 ("Orphanage Records").  US Life notes that in these records, "the only month and day of birth recorded for Ms. Cohen is January 29," and that "[n]one of the records produced . . . list Ms. Cohen's birthday as any date in May, or as any date in 1921."  US Life SJ Motion at 9.  The earliest record, a document entitled "Child's Physical Record," identified Catherine's birthday as January 29, 1920. Orphanage Records at 2-3.  But other medical records in this production listed Catherine's birthday as January 29, *1930.  See id.* at 4, 6.  US Life tries to dismiss the 1930 date, contending that "[t]hese records are obviously incorrect" and "[t]he author's reference to 1930 likely was intended to be 1920."  US Life SJ Motion at 9 n.6.  Perhaps, but this discrepancy adds to the murkiness of Catherine's actual date of birth.  Indeed, the remaining orphanage records are hardly clear on this point.  For example, a "Case History" document recorded Catherine's birthday as January 29, *1922*, and a baptismal record likewise recorded a 1922 date, which was crossed out and replaced with a 1920 birth year by someone at some point.  Orphanage Records at 9, 19.  US Life insists that these records were "corrected," US Life SJ Reply at 5, but while that too may be the case,

---

Failla Fourth Decl., Exh. 46 ¶ 7.

these internal inconsistencies give the Court pause and strongly counsel against finding an absence of a material dispute based on the orphanage records.

Further compounding these issues are questions about the reliability of the information reflected in those orphanage records. For example, Wells Fargo points out that there is no indication of the source for the January 29, 1920, date in those records. Opp. to US Life SJ Motion at 9. While US Life rejoins that there is no requirement that such evidence cite a source, US Life SJ Reply at 5, the absence of a source only creates a question of the records' reliability for the jury to resolve. Likewise, it is properly for the finder of fact to determine whatever weight to afford the apparent discrepancies in the records of Catherine's siblings and how those discrepancies might reflect on the reliability of records concerning Catherine. *Compare* Orphanage Records at 13 (reflecting dates of birth for Catherine's siblings), *with* Failla Fourth Decl., Exh. 54 (baptism record for Catherine's brother), Failla Fourth Decl., Exh. 55 (census reporting concerning Catherine's brother's age as of January 1, 1920), Failla Fourth Decl., Exh. 56 (baptism record for Catherine's sister); *see also* US Life SJ Reply at 6 ("The 'orphanage record' Wells Fargo refers to as recording 'different incorrect dates of birth' is a card created by the 'Social Service Exchange' (not the Orphanage) in 1941—four years after Ms. Cohen left the Orphanage—which does not undermine the accuracy of any Parish records, including records created more than ten years earlier."). The orphanage records also contain correspondences from the State of Pennsylvania to the St. Stanislaus Orphanage, dated October 1936 through March 1937, *see* Orphanage Records at 15-18, which suggest that the orphanage had asked the state to search for a birth certificate for Catherine. The State of Pennsylvania apparently searched records for the years 1920, 1921, and 1922, but failed to locate a birth certificate. *See id.* This further adds to the ambiguity surrounding the year of Catherine's birth. *See* Opp. to US Life SJ Motion at 10. While US Life may be correct that these letters cannot "prove what the Orphanage wrote" to the state, US Life SJ Reply at 5-6,

it is for jury to decide what inferences to draw from the state's correspondences.

US Life also points to a delayed birth certificate, which Catherine obtained from the Pennsylvania Department of Health in 1943 and recorded her birthday as January 29, 1920. US Life SJ Motion at 9-10; *see* Loterstein Second Decl., Exh. 24 ("Delayed Birth Certificate"). The birth certificate reflects that its information was based on a school record, the baptismal record mentioned above, and a notarized affidavit signed by "Albenia Deminski," who is noted as being Catherine's aunt. Delayed Birth Certificate. But Catherine's daughter, Marie, testified that she had never heard of Albenia Deminski, Maria Dep. Tr. at 62:24-63:10, casting at least some doubt on Deminski's relationship to Catherine and the basis for her apparent assertion that Catherine was born in 1920. And while Catherine may have filed an affidavit with the Pennsylvania Department of Health at some point to obtain that delayed birth certificate, *see* Loterstein Second Decl., Exh. 34 (excerpts from Purdon's Pennsylvania Statutes Annotated, 1948 Cumulative Annual Pocket Part) § 482; US Life SJ Reply at 4, that affidavit has not been submitted to the Court. Wells Fargo therefore appears to have grounds to challenge the reliability of Catherine's delayed birth certificate.

To be sure, this delayed birth certificate carries probative value as to Catherine's birthday. Yet it is just one piece of evidence in an otherwise conflicted record. On summary judgment, it is not appropriate for the Court to weigh that delayed birth certificate against a similarly strong piece of evidence like an affidavit signed by Catherine herself, *see* Catherine Affidavit ¶ 1 (attesting under penalty of perjury that May 10, 1921, is her date of birth). Likewise, even assuming Catherine swore an affidavit attesting that she was born on January 29, 1920, in order to receive the delayed birth certificate, that only further muddles the record with contradiction on a material factual issue.

Finally, US Life points to Social Security Administration records which list Catherine's

birthday as January 29, 1920, US Life SJ Motion at 11 (citing Loterstein Second Decl., Exhs. 25, 26), and notes that Catherine's eligibility for benefits began in 1985, when she would have been just sixty-four years old if she truly had been born in May 1921, *id.* (citing Loterstein Second Decl., Exh. 26; 42 U.S.C. §§ 402(a), 416(l)(1)(A)).    But on this, too, Wells Fargo identifies inconsistencies, including that Catherine first applied for benefits on May 15, 1986, which is more consistent with a May 1921 birthday.  Opp. to US Life SJ Motion at 12 (citing Loterstein Second Decl., Exh. 26).  Even with US Life's counterarguments in mind, *see* US Life SJ Reply at 6-7; *see also* US Life SJ Motion at 15 n.12 (underscoring that Catherine's application for a Social Security number recorded May 5, 1921, rather than May 10, 1921, as her birthday (citing Loterstein Second Decl., Exh. 35)), the Court cannot determine as a matter of law that Catherine's birthday was January 29, 1920, particularly given the exacting standards governing US Life's motion for summary judgment.

After reviewing the record and the parties' arguments, it is clear that US Life may have a story to tell a jury—May 10, 1921, was "simply a birthday assigned to [Catherine] by her older sister after she was taken in at the St. Stanislaus orphanage" and she in fact was born over fifteen months earlier on January 29, 1920.  US Life SJ Motion at 13.  US Life has evidence to support that story, and it might ultimately prove persuasive.  But the record has too much conflicting evidence as to Catherine's date of birth for the Court to resolve that factual question on summary judgment.  While US Life urges the Court to view Wells Fargo's evidence "through the lens of the uncontested evidence that Ms. Cohen's sister selected that date to serve as Ms. Cohen's birthday," *id.* at 15, that evidence is very much contested.  Indeed, the evidence presented by the parties also supports the plausible inference that no one truly knows when Catherine was born.[6]

---

[6] US Life's reliance on *Makina Ve Kimya Endustrisi A.S. v. A.S.A.P. Logistics Ltd.*, No. 22 Civ. 3933 (AS), 2024 WL 3638054 (S.D.N.Y. Aug. 2, 2024), is misplaced.  *See* US Life SJ Motion

Mindful that in the present posture the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party," *Mhany Mgmt.*, 819 F.3d at 620, as well as the presumption in favor of the accuracy of the birthdate listed on the Policy, the Court is left with the inescapable conclusion that a genuine dispute of material fact persists on the true date Catherine was born. As US Life's ability to prevail on its defenses of reformation and the application of the Misstatement of Age Provision hinges on establishing that Catherine was born on January 29, 1920, or otherwise on some other date which would have resulted in an attained age of 100 years or older upon her death, its summary judgment motion is denied.

## C.    US Life's Defenses

Wells Fargo's motion for partial summary judgment attempts to narrow US Life's available defenses at trial. "Where a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial— a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *CAI Rail, Inc. v. Badger Mining Corp.*, No. 20 Civ. 4644 (JPC), 2021 WL 705880, at *4 (S.D.N.Y. Feb. 22, 2021) (alterations adopted and internal quotation marks omitted) (quoting *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)). "Where the issues are purely legal and there is no disputed issue of fact, summary judgment is

---

at 15. In *Makina Ve Kimya Endustrisi A.S.*, the court considered the deposition testimony of a witness filed in opposition to a summary judgment motion, in which the witness testified about the termination of a particular contract. 2024 WL 3638054, at *13. The court discounted this witness's testimony for two reasons. First, the testimony was inadmissible hearsay. Second, the court determined that this testimony lacked probative value because the witness had testified she "didn't know" any facts pertinent to establishing the trademark infringement claim at issue in that case. *Id.* In contrast, Wells Fargo has presented evidence which may be admissible and either undercuts the persuasive value of the records on which US Life relies, such as Catherine's daughters' recanted statements and the existence of inconsistencies in the orphanage records, or which directly supports Wells Fargo's view of the facts, like Catherine's affidavit, Catherine's older siblings' affidavits, and Catherine's driver's license, identification cards, and passport applications. Unlike the situation in *Makina Ve Kimya Endustrisi A.S.*, this evidence is, of course, probative of the threshold factual issue in this case.

appropriate." *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1039 (2d Cir. 1995).

### 1. Modification of the Maturity Date

Before turning to the viability of US Life's affirmative defenses, the Court begins with US Life's argument that the Policy's Maturity Date can be changed without reforming the contract. Opp. to Wells Fargo SJ Motion at 23-25. New York law generally holds that "the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citation modified). And "[w]hen the terms and conditions of an insurance policy are clear and unambiguous, the construction of the policy presents questions of law to be determined by the court." *Superior Ice Rink, Inc. v. Nescon Contracting Corp.*, 861 N.Y.S.2d 362, 365 (2d Dep't 2008).

The Maturity Date of the Policy is clearly fixed as November 8, 2021. Policy at 2. Notwithstanding this explicit term, US Life urges the Court to interpret the Policy such that "it matured on November 8, 2019," arguing that this would reflect that "the Policy was intended to mature at [Catherine's] 'attained age' of 100." Opp. to Wells Fargo SJ Motion at 23. Under New York law, however, clear provisions of an insurance policy "must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement." *Gov't Emps. Ins. Co. v. Kligler*, 366 N.E.2d 865, 866 (N.Y. 1977). By its terms, the Policy explicitly sets the Maturity Date at November 8, 2021. Any appeal to the parties' "intent" when forming the contract to escape this plain language sounds in reformation, not interpretation, of the contract.

To sidestep this straightforward reading of the Policy, US Life invokes the absurdity doctrine. Opp. to Wells Fargo SJ Motion at 23-24. "In interpreting contracts, 'words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.'" *Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC*, No. 20 Civ. 9622 (DLC), 2022 WL 16833701, at *11

(S.D.N.Y. Nov. 8, 2022) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006)).  "The [New York] Court of Appeals has set a high bar for declaring a contract absurd" and the fact that a contractual provision might create an "unwise" outcome from the vantagepoint of one of the contracting parties, "by itself, does not render the result . . . absurd." *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16 Civ. 4584 (LGS), 2020 WL 1528526, at *6 (S.D.N.Y. Mar. 30, 2020) (alteration adopted) (first quoting *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 192 (1st Dep't 2013), then quoting *Jade Realty LLC v. Citigroup Com. Mortg. Tr. 2005-EMG*, 980 N.E.2d 945, 947 (N.Y. 2012)); *see also Jade Realty*, 980 N.E.2d at 947 ("[I]t is not a court's function to imply a term to save a defendant from the consequences of an agreement that it drafted." (internal quotation marks omitted)).  Under New York law, "only contracts that very nearly produce the opposite effect of what the parties likely desired will be held to be absurd." *Wiseman v. ING Groep, N.V.*, No. 16 Civ. 7587 (AJN), 2017 WL 4712417, at *6 (S.D.N.Y. Sept. 28, 2017) (collecting cases).

Reading the Policy in line with its stated Maturity Date does not rise to the level of absurdity.  US Life appeals to a perceived disconnect between the Maturity Date and the Policy's accompanying documentation, which indicates that maintaining coverage after age 100 may result in tax consequences and the loss of a guaranteed cost of insurance rate.  Opp. to Wells Fargo SJ Motion at 24.  But it is not absurd to think that an insured may elect to enter into an insurance policy notwithstanding these potential consequences.  US Life also argues that interpreting a policy in this manner may, in some cases, result in the policy terminating before an insured attains age 100.  *Id.*  Yet in such a scenario, a policy's expiration on its maturity date should be anticipated by the parties.  Moreover, such an insured presumably could explore purchasing a new policy after its expiration.  The Court is likewise unpersuaded that any resulting disparity between Catherine and other similarly situated insureds to whom US Life only provided coverage until age 100 would

amount to absurdity. *See id.* at 24 n.16. Such individuals would have entered into policies with provisions governing coverage, including any provisions addressing mistakes in the insured's age, like the Misstatement of Age Provision here. In sum, because US Life's supposed absurdities do not "produce the opposite effect of what the parties likely desired," *Wiseman*, 2017 WL 4712417, at *6, reading the Policy in accord with its plain terms as maturing on the specified Maturity Date does not run afoul of the absurdity doctrine. Nor should whether the absurdity doctrine applies in this context be decided by a jury. Under New York law, the interpretation of clear and unambiguous policy language is a task for the Court. *Superior Ice Rink*, 861 N.Y.S.2d at 365.

The Court's conclusion in this regard is buttressed by the District of Delaware's decision in *American General Life Insurance Company v. Wilmington Trust National Association*, No. 22 Civ. 1092 (GBW), 2024 WL 2975767 (D. Del. June 13, 2024), which reached the same conclusion when faced with similar circumstances. In *American General*, the plaintiff pressed for the reformation of two life insurance policies to modify their maturity dates, while the defendant argued that the policies' misstatement of age provisions (which were in substance the same as the Misstatement of Age Provision here) barred reformation. *See id.* at *1-2. There, too, the plaintiff asked the court to interpret the policies' maturity dates based on the insured's "true" age. *Id.* at *2-4. The *American General* court declined to do so, reasoning that, under the applicable New Jersey law, its job was to interpret the policies in line with the plain and ordinary meaning of their terms rather than to rewrite the agreement. *Id.* at *3. The court thus held that "the Maturity Date for each policy is clearly fixed and . . . the Policies do not permit Plaintiff to amend or correct the agreed-upon Maturity Dates." *Id.*

While US Life argues that *American General* is inapposite because it involved the application of New Jersey law, Opp. to Wells Fargo SJ Motion at 6 n.1, US Life does not identify any meaningful difference between New Jersey law and New York law on this issue. Under the

19

straightforward rules of interpretation identified in *American General*, New Jersey law required the court to interpret and apply the policy's clear and unambiguous terms—just as New York law does here. Like the court in *American General*, this Court finds the Maturity Date to be clear and unambiguous. There is no room for the non-textual interpretation that US Life urges.

In sum, US Life asks the Court to cast aside the plain and straightforward reading of the Maturity Date of the Policy, which the Court will not do. Any modification of the Maturity Date thus would require reformation of the Policy. The Court therefore turns to the merits of US Life's reformation defenses.

### 2. US Life's Reformation Defenses Are Unavailable

In moving for summary judgment, US Life presses two affirmative defenses that sound in the doctrine of reformation: reformation based on unilateral mistake and reformation based on mutual mistake. US Life SJ Motion at 12 (arguing for summary judgment on the basis of the "affirmative defenses of reformation based on (i) fraudulently induced unilateral mistake; and (ii) mutual mistake"); *see* Amended Answer at 16 ¶ 21(g), (h) (asserting affirmative defenses to include that "US Life is entitled to reform the Policy, including to correct Ms. Cohen's date of birth, age at issue, and/or the corresponding maturity date, based on mutual mistake" and "based on unilateral mistake resulting from Ms. Cohen's fraudulent, reckless, or otherwise inequitable or misleading conduct").

Under New York law, "reformation of a contract may be appropriate where a writing does not set forth the actual agreement of the parties." *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (internal quotation marks omitted); *see* Restatement (Second) of Contracts § 155 ("The province of reformation is to make a writing express the agreement that the parties intended it should. . . . [R]eformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to

express it correctly in the writing."). "There is, however, a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption." *Pilkington N. Am.*, 460 F. Supp. 3d at 492 (internal quotation marks omitted); *see* 27 Williston on Contracts § 70:33 (4th ed.) ("[C]ourts should hesitate, and then hesitate some more, before modifying a contract, even to remove an inadvertent flaw, as reformation is an extraordinary equitable remedy and should be granted only with great caution and in clear cases of fraud or mistake."). Under New York law, reformation is available only in instances of mutual mistake or unilateral mistake, with a higher burden placed on the latter theory.[7] *See Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 440 (E.D.N.Y. 2011) (collecting cases).

US Life's reformation defenses aim to reform the Policy's Maturity Date, reasoning that the Policy was issued with a Maturity Date of November 8, 2021, because Catherine had represented in her application that her birthday was May 10, 1921. US Life SJ Motion at 12. US Life therefore argues that, because the Maturity Date "was calculated based on [Catherine's] attained age of 100," if she had "properly disclosed her date of birth as January 29, 1920, the maturity date would have been set at November 8, 2019." *Id.* Wells Fargo, on the other hand, attacks the availability of reformation as a remedy for a misstatement of Catherine's age. *See* Wells Fargo SJ Motion at 10-12; Opp. to US Life SJ Motion at 16-18. In Wells Fargo's view, the parties contemplated the remedy for such a situation in the Policy's Misstatement of Age Provision, which provides for adjustment of the death benefit, not alteration of the Maturity Date.

---

[7] The parties disagree on whether New York law requires a party claiming reformation based on unilateral mistake to prove fraud or if a lower showing of inequitable conduct is sufficient. *Compare* Wells Fargo SJ Motion at 15-17, *with* Opp. to Wells Fargo SJ Motion at 11-14. As the Court decides that US Life has no ground to seek reformation in light of the Misstatement of Age Provision, it is unnecessary to pass on the appropriate standard for reformation based on unilateral mistake.

*See* Wells Fargo SJ Motion at 10-12; Opp. to US Life SJ Motion at 16-18.

Wells Fargo's argument is persuasive.  US Life's basis for reformation is that Catherine misstated her age when she applied for the Policy.  But the Misstatement of Age Provision sets forth the remedy for a situation where the policyholder's age is misstated, and that remedy is not to change the Maturity Date, but to adjust the death benefit.  *See* Policy at 12.  As discussed shortly, New York law does not allow for a reformation defense when the parties' contract contemplates the very contingent event that occurred.  Thus, a straightforward application of the Policy does not support the reformation remedy that US Life pursues.

Reformation "is an equitable remedy which emanates from the maxim that equity treats that as done which ought to have been done."  27 Williston on Contracts § 70:19 (4th ed.).  "Equity evolved the doctrine because an action at law afforded no relief against an instrument secured by fraud or as a result of mutual mistake."  *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062, 1066 (N.Y. 1978).  The purpose of the doctrine "is to make a defective writing conform to the agreement of the parties upon which there was mutual assent."  27 Williston on Contracts § 70:19 (4th ed.).  In the event that a contracted-for contingency arises, therefore, it is not clear that the doctrine of reformation should be employed to alter the contract in a deviant manner, even while reformation itself remains a tool in a court's arsenal.  "Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties."  *George Backer Mgmt. Corp.*, 385 N.E.2d at 1066; *see* 27 Williston on Contracts § 70:19 (4th ed.) ("In reforming a written agreement, a court may transpose, reject, or supply words, but has no power to make new contracts for the parties.").

One of the substantive limits New York law places upon the doctrine of reformation is that "reformation based upon mistake is not available where the parties purposely contract based upon

uncertain or contingent events." *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 234 (N.Y. 1986); *see Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 496 (S.D.N.Y. 2004) ("Substantively, neither reformation nor rescission is permitted if the parties entered an agreement based upon uncertain or contingent events and the claim is based upon mistake as to the outcome of such an event."); *Sears v. Grand Lodge A.O.U.W. of N.Y.*, 57 N.E. 618, 619 (N.Y. 1900) (holding reformation unavailable where the parties contracted based on a contingency and one contracting party claimed mutual mistake as to present fact concerning that contingency).   In considering a claim for recission of contract based on mutual mistake, the Second Circuit has described this substantive limit by explaining that "it is not a mutual mistake of fact where the parties entered into an agreement based on uncertain or contingent events and the claim is based upon mistake as to the outcome of such an event." *Republic of Rwanda v. Ferone*, 307 F. App'x 600, 602 (2d Cir. 2009).

*Republic of Rwanda* illustrates the application of this doctrine.   There, the Second Circuit considered a denial of a motion for an order of recission of a rider to a contract concerning a property conveyance from a seller to a purchaser.   *Id.* at 601.   The rider provided that the seller would have three years from the date of closing to obtain subdivision approval, and that "[i]n the event the subdivision is not approved, the deed and transfer documents for the subdivision parcel shall be returned" to the purchaser.   *Id.*   After subdivision approval apparently was not obtained within three years, the purchaser moved for an injunction requiring the conveyance of documents in line with the rider's terms, while the seller cross-moved for an order of recission.   *Id.*   The seller argued on appeal that the parties had harbored an "'erroneous belief' regarding how long it would take for the seller to obtain approval," and that this mutual mistake merited recission.   *Id.* at 602. The Second Circuit disagreed that recission was appropriate: "That the seller was unable to obtain the requisite approval . . . does not affect the parties' intent as expressed by the rider provision.

Indeed, any assumption that approval could be obtained within three years does not constitute a 'mutual mistake' because the parties made express provision for what was to happen in the event that approval was not obtained within that period." *Id.*

While not directly on point, the Court finds these cases concerning the application of reformation to future contingencies instructive. US Life and Catherine "purposely contracted based upon" a contingent event, namely what would occur if Catherine's age was misstated in the Policy. *CDL Hotels USA*, 322 F. Supp. 2d at 496. The parties, having acknowledged this possibility in the contract,[8] therefore acted in assumption of that risk and "made express provision for what was to happen" in its event. *Republic of Rwanda*, 307 F. App'x at 602. Reforming the Policy to alter the Maturity Date, rather than adjust the death benefit as provided in the Misstatement of Age Provision, would be tantamount to rewriting the parties' contracted-for contingency. Reformation also would render the Misstatement of Age Provision itself a

---

[8] At oral argument, US Life tried to distinguish the aforementioned line of New York cases insofar as the contingency provisions at issue in those contracts were often negotiated and agreed-upon, whereas the language in the Policy's Misstatement of Age Provision is statutorily mandated. Tr. at 89:7-90:5. This argument rests on the flawed premise that the precise language in the Misstatement of Age Provision is required by statute. Under New York law, "[a]ll life insurance policies . . . delivered or issued for delivery in [New York], shall contain in substance" either certain enumerated provisions "or provisions which the superintendent deems to be more favorable to policyholders." N.Y. Ins. L. § 3203(a). Among the enumerated provisions is one "that if the age of the insured has been misstated, any amount payable or benefit accruing under the policy shall be such as the premium would have purchased at the correct age." *Id.* § 3203(a)(5).

The Policy's Misstatement of Age Provision is not identical to the provision language in Section 3203(a)(5). Rather than utilizing the form language in the statute, the Policy includes other language which was "at least as favorable to policyholders as what the statute provides." *Nitkewicz as Trustee of Joan C. Lupe Fam. Tr. v. Lincoln Life & Annuity Co. of N. Am.*, 49 F.4th 721, 726 n.2 (2d Cir. 2022); *see also Sec. Mut. Life Ins. Co. of N.Y. v. Herpaul*, 827 N.Y.S.2d 141, 142 (1st Dep't 2007). Accordingly, the provision here is agreed-upon and so the premise of US Life's distinction argument fails. Even setting this aside, US Life's argument distracts from the point of these cases: Reformation simply has no import in this situation because the contracting parties' intent concerning the appropriate remedy for this situation has already been revealed through the contract itself. Catherine and US Life, of course, could have chosen to not enter the Policy, with the Misstatement of Age Provision, to begin with. But having done so, their intent is manifested by its writing.

meaningless part of the contract.  Rather than effectuating the intent of the parties to the Policy as plainly reflected in that provision, reformation would undermine it.  After all, "[w]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract."  *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co*., 773 F.3d 110, 114 (2d Cir. 2014) (quoting *Howard v. Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002)); *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("In interpreting an unambiguous contract, the court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby . . . .'" (quoting *Kass v. Kass*, 696 N.E.2d 174, 180-81 (N.Y. 1998))).

*American General* also supports the conclusion that the Policy's Misstatement of Age Provision forecloses a mutual mistake theory of reformation.  In *American General*, the court held that reformation on the theory of mutual mistake was unavailable because "the Policies expressly contemplate the possibility of a mistake in the insured's age and state what must be done in that case: . . . adjust the death benefits as provided in the misstatement-of-age provision."  *Am. Gen. Life Ins.*, 2024 WL 2975767 at *6.  The *American General* court's logic rested upon the premise that a mutual mistake theory of reformation requires that the parties share the same misunderstanding of fact and that the written contract fails to express the meeting of minds they reached.  *Id.*  Yet, the court concluded, "[b]ecause the Policies clearly contemplate a mistake in the Insured's age, Plaintiff cannot allege a claim for reformation based on mutual mistake."  *Id.* (internal quotations omitted).  In this respect too, the Court sees no difference between the relevant principles of New Jersey law relied on in *American General* and the doctrine of reformation under New York law.

In nonetheless urging reformation, US Life makes a few arguments.  First, US Life attempts to distinguish several New York cases on which Wells Fargo relies because they do not concern

reformation or are inapplicable to the present facts. *See* Opp. to Wells Fargo SJ Motion at 6-7 (arguing that "[a]t most, these cases show that where parties have contracted for a particular contingency, they cannot avoid the agreed-upon outcome by claiming mistake"). US Life, however, points to no supporting authority that arose in the situation presented here, *i.e.*, where a defendant presses for reformation based on mistake, while the contract itself provides for a different remedy in the event of that very mistake. And while *In re Janet L.*, 731 N.Y.2d 299 (3d Dep't 2001), and *George Backer Management Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062 (N.Y. 1978), the cases cited by Wells Fargo, *see* Wells Fargo SJ Motion at 11-12, may not be precisely on point, they do suggest a preference under New York law in favor of the contracted terms since those terms best evidence the parties' intent upon the moment of contracting. *See Janet L.*, 731 N.Y.2d at 301 (finding reformation based on mutual mistake due to difficulty unavailable because "this very issue was contemplated at the time of" contracting); *George Backer Mgmt. Corp.*, 385 N.E.2d at 219-20 (enforcing a disputed term on the basis that reformation was unavailable since there was a lack of evidence that the term differed from the parties' intention).

US Life next contends that Wells Fargo's argument would be contrary to "the settled New York doctrine that 'for there to be a complete bar to equitable relief,' a party's contract must contain 'explicit language' that a specific remedy mentioned in the contract 'was to be the sole remedy.'" Opp. to Wells Fargo SJ Motion at 7 (quoting *Rubinstein v. Rubinstein*, 244 N.E.2d 49, 51-52 (N.Y. 1968)). While US Life accurately describes New York law regarding the availability of equitable remedies, its argument misses the point. Wells Fargo does not question the availability of the equitable defense of reformation, but rather attacks the propriety of applying that remedy in this situation. *See* Wells Fargo SJ Reply at 4 ("The point is not that equitable relief is foreclosed here, but instead that reformation requires not only that a mistake occurred but that the parties did not address such potential mistake in the contract."). Under New York law, "reformation has been

limited both substantively and procedurally," because otherwise "freedom to contract would not long survive courts' ready remaking of contracts that parties have agreed upon." *Chimart Assocs.*, 489 N.E.2d at 234 (internal quotation marks omitted).  Applying reformation in a manner deviating from the Misstatement of Age Provision would not accord with the substantive limits New York law places on the doctrine.  The issue here is not the general availability of equitable remedies absent language of exclusivity, *see* Opp. to Wells Fargo SJ Motion at 7-8, but instead the distinct issue of whether there is a basis to employ reformation in these circumstances.

The Court also is unpersuaded by US Life's argument that the Misstatement of Age Provision "explains how, for a policy that has not matured, the parties will recalculate the benefits owed to correct for a misstatement of age," and therefore the provision "has no bearing on the entirely unrelated question of whether the *maturity date* can be reformed, so that the Policy expired before any death benefit was owed."  Opp. to Wells Fargo SJ Motion at 7.  This argument misapprehends the provision.  The Misstatement of Age Provision expressly and broadly states that the adjustment to the death benefit occurs "[i]f the insured's age or sex has been misstated." Policy at 12.  This provides the parties' contracted-to remedy for the specific mistake potentially at issue in this case.

Similarly unpersuasive is US Life's contention that declining to reform, and instead applying the Misstatement of Age Provision, would be harmful to insureds whose ages are understated.  *See* Opp. to Wells Fargo SJ Motion at 8-9.  As Wells Fargo points out, "there is no reason insureds ought to be able to reform their policy's maturity dates" in such a situation since "the policy explicitly addresses what will happen if such a mistake occurs."  Wells Fargo SJ Reply at 4 n.4.  Again, the Court's role is not to re-design the contract but to give effect to the contracting parties' intent, and that is done by applying the terms to which they agreed.

Whether a unilateral mistake theory of reformation is subject to this same substantive limitation as mutual mistake is less certain. US Life points out that "[n]one of the cases Wells Fargo cites held that reformation based on unilateral mistake was precluded because the agreement contemplated a potential mistake or a particular remedy." Opp. to Wells Fargo SJ Motion at 9. Perhaps so, but neither has US Life identified a case that places the unilateral mistake theory outside the ambit of the aforementioned principles instructing that a mutual mistake theory is untenable. As Wells Fargo noted at oral argument, "[t]he cases simply are not that specific." Tr. at 78:14. Yet the New York Court of Appeals has described these two theories of reformation— based on mutual mistake and based on unilateral mistake—as "closely related." *Chimart Assocs.*, 489 N.E.2d at 233. Whereas "[i]n a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement," in a case of unilateral mistake, "the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement." *Id.* at 233-34.

This Court concludes that the reasoning discussed for mutual mistake above equally applies to a case of unilateral mistake. In instances of both mutual mistake and unilateral mistake, the intent of the contracting parties as to the appropriate cure for a defect regarding the insured's age is set forth in the Policy's Misstatement of Age Provision. US Life offers no argument that the parties did not share this intent, and under New York law, reformation "cannot be utilized to vacate a portion of an agreement which, in fact, does comport with the parties' intention." *Surlak v. Surlak*, 466 N.Y.S.2d 461, 470 (2d Dep't 1983). Indeed, the remedy of reformation is intended to align the written instrument with the parties' intentions; where those intentions were shared, reflected in the contract, and remain unimpeached by the facts at issue, the Court's role is to enforce the parties' agreement as written. *See* 27 Williston on Contracts § 70:35 (4th ed.) ("[N]o

reformation of a written instrument will be decreed where the instrument agrees with the parties' purpose at the time of its execution.  Parties are not afforded reformation simply because their intentions were influenced by mistaken considerations when they contracted.  In seeking reformation, the issue is not to divine what would have been done if everyone had been better informed.").

With this understanding, neither a mutual mistake theory nor a unilateral mistake theory can justify reformation to modify a contract where the purported mistake is a contingency for which the parties already contracted a remedy.  In each instance, and absent any argument or indication that the contracting parties' intent as to that remedy was not properly expressed in the contract, the Court's role is limited to carrying out their intentions as evidenced through the written instrument.  "The court cannot substitute by reformation an agreement which it thinks is proper but to which the parties had never assented."  *Corcoran v. Corcoran*, 425 N.Y.S.2d 402, 404 (4th Dep't 1980).  To do otherwise would entail rewriting the parties' agreement with disregard to their express intent.[9]  And as discussed, the Misstatement of Age Provision expressly sets forth the parties' agreed-upon cure in the event that Catherine's age is misstated in the Policy.

The Court therefore grants Wells Fargo's motion for partial summary judgment as to the reformation defenses of unilateral mistake and mutual mistake.  US Life may not pursue those reformation defenses at trial.

### 3. Operation of the Misstatement of Age Provision

This leaves the parties' arguments as to the operation of the Misstatement of Age Provision. Citing the doctrine of judicial estoppel, Wells Fargo first argues that any attempt by US Life to

---

[9] As the Court holds that the Policy's Misstatement of Age Provision provides for the appropriate remedy and precludes US Life's proffered reformation defenses, it has no need to pass on Wells Fargo's alternative arguments for summary judgment as to those defenses.

invoke the Misstatement of Age Provision to adjust the death benefit must be subject to the standards for reformation. Wells Fargo SJ Motion at 20-25.

Wells Fargo points to US Life's position in *Jaroslawitz v. United States Life Insurance Company*, No. 651492/2021, 2022 WL 2904413 (N.Y. Sup. Ct. N.Y. Cnty. July 20, 2022), where an insured brought a breach-of-contract claim against US Life. The insured claimed that US Life breached a misstatement of age provision identical to the one here. *Id.* at *1. US Life invoked a statute of limitations defense, arguing that "New York courts treat a claim based on the insured's misstated age as one for reformation of the policy contract, based on either the parties' mutual mistake or unilateral mistake or fraud in the inducement," and therefore the insured's claim for misstatement of age was time-barred by a six-year statute of limitations. *Id.* The *Jaroslawitz* court agreed, holding that although the plaintiff had alleged a breach of contract, the "claims actually seek reformation of the policy, to wit, that the policy be corrected to include the insured's correct date of birth and that the death benefits be adjusted accordingly." *Id.* at *2. As such, the court dismissed the action as barred by the statute of limitations. *Id.*

Wells Fargo contends that US Life should be judicially estopped based on its position in *Jaroslawitz*, and that any invocation of the Misstatement of Age Provision must therefore rely on a showing of unilateral mistake coupled with fraud, since a claim for mutual mistake would be time-barred. Wells Fargo SJ Motion at 20-25. The doctrine of judicial estoppel "functions generally to bar litigants from taking inconsistent positions in successive suits," and "the exact criteria for invoking judicial estoppel will vary based on specific factual contexts." *Clark v. All Acquisition LLC*, 886 F.3d 261, 265 (2d Cir. 2018) (internal quotation marks omitted). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citations and internal quotation marks omitted). "Before judicially estopping a litigant, a court

must inquire into whether the particular factual circumstances of a case 'tip the balance of equities in favor' of doing so." *Clark*, 886 F.3d at 266-67 (quoting *New Hampshire*, 532 U.S. at 751).

The Court declines to apply judicial estoppel for two reasons. First, the judicial estoppel inquiry "begins by asking whether the prior inconsistent position in question gave the party to be estopped an unfair advantage over the party seeking estoppel." *Id.* at 267 (internal quotation marks omitted). "[T]ypically the application of judicial estoppel requires showing unfair advantage against the party seeking estoppel," though the Second Circuit has not made this a hard-and-fast requirement. *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (internal quotation marks omitted).

The Court sees no prejudice to Wells Fargo from declining to impose judicial estoppel. As US Life argues, Wells Fargo's position that reformation is precluded by the Misstatement of Age Provision, *see supra* II.C.2, finds some tension with its argument for judicial estoppel. As discussed, in seeking (successfully) summary judgment on US Life's reformation defenses, Wells Fargo has argued that the Misstatement of Age Provision is a contractual provision that expresses the contracting parties' intent in the event of an age misstatement and therefore bars reformation on that basis. *See* Opp. to Wells Fargo SJ Motion at 18-20; *supra* II.C.2. Treating the Misstatement of Age Provision as a claim for reformation in arguing for estoppel therefore stands in tension with Wells Fargo's contention that the provision itself barred the application of the reformation doctrine. Nor is the Court persuaded by Wells Fargo's position that no tension exists because the Misstatement of Age Provision "sets forth *how* the Policy will be reformed . . . foreclosing other reformation claims." Wells Fargo SJ Reply at 9 n.9. Enforcing the Misstatement of Age Provision is not reformation in any sense; it is merely giving effect to the Policy's terms. This argument also ignores that giving effect to that provision would sound in law, not equity. Accordingly, with no showing of prejudice to Wells Fargo and no unfair advantage to US Life in

31

this litigation, the Court declines to apply judicial estoppel.  *See, e.g.*, *United States v. Swartz Fam. Tr.*, 67 F.4th 505, 519 (2d Cir. 2023) (affirming a decision not to apply judicial estoppel where there was an insufficient showing of prejudice).

The Court additionally declines to apply judicial estoppel because the purported inconsistency in US Life's position is one of legal argument, not factual contention.  "Judicial estoppel typically only applies to inconsistent factual positions, not to issues of law."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, Nos. 05 Md. 1720 (MKB), 20 Civ. 2394 (MKB), 2024 WL 4224160, at *8 (E.D.N.Y. Sept. 18, 2024) (collecting cases).  Second Circuit caselaw similarly explains that judicial estoppel "prevents a party from asserting a *factual position* in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding."  *Clark*, 886 F.3d at 264 (emphasis added and internal quotation marks omitted); *see, e.g.*, *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004); *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999); *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996); *see also Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Loc. 38*, 288 F.3d 491, 504 (2d Cir. 2002) (holding that "legal conclusions are not inconsistent factual positions as would ordinarily justify judicial estoppel" (internal quotation marks omitted)), *vacated and remanded on other grounds*, 538 U.S. 918 (2003).

While Wells Fargo contends that this understanding of the doctrine is inconsistent with *New Hampshire v. Maine*, 532 U.S. 742 (2001), *see* Wells Fargo SJ Reply at 10, the Second Circuit has emphasized the factual nature of judicial estoppel since *New Hampshire* was decided.  *See Clark*, 886 F.3d at 264; *Rodal*, 369 F.3d at 118; *Mulvaney*, 288 F.3d at 504.  Nor is the Second Circuit alone in limiting the application of the doctrine to situations of factual inconsistencies.  *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 912 (10th Cir. 2016) (explaining that under Tenth

Circuit precedent, "judicial estoppel only applies when the position to be estopped is one of fact, not one of law" (internal quotation marks omitted)); *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 274 (4th Cir. 2003) (declining to apply judicial estoppel where the inconsistency was "not a factual assertion for purposes of judicial estoppel; rather, it is a legal argument about what issues were raised and resolved at trial," and explaining that "judicial estoppel exists to deter the use of facts from other litigation to manipulate a subsequent court that is unfamiliar with the prior factual positions assumed by the litigants"). *But see* Wright & Miller, Federal Practice & Procedure § 4477.3 (noting that some courts have held that legal opinions are not subject to judicial estoppel but disagreeing with that approach). For this reason as well, the Court does not find US Life to be judicially estopped based on its position in *Jaroslawitz*, and therefore the Misstatement of Age Provision is not limited to application through reformation.

The analysis then turns to the function of the provision itself. Recall that the Misstatement of Age Provision reads: "If the insured's age or sex has been misstated, we will adjust the death benefit to reflect the amount at risk that would have been provided by the most recent monthly deduction made and the most recent cost of insurance rate for the insured's correct age and sex." Policy at 12. US Life argues that because it did not have a cost of insurance rate for individuals over 100 years of age, if the Misstatement of Age Provision is utilized, the adjustment would yield a death benefit of $0 because there is no "most recent" cost of insurance rate on which to base the adjustment. US Life SJ Motion at 24. Wells Fargo disagrees, arguing that US Life improperly seeks to write an exclusion into the Policy and that there should be no reduction in the death benefit in the event US Life is unable to calculate the applicable cost of insurance rate. Opp. to US Life SJ Motion at 23-25; Wells Fargo SJ Reply at 7-8.

The interpretation of an insurance contract proceeds in three steps under New York law. First, the court must "determine whether there is an ambiguity, either patent or latent, in the terms

of the Policy that prevents deciding the dispute solely on the basis of the terms of the contract without reference to extrinsic factors." *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 396 (2d Cir. 2023); *see Lockheed Martin Corp.*, 639 F.3d at 69 ("In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous."). If there is such ambiguity, the court "assess[es] whether the parties provided admissible extrinsic evidence that could resolve the ambiguity." *Ezrasons*, 89 F.4th at 396. "If they have not, then New York law dictates that the ambiguity should be decided in favor of the insured, as a matter of law, provided the insured's interpretation is reasonable. If they have, then . . . the extrinsic evidence may be considered by the factfinder," and summary judgment must be denied so that the ambiguity may be "submitted to the factfinder for resolution by resort to the extrinsic evidence." *Id.*

First, the Court finds that a latent ambiguity in the Policy exists. "The matter of whether the contract is ambiguous is a question of law for the court." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Cervecería Modelo de México, S. de R.L. de C.V. v. CB Brand Strategies, LLC*, No. 23-810-cv, 2024 WL 1253593, at *1 (2d Cir. Mar. 25, 2024) (internal quotation marks omitted). "[I]n deciding whether an agreement is ambiguous[,] courts should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed." *Kass*, 696 N.E.2d at 180 (internal quotation marks omitted). "[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech." *Ezrasons*, 89 F.4th at 395 (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 81 (N.Y. 2015)). While courts "cannot disregard 'the plain meaning of the [contract]'s language . . . in order to find an ambiguity where none exists,'" *Fed. Ins. Co. v.*

*Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (quoting, in turn, *Empire Fire & Marine Ins. Co. v. Eveready Ins. Co.*, 851 N.Y.S.2d 647, 648 (2d Dep't 2008)), "[w]here the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, then the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent properly is admissible," *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir. 1995) (internal quotation marks omitted).

Here, the Policy is ambiguous as to how and whether the death benefit should be adjusted if there exists no "most recent" cost of insurance for the insured's actual age and sex. Both parties have offered interpretations of the Misstatement of Age Provision that are reasonable when viewed through "the reasonable expectations of the average insured upon reading the policy and employing common speech." *Ezrasons*, 89 F.4th at 395. The provision does call for an adjustment based on specified criteria, and therefore Wells Fargo is right that "[b]y its plain language, the provision calls for an adjustment . . . not elimination entirely." Wells Fargo SJ Motion at 17. But US Life too presents a compelling argument that, since its own rates did not continue past age 100 at the time of Catherine's death, no such referent for the adjustment exists and therefore its liability should be reduced to zero because "[f]or an insured greater than 100 years old, there is no amount of insurance that could have been purchased." US Life SJ Motion at 24 (citing Policy; Loterstein Second Decl., Exh. 4 (table with cost of insurance rates)).

While the parties advance several arguments for why they have the better reading, one of Wells Fargo's arguments can be rejected as a matter of New York law. Wells Fargo argues that the death benefit cannot be reduced to zero because New York law requires exclusions from coverage to be clear and unmistakable in a policy. Wells Fargo SJ Motion at 17-18; *see Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984) ("[W]henever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable

language." (internal quotation marks omitted)).   Yet, as US Life notes,[10] New York law distinguishes between a policy exclusion and a reduction in liability.   Opp. to Wells Fargo SJ Motion at 15; US Life SJ Reply at 10.   "New York law does *not* construe language limiting the amount or extent of liability as an exclusion."  *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 629 F. App'x 127, 130 (2d Cir. 2015) (summary order); *see Roman Cath. Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666, 671 (N.Y. 2013) ("[T]he defenses at issue do not relate to an argument of exclusion or disclaimer, but rather, focus on the extent of alleged liability under the various policies. . . .   [A]rguments pertaining to the appropriate methodology for allocating liability do not provide an exclusionary basis to evade coverage.").   In arguing otherwise, Wells Fargo relies on caselaw that predates the decision of the New York Court of Appeals in *Roman Catholic Diocese*.  *See* Wells Fargo SJ Reply at 7.  Wells Fargo's argument that such a reduction would be tantamount to an "implied exclusion to coverage," *id.*, is likewise unpersuasive.   Under US Life's interpretation of the Misstatement of Age Provision, such an adjustment to the benefit would not be impliedly excluding coverage but rather limiting liability in line with the provision's text.

---

[10] The Court is not persuaded, however, by US Life's reliance on *Yang v. Farmers New World Life Insurance Company*, 898 F.3d 825 (8th Cir. 2018).  *See* Opp. to Wells Fargo SJ Motion at 16 & n.8.  The misstatement of age clause in that case provided that "the amount payable will be that which the premiums paid would have purchased at the correct age or sex."  *Yang*, 898 F.3d at 826 (internal quotation marks omitted).  The policy in *Yang* was only available to individuals under the age of sixty, *id.*, and therefore the Eighth Circuit straightforwardly read the clause to include the possibility that there may be a reduction in the amount payable to zero since the insured, who was nearly seventy, would have been ineligible to purchase the policy.  *Id.* at 828 (holding that "[i]t is irrelevant that adjusting the policy's benefits under the clause may result in their complete elimination" because the "elimination occurs pursuant to the policy's terms").  That is not the case here, where the Misstatement of Age Provision explicitly calls for an adjustment.  In any case, the Eighth Circuit in *Yang* "express[ed] no opinion on whether the adjustment . . . would actually result in an elimination," stating only that the district court's assumption that an elimination would result "might have been correct" but that it was "not apparent from the language of the clause" that this was necessarily the case.  *Id.* at 829-30.

So while the text of the Misstatement of Age Provision may unambiguously address many situations where an adjustment would be called for, that language is ambiguous as to the application of an adjustment under the facts here, where there is no most recent cost of insurance on which to base the adjustment. *See Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) ("[T]hat terms of a policy of insurance may be construed as ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the purview of such terms." (internal quotation marks omitted)); *see also Ezrasons*, 89 F.4th at 395-96 (discussing the doctrine of latent ambiguity). A latent ambiguity therefore exists as to the Misstatement of Age Provision.

To resolve any ambiguity, Wells Fargo appeals to the doctrine of *contra preferentem*. *See* Wells Fargo SJ Reply at 8 ("[I]f there is any ambiguity regarding how to interpret the Misstatement of Age Provision, any ambiguity must be construed against U.S. Life."). The application of that doctrine, however, is not as straightforward as Wells Fargo suggests. "When dealing with insurance policies, it is a 'fundamental' principle of New York law that ambiguities should be interpreted against the insurer and in favor of the insured." *Ezrasons*, 89 F.4th at 396 (collecting cases). But this presumption "is used only as a matter of last resort, after making use of all other available tools to resolve the ambiguity." *Id.* (internal quotation marks omitted). As noted above, *contra preferentem* is utilized under New York law when the parties' intent cannot be discerned from external evidence, and therefore does not apply if admissible extrinsic evidence may resolve the ambiguity. *See Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 342 (S.D.N.Y. 2014) (explaining that *contra preferentem* operates where "there is no extrinsic evidence, and accordingly no aid in determining parties' intent outside of the language of the contract").

The Court therefore must "assess whether the parties provided admissible extrinsic evidence that could resolve the ambiguity." *Ezrasons*, 89 F.4th at 396. "[I]f the tendered extrinsic

evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court," and "[u]nder those circumstances, the ambiguity must be resolved against the insurer which drafted the contract." *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985) (internal citations omitted). And in examining whether the parties' proffered extrinsic evidence is "admissible," a court considers whether it would carry any probative force in resolving the provision's ambiguity. *See Ezrasons*, 89 F.4th at 396; Fed. R. Evid. 401. When extrinsic evidence is used to resolve an ambiguity in a contract, the evidence must go to a "determination of the intent of the [contracting] parties." *Hartford Accident & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973). Wells Fargo and US Life thus must offer "relevant evidence extrinsic to the insurance policy bearing on the intention of the [contracting] parties at the time of its execution." *Id.*

*Ezrasons* illustrates the kinds of extrinsic evidence which would not be relevant to Catherine and US Life's intent at the time they executed the Policy. In that case, the Second Circuit considered a declaration offered by an insurer as extrinsic evidence to resolve ambiguous contract language centering on whether a particular warehouse location—which later burned down, resulting in a loss of stored goods—was approved by the insurer to store the goods or if the insurer had instead approved a different warehouse location. *Ezrasons*, 89 F.4th at 400-01. The declarant, relying on his "personal knowledge" of the insurer's underwriting process and its process for developing rates, concluded that the burned-down location had not been approved because the insurer had not subjected that location to its usual evaluation process before the policy was issued, while the other location had been subjected to the evaluation process. *Id.*

The Second Circuit held that this declaration was not the kind of extrinsic evidence which could be offered to resolve the ambiguity. This was because, "[t]o the extent that it tells that [the insurer] never conducted the elaborate inquiries and evaluations that assist in making an informed

decision to insure a particular warehouse and on what terms," the declaration was evidence that the insurer "never intended to underwrite" the location which burned down. *Id.* at 401. But what the insurer "did or did not do on its own in agreeing to the Policy language is irrelevant to what the Insured could reasonably understand to be the meaning of the Policy," as the declarant "did not assert that these facts or intentions were communicated by [the insurer] to the Insured." *Id.* The Second Circuit in *Ezrasons* contrasted this kind of evidence with "statements about the contents of negotiating exchanges between [the insurer] and the Insured, which might be relevant to interpreting ambiguities of the Policy." *Id.* The declarant in *Ezrasons* "had no personal knowledge of the exchanges between [the insurer] and the Insured that resulted in their agreement on the Policy," nor did the declaration "include business records, which, depending on what they say, might have furnished a competent source for his contentions." *Id.* at 401-02. Thus, the declaration was not admissible. *Id.*

The parties do not rely on the sort of extrinsic evidence that would be most useful in resolving the Policy's latent ambiguity under *Ezrasons*, namely "statements about the contents of negotiating exchanges between [US Life] and [Catherine], which might be relevant to interpreting ambiguities of the Policy." *Id.* at 401. At least one piece of extrinsic evidence does exist which— by the Misstatement of Age Provision's own terms—speaks to the parties' intent when contracting: US Life's internal cost of insurance rates table. That table is the referent used in the Policy's terms, so there is some indication that the table speaks to the contracting parties' intent. *See* Policy at 12 ("If the insured's age or sex has been misstated, we will adjust the death benefit to reflect the amount at risk that would have been provided by the most recent monthly deduction made and *the most recent cost of insurance rate for the insured's correct age and sex*." (emphasis added)). At this point, the relevance of that table to Catherine and US Life's intent is unclear. On one hand, this extrinsic evidence largely lays the foundation for the specific latent ambiguity at issue: that

the absence of a rate in the table adds to the ambiguity as to the Misstatement of Age Provision's application.  Yet as US Life argues, perhaps this evidence speaks to the contracting parties' intent favoring its interpretation, particularly when combined with other intrinsic evidence.  *See* US Life SJ Reply at 10 n.13 (arguing for US Life's interpretation based on the combination of the rates table and the Policy's language "provid[ing] that US Life will maintain cost of insurance rates that apply consistently to all insureds").

Other extrinsic evidence in the record also may speak to the intent of the parties to the Policy.  For example, US Life points to evidence that this product was only priced to age 100, as well as the fact that the Policy's guaranteed cost of insurance rates were based on a mortality table which only went up to age 100.  *See* US Life SJ Motion at 5.  The mentions in the product literature for the Policy of the possibility of obtaining a maturity extension rider beyond the age of 100, *see* Loterstein Second Decl., Exh. 3 at USL001097 (explaining that the policyowner may "extend the maturity date beyond age 100"); *id.* at USL001102 (listing a "Maturity Extension Rider of Death Benefit"), also may speak to the contracting parties' intent regarding a most recent cost of insurance for the product.  To be sure, these pieces of evidence are not as probative as would be a fact witness describing the parties' negotiations of contract terms.   But the jury may draw inferences from them in discerning Catherine and US Life's intent when they entered the Policy

The parties also appeal to the import of expert testimony from Mr. Shelley and Mr. Sarathy.  *See* Opp. to US Life SJ Motion at 25; US Life SJ Reply at 10 n.13.  For reasons discussed at *infra* III.C.2, the Court concludes that some of this proposed testimony may survive if it is couched in terms of industry custom and practice.  *See Bernard Nat'l Loan Invs., Ltd. v. Traditions Mgmt., LLC*, 688 F. Supp. 2d 347, 364 (S.D.N.Y. 2010) (explaining that custom and practice evidence "may be considered as an interpretive aid" to resolve a contract ambiguity).  "Under New York law, custom and usage evidence must establish that the omitted term is fixed and invariable in the

industry in question," and "the trade usage must establish either that the party sought to be bound was aware of the custom, or that the custom's existence was so notorious that it should have been aware of it." *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003) (citation modified). Accordingly, to offer testimony on industry custom and practice to resolve the latent ambiguity, a party would have to show that the trade usage offered by their expert is "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto." *Id.* (internal quotation marks omitted). As suggested at *infra* III.C.2, the parties may face some difficulty establishing that testimony from these experts satisfies this test. But if they are able to, the experts' testimony would be relevant to resolving the latent ambiguity in the Misstatement of Age Provision.

In sum, the latent ambiguity posed by the Misstatement of Age Provision raises a question of fact as to the contracting parties' intent and admissible extrinsic evidence exists which may shed light on their intent regarding the application of the Misstatement of Age Provision in this situation. Thus, the ambiguity must be "submitted to the [jury] for resolution by resort to the extrinsic evidence." *Ezrasons*, 89 F.4th at 396. Wells Fargo's motion for summary judgment on the operation of the Misstatement of Age Provision is therefore denied.

### III.  Expert Motions

Each party has moved to exclude its adversary's proffered expert witnesses under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). US Life moves to exclude the testimony of Kathleen Hinckley, Dkt. 79, Laura Dambier, Dkt. 88, and Stanley Shelley, *id.* Wells Fargo moves to exclude the testimony of Suhas Sarathy, Dkt. 78, Barbara Mueller, Dkt. 83, and Roger Joslyn, Dkt. 86.

### A.      Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The fundamental requirements are thus that such evidence be relevant and reliable." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (citing *Daubert*, 509 U.S. 579; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)).  "Relevancy is determined by whether the proffered evidence 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable.'" *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075 (LJL), 2022 WL 2757643, at *2 (S.D.N.Y. July 14, 2022) (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002)).  Reliability, meanwhile, encompasses "a number of factors . . . that district courts may consider," and is designed to be a flexible standard, "focus[ed] on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266.

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," although "the district court is the ultimate gatekeeper." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). (internal quotation marks omitted).  This role requires the district court to find that any admitted

expert testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. A district court has "broad discretion to carry out this gatekeeping function" under Rule 702, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016), which "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge," *Kumho Tire*, 526 U.S. at 141. *See 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 641 (S.D.N.Y. 2014) ("It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996))). As the Supreme Court made clear, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142. But Rule 702 still requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590).

"Under this framework, a district court's Rule 702 inquiry entails assessing three factors: (1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will 'assist the trier of fact')." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 352 (S.D.N.Y. 2023). In addition, the Second Circuit has instructed that a district court "should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," but that "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (citation, internal quotation marks, and modification omitted).

### B.    Genealogy Experts

#### 1.    Roger Joslyn

US Life retained Roger Joslyn "to research and testify about issues in this case regarding genealogical and historical practices related to documenting a person's birth and age." Dkt. 87-2 ("Joslyn Report") ¶ 1. Mr. Joslyn has practiced as a genealogist since 1978 and has been certified by the Board for Certification of Genealogists since 1981. *Id.* ¶ 4. He is a Fellow of the American Society of Genealogists and previously served as the president of both that organization and the Association of Professional Genealogists. *Id.* ¶ 5. Mr. Joslyn also belongs to several genealogy organizations and has published scholarly articles in the field. *Id.* ¶¶ 6, 9.

In his expert report, Mr. Joslyn opined "to a reasonable degree of certainty, that Catherine Cohen was born on January 29, 1920." *Id.* ¶ 18. Mr. Joslyn reached this conclusion after reviewing records produced during the litigation, including the documents discussed at *supra* II.B, and publicly available materials like census results, social security indices, and news articles. *See* Joslyn Report, Exh. C.

Wells Fargo moves to exclude Mr. Joslyn's testimony on several grounds. Principally, Wells Fargo argues that Mr. Joslyn's proffered testimony would overlap with the jury's tasks of weighing the various pieces of evidence concerning Catherine's birthday and reaching a conclusion about her true date of birth. Although Wells Fargo styles this argument several ways, *see* Joslyn *Daubert* Motion at 4-10 (arguing that Mr. Joslyn's testimony "is solely based on his review of the evidence, which he selectively credits and discredits, and not based on any expertise or specialized knowledge"); *id.* at 10-12 (arguing that Mr. Joslyn's testimony should be excluded because he "merely narrates the story U.S. Life champions regarding Cohen's date of birth"); *id.* at 12-13 (arguing that "Joslyn, as an expert witness, may not direct the factfinder to resolve the disputed issue in U.S. Life's favor"), the thrust of its motion is that Mr. Joslyn's testimony will

usurp the role of the jury.[11]  The Court agrees that much of Mr. Joslyn's proffered expert testimony would concern matters appropriately within the province of the jury, and thus grants Wells Fargo's motion to exclude Mr. Joslyn's testimony in large part.

At oral argument, US Life proffered that Mr. Joslyn would offer testimony falling into a few categories.  First, Mr. Joslyn would testify about his background and qualifications, as well as explain the genealogical standards and research methods used by practicing genealogists.  Tr. at 91:1-5.  Second, Mr. Joslyn would offer his opinion that, based on those standards and his research, Catherine was born in January 1920, a conclusion he reached to a reasonable degree of genealogical certainty.  *Id.* at 91:5-8.  Mr. Joslyn would explain how he reached this conclusion by describing the standards he employed to "collect, sequence, and synthesize evidence" of Catherine's date of birth, as well as how he weighed the evidence surrounding her date of birth using board-approved methods and his assessment of the reliability of certain pieces of evidence. *Id.* at 91:9-18.  Mr. Joslyn would also explain why various documents reflecting a 1921 date of birth are, in his view, less persuasive or reliable.  *Id.* at 92:21-93:1.  Third, Mr. Joslyn would explain certain kinds of evidence that the jury may not be familiar with.  *Id.* at 91:19-92:20.  For example, US Life proffered that Mr. Joslyn would testify about what a delayed birth certificate is and how one was issued under a 1941 statute in Luzerne County, Pennsylvania, *id.* at 92:1-5, and what sacramental records are and their significance within the Catholic Church, *id.* at 92:16-20. Mr. Joslyn also would explain why certain documents or kinds of evidence that would support the issuance of a delayed birth certificate are no longer available.  *Id.* at 92:5-8.

Beginning with the first category, the methodologies employed for genealogical research, Mr. Joslyn explains in his report that the process starts with identifying relevant records about a

---

[11] Wells Fargo does not directly attack Mr. Joslyn's qualifications.  In any event, the Court finds him qualified to serve as a genealogy expert based on his aforementioned experience and credentials.

particular person.  Joslyn Report ¶¶ 13-14.  Then, according to Mr. Joslyn, a genealogist resolves any conflicting information contained in those records by "consider[ing] when, where, and why the conflicting records were created"; "assess[ing] the reliability of a record, [by] consider[ing] whether a particular record is a primary, secondary, or derivative source"; and considering whether a specific piece of information in a particular record "is primary or secondary."  *Id.* ¶ 16.  Mr. Joslyn additionally explains that, in assessing the reliability of particular information, "genealogists also consider how the information fits contextually with other information about related topics," including "how information about that person's parents or siblings correlates with the different dates of birth recorded for that person."  *Id.* ¶ 17.

The Court excludes this first category of testimony because it concerns either matters that would not be helpful to the jury or matters that the jury can discern for itself.  The relevance of this testimony primarily stems from the foundation it would lay for Mr. Joslyn's second category of testimony, his evaluation of the reliability of certain evidence and conclusion as to Catherine's date of birth.  For reasons that will be explained next, the Court excludes that category, which therefore significantly diminishes the relevance of Mr. Joslyn explaining genealogical standards through the first category of testimony.

With the second category excluded, the residual helpfulness of the first category would seem to be a quasi-tutorial in genealogy to help the jurors assess the trial evidence.  US Life likens Mr. Joslyn's analysis to that of a historian, whose "specialized knowledge could potentially aid a trier of fact in some cases," including by "'help[ing] to identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson.'"  Joslyn *Daubert* Opp. at 7 (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013)).

But while insisting that Mr. Joslyn's testimony is necessary to help a jury "interpret evidence that would otherwise elude, mislead, or remain opaque," *id.*, US Life also acknowledges

that "jurors would be able to read each genealogical record admitted into evidence without expert assistance," *id.* at 9. "[I]f the expert's opinion is one that the jury could reach with their own 'common knowledge and common sense,' no expert testimony is warranted." *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *4 (S.D.N.Y. Nov. 11, 2021) (citation modified).

Unlike instances when an expert provided background to jurors on unfamiliar topics, *see* Joslyn *Daubert* Opp. at 7-8 (collecting cases), the evidence here is rather straightforward and understandable by a layperson. While it cannot be seriously disputed that Mr. Joslyn has accumulated significant knowledge in the field of genealogy, the question is whether his anticipated testimony from that base of knowledge would help the factfinder analyze the evidence at trial or instead would concern matters that the factfinder can discern for itself. *See Hamrit v. Citigroup Glob. Mkts., Inc.*, No. 22 Civ. 10443 (JPC), 2024 WL 4891889, at *5 (S.D.N.Y. Nov. 26, 2024). Understanding that a primary rather than secondary source presents a more reliable record, for example, would be well-within the grasp of the average juror. Expert testimony to that effect is "not helpful" because it "simply addresses 'lay matters which the jury is capable of understanding and deciding without the expert's help.'" *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).

Another concern with Mr. Joslyn's proffered testimony on the methodologies for genealogical research is that it may cause a juror to disregard his or her own method for assessing the reliability and credibility of the documents in the record in lieu of that presented by Mr. Joslyn, despite the average juror being perfectly capable of performing that assessment. *See* Fed. R. Evid. 702(a) (requiring that the expert's knowledge "help the trier of fact to understand the evidence or to determine a fact in issue"). US Life argues that Mr. Joslyn's specialized knowledge would

allow him to "provide frameworks to aid the jury in understanding the evidence better and provide it with the necessary tools to make their ultimate determination." Joslyn *Daubert* Opp. at 9 (citation modified) (quoting *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950 (AT), 2022 WL 814074, at *5 (S.D.N.Y. Mar. 17, 2022)). But a court must avoid allowing an expert to usurp the role of the jury in interpreting the evidence presented at trial. *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (collecting cases). Our judicial system relies on jurors applying their common sense and life experiences to intuit an answer from a conflicting factual record. This is not a situation where, for example, the expert knows "a good deal more" about the customs of a particular trade or the evidence involves unfamiliar terminology or practices such that expert testimony is required to assist the jury in evaluating the evidence. *See United States v. Brown*, 776 F.3d 397, 400 (2d Cir. 1985). Nor would this testimony "provide context to the jury to aid its understanding of the facts." *Chen-Oster*, 2022 WL 814074, at *5. Instead, the testimony would offer a heuristic to evaluate those facts. But jurors must utilize their own sense for discerning the truth when assessing the reliability and credibility of evidence. For these reasons, this first category of proffered testimony from Mr. Joslyn is excluded.

Moving to the second category of testimony, US Life seeks to have Mr. Joslyn testify about his review of the individual documents concerning Catherine's life, his assessment of those documents, and his evaluation of their relative consistency and reliability, in arriving at his conclusion that she was born on January 29, 1920. *See, e.g.*, Joslyn Report ¶¶ 33-37, 38 (opining that certain records "are obviously incorrect"); *id.* ¶ 40 (opining that a date in one document "was likely an error"); *id.* ¶ 43 ("I do not consider that application to be reliable proof of Catherine's date of birth because the application contains other information that is clearly inconsistent with the total body of information about Catherine's family."); *id.* ¶ 52 (considering "the delayed birth certificate to be more reliable . . . than the documents reflecting a May 1921 birthday"); *id.* ¶ 55

(opining that a document "has other apparent errors that suggest it is unreliable"); *id.* ¶ 57 (opining that information in a marriage license is not reliable "in light of the remaining evidence of [Catherine's sister]'s and her siblings' births"). Expert testimony as to such opinions would not be admissible.

Under Federal Rule of Evidence 704, an expert opinion "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But the Advisory Committee Notes to Rule 704 emphasize that "[t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions," and that the Federal Rules of Evidence "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704 advisory committee notes. "[E]xpert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations," nor may an expert "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story.'" *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13 Civ. 8645 (KBF), 2018 WL 1889763, at *3-4 (S.D.N.Y. Apr. 18, 2018). Accordingly, "[i]t is well established that expert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties." *Snyder v. Wells Fargo Bank, N.A.*, No. 11 Civ. 4496 (SAS), 2012 WL 4876938, at *4 (S.D.N.Y. Oct. 15, 2012) (citation modified). "'[W]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's'" and such testimony "goes well beyond the expert's 'limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination.'" *Id.* (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

As discussed above, a crucial factual question in this litigation is when Catherine in fact was born, as its answer will dispose of the threshold legal issue of whether her age was misstated

in the Policy.  If her age was not misstated, US Life cannot prevail in this action.  By not just opining on Catherine's date of birth, but also opining on the reliability and consistency of documents presented by the parties in support of their respective views as to Catherine's date of birth, Mr. Joslyn's testimony would usurp the fact-finding function of the jury.  *Cf. Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) ("It is a well-recognized principle of our trial system that 'determining the weight and credibility of a witness's testimony . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'" (citation modified) (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891))).

US Life very well may be correct that Mr. Joslyn's testimony in this regard would "draw on his specialized knowledge and experience" in genealogy.  Joslyn *Daubert* Opp. at 11.  The concern, however, is not that the testimony would be unbased from his expertise.  The problem is that the conclusions US Life seeks to have Mr. Joslyn draw from that expertise, and the methods he would employ to reach those conclusions, overlap too substantially with the task of the jury in this specific and somewhat unusual case.  And while "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Civ. P. 704(a), the proffered testimony here strays into effectively "tell[ing] the jury what result to reach" on that ultimate issue, *Duncan*, 42 F.3d at 101.  While the jury is "free to accept or reject expert testimony, and is free to draw its own conclusion," the Second Circuit has "consistently held that expert testimony that usurps the role of the jury in applying the law to the facts before it by undertaking to tell the jury what result to reach or attempting to substitute the expert's judgment for the jury's is inadmissible."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 114 (2d Cir. 2013) (citation modified).

US Life also argues that Mr. Joslyn's testimony offering his opinion as to various pieces of evidence reflecting Catherine's true date of birth "will not resolve any of the parties' claims"

because "[t]he jury will need to resolve the question of when Ms. Cohen was born as a threshold question." Joslyn *Daubert* Opp. at 12. But as US Life recognizes, the issue of Catherine's age is a "threshold question" in the litigation. And US Life is not necessarily correct to say that "answering the factual question of when Ms. Cohen was born will not dispose of" this matter. *Id.* As mentioned, if the jury is not persuaded by US Life's position that Catherine was not in fact born on May 10, 1921, no misstatement of age occurred and thus no ground exists for US Life's defenses.[12] Likewise, even if Mr. Joslyn's opinion as to Catherine's date of birth would not necessarily dispose of the breach-of-contract claim, *see* Joslyn *Daubert* Opp. at 12-13 (arguing that the testimony is proper because it does not tell "the finder of fact exactly how to dispose of at least one of the parties' claims"), it still would be inextricably linked to the resolution of the legal issue at hand.

In sum, this second category of testimony strays too far from the proper scope of expert testimony and into the realm of the jury's fact-finding and evidence-weighing role. The risk of such testimony is obvious. If the Court allows a battle of the experts on the factual question of Catherine's date of birth, jurors may simply determine which expert they found more credible and adopt that person's view of the evidence, rather than tackling for themselves the difficult task of

---

[12] *United States v. Felder*, 993 F.3d 57 (2d Cir. 2021), on which US Life relies, is distinguishable. *See* Joslyn *Daubert* Opp. at 12. In *Felder*, an appeal of a conviction for carjacking, robbery, and firearms offenses, a firearms expert testified that, in his opinion, a dark object visible in a defendant's hand in a surveillance video was a firearm. 993 F.3d at 71. The expert rested this testimony on his specialized knowledge of firearms components and how the "grainy surveillance" video depicted those components. *Id.* at 72-73. The Second Circuit held that this testimony did not usurp the role of the jury because the expert was testifying about "what he saw in the video that informed [his] opinion," and the expert "did not 'tell the jury what result to reach' with respect to any of the charges at issue in the case." *Id.* at 74. In contrast, Mr. Joslyn would be asked to testify on an issue that does not require the application of any specialized knowledge and would offer an opinion striking directly to the heart of the threshold legal issue in this case. Additionally, for the jury to find the defendant guilty in *Felder*, it would have had to determine more complicated issues like the defendant's *mens rea* and causation, *see id.* at 63, but the claim at issue in this case potentially can be disposed of through the subject of Mr. Joslyn's proposed testimony.

evaluating the reliability of the complicated and conflicting record in this case.  Thus, testimony regarding Mr. Joslyn's review and assessment of various pieces of evidence reflecting Catherine's date of birth, including his opinion as to the reliability of those pieces of evidence, is excluded. For many of the same reasons, the Court excludes Mr. Joslyn's ultimate conclusion: "to a reasonable degree of certainty, that Catherine Cohen was born on January 29, 1920."  Joslyn Report ¶ 18.  That conclusion is for the jury to reach.

The final category of testimony would entail Mr. Joslyn providing the jury with historical context and background for specific kinds of documents.  For example, Mr. Joslyn states that immigrants from non-English speaking countries in the early twentieth century often had their names recorded "using numerous different English spellings of their surname."  *Id.* ¶ 19.  Mr. Joslyn also explains that "statewide recording of births was not implemented in Pennsylvania until 1906, and it was not uncommon in the early part of the 20th century, even after that date, for births to go unrecorded contemporaneously."  *Id.* ¶ 25.  Mr. Joslyn also provides historical context on Pennsylvania's recording of births in the early twentieth century and the requirements in Pennsylvania for obtaining delayed birth certificates beginning in the 1940s.  *Id.* ¶¶ 45, 47-50. When asked at oral argument if US Life would seek to offer such testimony if the bulk of Mr. Joslyn's anticipated testimony was otherwise excluded, US Life indicated it would.  Tr. at 93:23-94:14.

The Court will permit testimony of this kind.  First, Mr. Joslyn is qualified to offer such testimony.  "Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert."  *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 538 (S.D.N.Y. 2024) (internal quotation marks omitted).  "To determine whether a witness qualifies as an expert, courts compare the area in which

the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Mr. Joslyn is a certified genealogist, regularly publishes in the field, has held a number of prestigious positions, and specializes in the Mid-Atlantic region. *See* Joslyn Report ¶¶ 4-6, 9; Joslyn Report, Exh. A (*curriculum vitae*); Joslyn Report, Exh. B (list of expert testimony in last four years and publications in last ten years); Joslyn Dep. Tr. at 143:11-144:7 (Mr. Joslyn explaining that in "a rather substantial book" offering "a guide to the states and genealogical historical materials," he authored a section on "the Mid-Atlantic states, of which Pennsylvania is one"). This proffered testimony relies on Mr. Joslyn's specialized knowledge in genealogy, and particularly his experience with genealogical research in the Mid-Atlantic region. *See* Joslyn Report ¶ 45 (basing discussion of Pennsylvania's historical practice for contemporaneous recording of births on Mr. Joslyn's "genealogical research experience"); *id.* ¶ 49 (explaining from experience what other delayed birth certificate forms were in use in Pennsylvania counties in the 1940s).

Moreover, unlike the testimony in the first category, this testimony would be helpful to the trier of fact by providing background context on documents the jury is likely to see at trial, based on specialized knowledge not possessed by a lay juror and without opining on the reliability of any particular document. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[E]xpert testimony may help a jury understand unfamiliar terms and concepts."). Such historical context and background testimony would assist jurors in evaluating and weighing various records at trial.

Wells Fargo contends that testimony from Mr. Joslyn in this category would be opinions "on issues of law." Joslyn *Daubert* Motion at 14 (quoting *Bilzerian*, 926 F.2d at 1294). But Mr. Joslyn's testimony, as authorized herein, would be limited to the historical context and background

of documents; it would not extend to opining on legal issues or offering legal interpretations. To the extent that Mr. Joslyn informs the jurors of the statutory framework in Pennsylvania in the mid-twentieth century, that testimony would provide background context for the jurors on unfamiliar documents. Such testimony falls within the scope of proper expert testimony. *See Bilzerian*, 926 F.2d at 1295 (affirming the admission of testimony offering "general background on federal securities regulation and the filing requirements of Schedule 13D, which [the expert] presented by referring to a blank form"); *In re Elysium Health-ChromaDex Litig.*, No. 17 Civ. 7394 (LJL), 2022 WL 421135, at *26 (S.D.N.Y. Feb. 11, 2022) (observing that expert testimony regarding "the general background of FDA regulation and the specific requirements and regulations" is permissible because it "may help a jury understand unfamiliar terms and concepts, and does not encroach on the roles of judge or jury" (internal quotation marks omitted)). To be sure, Mr. Joslyn's testimony in this regard must be limited to historical context and background, and may not veer to opining on the reliability of any of those records or offering his conclusion as to Catherine's date of birth.

Accordingly, the Court grants Wells Fargo's motion to exclude Mr. Joslyn's testimony in part and denies it in part.

### 2.    Kathleen Hinckley

Wells Fargo retained Kathleen Hinckley as a rebuttal expert in genealogy to respond to Mr. Joslyn. *See* Dkt. 82-1 ("Hinckley Report") at 1. Ms. Hinckley is a "Forensic Genealogist, specializing in analyzing and reporting cases with legal implications such as missing heirs, mineral rights, and repatriation of remains of soldiers missing from WWII and the Korean War." *Id.* Ms. Hinckley has been certified as a genealogist by the Board for Certification of Genealogists since 1984. *Id.* Among other credentials in the field, Ms. Hinckley served as the Executive Director of the Association of Professional Genealogists from 1995 to 2023, a trustee for the Board for

Certification of Genealogists, and a board member of the Federation of Genealogical Societies. *Id.* at 15. According to Ms. Hinckley's *curriculum vitae*, she has published numerous articles in the field of genealogy and has been a faculty member at the National Institute on Genealogical Research at the National Archives in Washington, D.C., and the Institute of Genealogy and Historical Research at Samford University. *Id.*

Ms. Hinckley prepared an expert report in this case which reached four conclusions. *See id.* at 1-18. First, Ms. Hinckley opines that Mr. Joslyn's "analysis is flawed" because he "relied heavily on orphanage records and the delayed birth certificate . . . to give his opinion that Catherine Cohen was born on January 29, 1920," and in Ms. Hinckley's view, "[t]he orphanage records and delayed birth certificate are not reliable sources." *Id.* at 14. Second, Ms. Hinckley notes that Mr. Joslyn "did not accept Catherine's Social Security Number application, nor her brother's affidavit as reliable sources," yet she opines that "both records are reliable and should be accepted in the analysis of Catherine's date of birth." *Id.* Third, Ms. Hinckley concludes that Mr. Joslyn improperly ignored "Catherine's use of the 1921 year of birth beginning in 1940 and throughout her life." *Id.* Fourth, Ms. Hinckley opines that "[a]bsent a contemporary birth record or infant baptism, Catherine's date of birth cannot be determined with any reasonable degree of certainty. There are too many inconsistencies and conflicts." *Id.*

"The task of a rebuttal expert is different from that of an affirmative expert. A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 138 (S.D.N.Y. 2022) (internal quotation marks omitted). "[R]ebuttal experts must still meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Id.* (alterations adopted).

In light of the Court's substantial limitation on the scope of Mr. Joslyn's testimony as set forth at *supra* III.B.1, it is unclear whether Wells Fargo will continue to offer Ms. Hinckley as a rebuttal expert.  Wells Fargo's opposition papers primarily argue that neither of the genealogy experts should be permitted to testify, mainly for the reasons which serve as the basis for the Court excluding the bulk of Mr. Joslyn's testimony, *i.e.*, that the testimony regarding the reliability of certain pieces of evidence and Catherine's date of birth usurps the role of the jury and does not rely on any specialized knowledge.  *See* Hinckley *Daubert* Opp. at 12-16.  Wells Fargo takes the position that "if Joslyn is permitted to offer his opinion that Cohen's date of birth was January 29, 1920 . . . to a reasonable degree of certainty, Hinckley should plainly be permitted to offer her rebuttal opinion that Cohen's date of birth cannot be determined with any reasonable degree of certainty with the jury deciding which expert's testimony to credit."  *Id.* at 12.  Given the Court's exclusion of such an opinion from Mr. Joslyn, as well as his proffered testimony concerning how he views the comparative reliability, consistency, and credibility of the documents at issue in this case, Ms. Hinckley's opinions on such matters would not be necessary for rebuttal and likewise would exceed the scope of proper expert testimony.

The Court strains to see how Wells Fargo has proffered testimony from Ms. Hinckley rebutting the limited category of historical background and context testimony from Mr. Joslyn that the Court has permitted.  To the extent that Ms. Hinckley's report offers opinions on those issues, her views appear largely consistent with those of Mr. Joslyn.  *See* Hinckley Report at 4 ("Even though birth registration was required when Catherine was born, 'enforcement was haphazard' across the entire country."); *id.* at 4-5 (explaining issues pertaining to records of immigrant families, including the variations in spelling names); *id.* at 8 (outlining the requirements for recordkeeping in Pennsylvania counties in the early twentieth century).  Wells Fargo has not proffered that Ms. Hinckley will be testifying about these issues and its response when asked about

this issue at oral argument was equivocal.  *See* Tr. at 106:1-107:7.  The Court therefore sees no reason to determine at this stage whether any such testimony by Ms. Hinckley would be admissible.

The Court thus reserves judgment on whether Ms. Hinckley may provide rebuttal expert testimony responding to Mr. Joslyn's anticipated historical background and context testimony, and denies US Life's motion in part as to that kind of testimony.  The Court otherwise grants US Life's motion to exclude Ms. Hinckley's testimony, given its exclusion of the corresponding testimony from Mr. Joslyn.

## C.    Insurance Experts

Wells Fargo seeks to offer testimony from two insurance experts, Laura Dambier and Stanley Shelley.  In their reports, both Ms. Dambier and Mr. Shelley opine on the importance of claims handling procedures in the insurance industry.  Dkt. 90-2 ("Dambier Report") at 2-3, 5-6; 90-5 ("Shelley Report") at 5-9.  Wells Fargo contends that these experts will "testify[] regarding the significance of claims manuals within the life insurance industry to provide the jury with important context regarding U.S. Life's claims manual," one of the pieces of evidence in this case. Dambier & Shelley *Daubert* Opp. at 18.  US Life seeks to offer testimony from Barbara Mueller as a rebuttal expert on claims handling procedures.  Dkt. 85-5 (Mueller rebuttal report).  Mr. Shelley further opines in his report on the application of the Misstatement of Age Provision. Shelley Report at 11-16.[13]  US Life seeks to offer expert testimony from Suhas Sarathy concerning the Misstatement of Age Provision.  Dkt. 81-2 ("Sarathy Disclosure").

---

[13] In his report, Mr. Shelley also offers his opinion concerning US Life's position about changing the Maturity Date in the Policy.  *See* Shelley Report at 9-11.  The Court excludes that testimony as irrelevant given its conclusions that a reformation defense is not available to US Life. *See supra* II.B.2.

### 1.    Claims Handling Testimony

Ms. Dambier and Mr. Shelley offer a few opinions regarding claims handling in their reports.  Ms. Dambier offers her opinion that, "[i]t is standard practice in the life insurance industry that a life insurance company's claims manual defines the documentation required to process a death claim," and that "[w]hen the required documentation to process a claim does not exist or is not available despite best efforts, a life insurance company should accept alternative forms of documentation in order to validate the information that is required."  Dambier Report at 5.  Specific to this case, Ms. Dambier opines that "US Life should follow the requirements stated in its claims manual," that certain documents produced during the litigation process "are not listed in US Life's claims manual as acceptable indications of an insured's date of birth," and that "US Life had sufficient documentation in its possession and adequate tools available to it to pay the claim in question without the need for litigation."  *Id.* at 5-6.

Mr. Shelley similarly opines in his report that "U.S. Life has violated its own guidelines and custom and practice in the life insurance industry by taking the position that Ms. Cohen's birthdate is January 29, 1920.  Instead, applying its own claims manual and guidelines, it should have accepted the May 10, 1921 date of birth because the only documents sufficient to establish date of birth in those guidelines state that Ms. Cohen was born on May 10, 1921."  Shelley Report at 4-5.

At oral argument, Wells Fargo significantly narrowed the scope of the experts' opinions it seeks to offer at trial.  Wells Fargo advised that it would not seek to have Ms. Dambier and Mr. Shelley opine on the application of US Life's claims handling manual in this case nor on whether US Life violated its guidelines by not accepting the documents offered by Wells Fargo during the claims handling process.  Instead, Wells Fargo represented that these experts would testify about how claims manuals operate in the customs and practice of the insurance industry.  Tr. at 124:18-

125:3, 126:19-127:4, 151:5-152:4. US Life responded that such testimony would not be permissible custom and practice testimony because it would not go to the interpretation of a specific ambiguous term in the Policy. *Id.* at 152:8-21.

The Court agrees with US Life that the claims handling testimony should be excluded, even in the more modest scope that Wells Fargo has proffered. As an initial matter, US Life is correct that custom and practice testimony is not typically used in the context that Wells Fargo seeks to offer it here. *Thor Equities, LLC v. Factory Mutual Insurance Company*, 627 F. Supp. 3d 330 (S.D.N.Y. 2022), is instructive on this point. In *Thor Equities*, the plaintiff sought to have an expert testify about "the history and development of key coverages and provisions, including the development of the exclusions at issue here in the industry, and foundational testimony regarding property and business interruption insurance." *Id.* at 342-43 (internal quotation marks omitted). This testimony was offered under the auspices of "admissible custom and practice expert testimony." *Id.* at 343 (internal quotation marks omitted).

The court in *Thor Equities* excluded the testimony. While it acknowledged that "[i]t is certainly permissible for an expert to provide testimony on custom and usage in the industry as to an ambiguous term," it found that the proposed testimony did "not itself actually home in on any particular term that is contended to be potentially ambiguous and explain why custom and practice elucidates the meaning of that term." *Id.* Rather, the expert testimony "discusse[d] the various coverages in the Policy generally, giving a history of those coverages in the insurance industry." *Id.* The *Thor Equities* court held that "the admission of custom or usage evidence requires more precision" than simply referring to the historical use of certain kinds of policies. *Id.* at 343-44. "A party offering such evidence must use it to illuminate the meaning of a specific, potentially ambiguous contractual term; not merely to argue . . . that the inclusion or exclusion of certain types of provisions in an insurance contract is consistent or inconsistent with industry practice." *Id.* at

344. The court also observed that the plaintiff had not identified any Second Circuit decision upholding such custom and practice testimony in the insurance industry, "except in instances where there is a need to interpret a specific ambiguous term in a contract." *Id.*

Like the proffered expert testimony precluded in *Thor Equities*, Ms. Dambier and Mr. Shelley do not offer the kind of custom and practice testimony typically admissible in insurance disputes. *See Fidelity Nat'l Title Ins. Co. v. Cole Taylor Bank*, 878 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (allowing expert testimony which "clarified some of the terminology in the relevant evidence"). As framed by Wells Fargo at oral argument, these two experts would explain why insurers use guidelines reflected in claims handling manuals and the importance of those guidelines in industry custom and practice. Tr. at 151:5-152:4. Such custom and practice evidence would exceed the limitations that courts have placed on that kind of testimony.

Wells Fargo's cited authority does not counsel otherwise. *See* Dambier & Shelley *Daubert* Opp. at 20. For example, in *Reach Music Publishing, Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 403 (S.D.N.Y. 2013), at issue was the parties' knowledge of a songwriting agreement. The court held that industry custom testimony about the sharing of agreements would be helpful to the factfinder because "[i]f it were proven to the juror that it was the custom and practice in the industry to share such agreements in the situation presented here, the juror could more easily draw the inference that [given certain facts] no such contract existed." *Id.* But here, Ms. Dambier and Mr. Shelley's proffered testimony would not provide a factual basis to enable jurors to "more easily draw [an] inference" about the contract in dispute. *Id.* The sole claim in this case is for breach of contract. The Policy states, and Ms. Dambier and Mr. Shelley agree, that the claims handling manual is not part of the contract between US Life and the policyholder. *See* Policy at 12 ("This policy, including any riders and endorsements, the original application, and any supplemental applications and declarations, is the entire contract[.]"); Dambier Dep. Tr. at

83:21-22 (Ms. Dambier testifying that the claims guidelines are "not a part of the contract");

Shelley Dep. Tr. at 135:15-136:2 (Mr. Shelley testifying that the contract "[i]s the policy itself"

and "doesn't include the claims manual"); *see also* Dambier & Shelley *Daubert* Opp. at 21

("Neither expert offers an opinion that claims manuals are legally binding or enforceable against

an insurer.").

The only way the Court conceives such testimony as possibly speaking to disputed facts

would be to point out a disjunction between the reliability assigned to certain documents in the

claims handling manual and US Life's position as to the reliability of those documents in this case.

*See* Dambier & Shelley *Daubert* Opp. at 19 (arguing that this testimony could aid the jury's

"evaluation of the conflicting records regarding [Catherine's] date of birth").  But, as Wells Fargo

seems to appreciate, any such tension could be readily appreciated by a lay juror.  *See id.*

(acknowledging that "[a] lay jury reviewing U.S. Life's claims manual will, of course, already be

capable of spotting" that "U.S. Life's own manual directly contradicts the arguments U.S. Life

will be making to the jury regarding what records the jury should give greater weight in its

decision").  Expert testimony in this vein thus would not aid the jury's ability to assess and weigh

the evidence.  *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 173 (expert testimony is

not admissible if it "simply addresses 'lay matters which the finder of fact is capable of

understanding and deciding without the expert's help'" (quoting *Lumpkin*, 192 F.3d at 289)).

The Court therefore grants US Life's motion to exclude the testimony of Ms. Dambier in

full and the testimony of Mr. Shelley as it relates to his opinions as to claims handling.  In light of

the exclusion of this testimony, the testimony of US Life's rebuttal claims handling expert, Ms.

Mueller, is excluded as irrelevant.  *See In re Keurig Green Mountain Single-Serve Coffee Antitrust*

*Litig.*, No. 14 Md. 2542 (VSB), 2025 WL 354671, at *7 (S.D.N.Y. Jan. 30, 2025) (declining to

reach issues concerning the admissibility of rebuttal experts' testimony where the primary expert's

testimony has been excluded).  Wells Fargo's motion to exclude Ms. Mueller's testimony, *see* Mueller *Daubert* Motion, is therefore granted as well.

### 2.    Misstatement of Age Testimony

As recounted above, Wells Fargo also seeks to have Mr. Shelley testify about the operation of the Misstatement of Age Provision.  *See* Shelley Report at 11-16.  US Life has provided a Rule 26(a)(2)(C) expert disclosure for Mr. Sarathy also to testify concerning the Misstatement of Age Provision.  Sarathy Disclosure at 2-4.  Both sides have moved to exclude the testimony of the other party's expert on this issue.  *See* Dambier & Shelley *Daubert* Motion at 21-24; Sarathy *Daubert* Motion.

The Court begins with Wells Fargo's motion to exclude Mr. Sarathy's testimony.  Mr. Sarathy is Vice President & Actuary, Life Insurance, and Head of Life Inforce Management at Corebridge Financial, of which US Life is a subsidiary.  Sarathy Disclosure § I.  US Life seeks to have Mr. Sarathy testify about "(i) the correct way to apply the misstatement of age provision, (ii) the cost of insurance ('COI') rate tables for the Medalist Premier product that apply to the Policy, (iii) the manner in which life insurance companies like US Life price universal life insurance, and (iv) the significance of a misstatement of age in pricing universal life insurance." *Id.* § II.  Wells Fargo moves to exclude Mr. Sarathy's testimony only as to the first category.

Wells Fargo argues that Mr. Sarathy's testimony about the application of the Misstatement of Age Provision should be excluded on two grounds.  First, Wells Fargo challenges Mr. Sarathy's qualifications to offer an expert opinion regarding the application of the Misstatement of Age Provision.  Sarathy *Daubert* Motion at 10-11.  As mentioned, a court must make a threshold determination of "whether the witness is qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert, before reaching an analysis of the testimony itself." *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016).  "Even if a proposed expert

lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' qualifying him to give opinion testimony under Rule 702." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022).

Wells Fargo argues that Mr. Sarathy is not qualified to opine on the application of the Misstatement of Age Provision because he has never applied a misstatement of age provision and is unfamiliar with who at US Life regularly applies such a provision. Sarathy *Daubert* Motion at 11-12. This argument rests on an overly myopic view of the expert qualification requirement. "In assessing whether a witness can testify as an expert, courts have liberally construed the expert qualification requirement." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (collecting cases). An expert witness may be qualified where he has "experience, knowledge, or training related to [a] general area," even if he lacks experience as to the "specific question before [the] trier of fact." *Id.*; *see In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").

Mr. Sarathy received education in mathematics, works as a professional actuary, and has been a Fellow of the Society of Actuaries since 2008 and a member of the American Academy of Actuaries since 2023. Sarathy Disclosure § I. He received a Bachelor of Arts in Mathematics from the University of Chicago and an MBA from the University of Houston. *Id.* Mr. Sarathy has worked for Corebridge and affiliated entities since 2000 and has worked in the actuarial field for over twenty years. *Id.* Although Mr. Sarathy may not have experience performing the exact calculation required under the Misstatement of Age Provision, this educational background and extensive actuarial experience qualifies him to opine on the issue at hand. *See Rubenstein v.*

*Knight-Swift Transp. Holdings Inc.*, 664 F. Supp. 3d 523, 548 (S.D.N.Y. 2023) ("[A]n expert should not be required to satisfy an overly narrow test of his own qualifications." (internal quotation marks omitted)); *see also* Sarathy *Daubert* Opp. at 8-9 (collecting cases). Wells Fargo may attack Mr. Sarathy's credentials at trial, but such arguments would "go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). The Court thus concludes that Mr. Sarathy is qualified to offer the opinions set forth in the disclosure.

Second, Wells Fargo challenges Mr. Sarathy's conclusions, arguing that his opinion "that the 'proper application' of the Misstatement of Age Provision results in U.S. Life not having to pay any of the Death Benefit is an impermissible legal conclusion that must be excluded." Sarathy *Daubert* Motion at 12-14; *see* Sarathy *Daubert* Reply at 6-7 (arguing that Mr. Sarathy cannot testify as to the interpretation and application of the Policy). It is "well-established that expert witnesses are not permitted to testify about issues of law—which are properly the domain of the trial judge and jury." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 223-24 (S.D.N.Y. 2010). As discussed, assuming the jury finds a misstatement of age, the role of the jury as it relates to the Misstatement of Age Provision will be to resolve the latent ambiguity in the term's language by determining Catherine and US Life's intent. *See ISC Holding AG v. Nobel Biocare Invs. N.V.*, 351 F. App'x 480, 482 (2d Cir. 2009) (observing that when "a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract" (internal quotation marks omitted)).

At least some of Mr. Sarathy's anticipated testimony may be helpful to this inquiry insofar as it provides background on misstatement of age calculations generally. For example, testimony concerning what cost of insurance rates typically apply to this product, how insurance is priced,

and the significance of a misstatement in pricing insurance, *see* Sarathy Disclosure § II, all may help a jury understand the evidence and discern the intent of Catherine and US Life, at the time they entered the Policy, as to how the Misstatement of Age Provision would be applied. This testimony would need to be consistent with the direction in *Ezrasons* explained above and cannot address only US Life's intent. *See supra* II.C.3. Mr. Sarathy's testimony may also be helpful by explaining ways a policy may be adjusted under a similar circumstance, so long as Mr. Sarathy does not endorse a particular method. *See* Sarathy Disclosure § III ("If one wanted to use the correct Medalist Premier COI rate tables and perform a misstatement of age adjustment . . . one option is to use the first monthly cost of insurance deduction after the policy was issued and the then-applicable COI rate for the insured's correct age.").

But the Court agrees with Wells Fargo that Mr. Sararthy's testimony would stray into an impermissible area if he opines on the "proper application of the Policy's misstatement of age provision," or attempts to explain "how the misstatement of age provision is supposed to be applied under the Policy." *Id.* Such an opinion would instruct the jury how, in the expert's view, the fundamental ambiguity in the Misstatement of Age Provision should be resolved. That issue is for the jury to determine.

US Life also proffers that Mr. Sarathy would "opine that it would be improper methodology for US Life to invent a new COI rate for the purpose of calculating the Policy's death benefit." Sarathy *Daubert* Opp. at 11. It is not clear to the Court for what purpose US Life wishes to offer such testimony. To the extent this testimony would be intended to speak to the contracting parties' intent when the contract was formed, it would need to reach Catherine's intent, not just the intent of US Life or the view of US Life's actuaries *ex post*. *See supra* II.C.3.

Alternatively, US Life may be seeking to have Mr. Sarathy's testimony establish industry custom and practice for purposes of persuading the jury to adopt a particular interpretation of the

Misstatement of Age Provision.  As explained *supra* II.C.3, to offer testimony on industry custom and practice which may resolve a latent ambiguity in a contract, a party would have to show that the trade usage offered by their expert is "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto."  *British Int'l Ins.*, 342 F.3d at 84 (internal quotation marks omitted).  US Life makes no argument concerning how Mr. Sarathy's testimony would accord with these standards, nor has Wells Fargo argued that it would not.

Finally, Mr. Sarathy could be testifying about how to resolve a factual issue which would follow a particular interpretation of the Policy's language.  For example, the jury might conclude that the extrinsic evidence indicates that it was the contracting parties' intent that a cost of insurance rate for an insured of Catherine's age be calculated by US Life's actuaries, and then the Misstatement of Age Provision applies using that number as the denominator.  Mr. Sarathy might be testifying about how that cost of insurance rate would be calculated by US Life's actuaries and then how the calculation under the Misstatement of Age Provision would occur.

Given that the precise scope of Mr. Sarathy's proffered expert testimony is unclear at this time, that the legal issues alluded to above have not been fully briefed by the parties, and that the parties' positions may be informed by this Opinion's framing of the issues that survive summary judgment, the Court will not pass on whether to exclude these areas of testimony now, but will revisit these issues closer to trial to set the appropriate parameters for Mr. Sarathy's testimony.

Wells Fargo's motion to exclude Mr. Sarathy's testimony is therefore granted in part and denied in part.

Finally, US Life moves to exclude Mr. Shelley's opinions concerning the Misstatement of Age Provision.  Mr. Shelley's proposed testimony in this respect falls into a few categories.  First, Mr. Shelley's report identifies the regulatory background for misstatement of age provisions and

how those provisions typically operate. *See* Shelley Report at 12-13. As to this first category, while US Life briefly argues that this testimony should be excluded as a legal conclusion, *see* Dambier & Shelley *Daubert* Motion at 22 n.13, the Court finds the testimony appropriate as providing legal context for an unfamiliar document for the reasons set forth at *supra* III.B.1.

Second, Mr. Shelley opines that application of the Misstatement of Age Provision to result in a $0 death benefit "would not be compliant with New York's insurance regulations." Shelley Report at 15. Such a conclusion plainly relies on Mr. Shelley's interpretation of New York insurance law, however, and therefore is excluded as a legal conclusion. *See Hygh*, 961 F.2d at 363.

Third, Mr. Shelley concludes that "[t]here is simply no basis under industry custom and practice for U.S. Life to avoid paying any death benefit due to a misstatement of age based on a purported inability to recalculate the death benefit owed." Shelley Report at 14. In support of this contention, Mr. Shelley opines that US Life's claims department and actuaries could have "determin[ed] a reasonable COI rate to use for an age over 100 in its calculation." *Id.* Mr. Shelley provides an example of a calculation to "illustrate how [a misstatement of age] calculation could be performed" by using guaranteed cost of insurance rates from the 2017 Commissioners Standard rating table for non-smokers, which would result in a reduction of death benefit "to approximately $9,084,600." *Id.* at 14-15.

In moving to exclude the third category of testimony, US Life makes two arguments. First, US Life challenges Mr. Shelley's qualifications to offer an expert opinion regarding misstatement of age calculations. Dambier & Shelley *Daubert* Motion at 21-23. US Life argues that Mr. Shelley has "never observed how other insurers . . . perform misstatement of age calculations," and that Mr. Shelley cannot opine about misstatement of age adjustments because he is not an actuary. Dambier & Shelley *Daubert* Motion at 22-23; Dambier & Shelley *Daubert* Reply at 7-8.

Two kinds of testimony constitute this third category.  First is Mr. Shelley's opinion that, under industry custom and practice, an insurance company typically would proceed in the circumstances presented here by having its claims department and actuaries "determin[e] a reasonable COI rate to use for an age over 100 in its calculation." Shelley Report at 14-15.  Second is Mr. Shelley's opinion regarding how a calculation could be performed given a determined rate. *Id.*  The Court does not understand Wells Fargo to be offering Mr. Shelley to testify on how the cost of insurance rate would be determined or the correct actuarial principles to arrive at that cost of insurance rate.  *See* Dambier & Shelley *Daubert* Opp. at 23 n.12.

With this understanding, the Court does not share US Life's concern with Mr. Shelley's qualifications to testify about whether an adjustment for a miscalculation of age would typically be made under industry custom and practice.  Mr. Shelley received a degree in Business Management and Finance from Brigham Young University.  Shelley Report at 2.  He has received multiple certifications from the Life Office Management Association, the "largest trade association supporting the insurance and related financial services industry."  *Id.* at 2 & n.1.  In obtaining these certifications, Mr. Shelley completed courses in "numerous areas of life insurance including, among others, claims and actuarial."  *Id.* at 2.  Mr. Shelley has received numerous licenses in the insurance industry and has held a number of jobs in that industry, including Executive Vice President (Distributions) and Senior Vice President (Operations) for Lincoln Benefit Life and Senior Vice President (Operations) for Surety Life.  *Id.*

Mr. Shelley has particular qualifications that allow him to opine about the Misstatement of Age Provision.  While at Lincoln Benefit Life and Surety Life, he "oversaw [the] claims department and reviewed thousands of claims files," and the "claims departments applied Misstatement of Age provisions," similar to the one at issue in this case, "in the event of confirmed misstatements of age."  *Id.* at 13.  Mr. Shelley testified at his deposition that he often calculated

adjustments on misstatements of age, even though he "didn't process the claim itself."  Shelley

Dep. Tr. at 89:19-93:18.  This experience overseeing and making such adjustments provides him

with the necessary knowledge to opine on these matters.  *See Am. Empire Surplus Lines Ins. Co.*

*v. J.R. Contracting & Envt'l Consulting, Inc.*, 743 F. Supp. 3d 530, 540 (S.D.N.Y. 2024) (finding

a witness qualified as an expert under Rule 702 where he "possesses extensive experience with

insurance products and their interaction with audits spanning more than 30 years," and noting the

Second Circuit's "liberal view" of Rule 702's qualification requirement).

    The Court also notes that, particularly in light of these qualifications, it is not persuaded by

US Life's criticism of Mr. Shelley for having "never served as an expert or been qualified as an

expert on any subject, in any jurisdiction."  Dambier & Shelley *Daubert* Motion at 22.  "A witness

may have sufficient experience to qualify him as an expert even if . . . he has never served as an

expert witness before."  *Tools Aviation, LLC v. Digit. Pavilion Elecs. LLC*, No. 20 Civ. 2651

(PKC), 2024 WL 4350466, at *7 (E.D.N.Y. Sept. 30, 2024) (collecting cases); *accord Alves v.*

*Affiliated Care of Putnam, Inc.*, No. 16 Civ. 1593 (KMK), 2022 WL 1002817, at *7 (S.D.N.Y.

Mar. 30, 2022).  The Court finds that Mr. Shelley possesses "a specialized knowledge [that] will

help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid.

702(a), *i.e.*, how such miscalculation of age adjustments are typically made and that such

adjustments may occur under industry custom and practice.  Of course, if Mr. Shelley seeks to

offer industry custom and practice testimony to speak to the resolution of the ultimate ambiguity

in this case, Wells Fargo would need to show that his testimony satisfies the requirements for

industry custom and practice testimony set forth above.

    US Life also moves to exclude the example of a calculation in Mr. Shelley's report as

unreliable.  In his expert report, Mr. Shelley describes his method as "the type of good faith and

even-handed analysis and calculation [US Life] should have performed."  Shelley Report at 15.

Wells Fargo, however, does not appear to be defending Mr. Shelley's calculation or seeking to offer it at trial. Rather, Wells Fargo explains that Mr. Shelley "is not being proffered to demonstrate to the jury that they must accept one specific calculation, but rather to demonstrate that U.S. Life's $0 calculation is demonstrably wrong and that any reasonable calculation would be immensely higher," intimating that Mr. Shelley's testimony will be limited to "critiquing the other side's calculations." Dambier & Shelley *Daubert* Opp. at 24-25.

As an initial matter, the Court excludes the exemplar calculation in Mr. Shelley's report as unreliable. As Mr. Shelley conceded at his deposition, the rates he used do not apply to the product at issue in this case. Shelley Dep. Tr. at 238:21-239:18. This calls into the question the reliability of the method Mr. Shelley employed in conducting this exemplar calculation. Allowing testimony on this calculation also would bring a high risk of misleading the jury on a crucial issue. Therefore, mindful of its slim probative value, the exemplar calculation is inadmissible under Rule 403.

The Court, however, does not preclude Mr. Shelley from providing his critique of Mr. Sarathy's conclusions, at least at this point. As noted above, the scope of Mr. Sarathy's testimony and the purpose for which US Life would offer it at trial is not clear at this stage in the litigation. If Mr. Sarathy is offered for the purpose of persuading the jury to adopt a particular interpretation of the Misstatement of Age Provision based on industry custom and practice, it would seem Mr. Shelley could offer rebuttal testimony that, in his professional experience overseeing adjustments and actuaries performing that work, industry custom and practice supports a contrary view as to whether and how a cost of insurance rate would be calculated and then utilized. *See Capri Sun*, 595 F. Supp. 3d at 140 (explaining that "the charge of a rebuttal expert" is "to criticize the analysis presented by another party" (citation modified)). In this situation, Mr. Shelley, like Mr. Sarathy, would have to testify in a manner consistent with the standards for admissible custom and practice testimony. Such issues, like those present with any testimony from Mr. Sarathy, are better suited

70

for resolution in pretrial motions *in limine* after the parties have considered the issues remaining after summary judgment.

US Life's motion to exclude Mr. Shelley's Misstatement of Age Provision testimony is therefore granted in part and denied in part.

### IV.  Conclusion

For these reasons, US Life's motion for summary judgment is denied and Wells Fargo's partial motion for summary judgment is granted in part and denied in part.  The Court also grants in part and denies in part Wells Fargo's motion to exclude the testimony of Roger Joslyn; grants in part and denies in part US Life's motion to exclude the rebuttal testimony of Kathleen Hinckley; grants in part and denies in part US Life's motion to exclude the testimony of Stanley Shelley; grants in part and denies in part Wells Fargo's motion to exclude the testimony of Suhas Sarathy; grants US Life's motion to exclude the testimony of Laura Dambier; and grants Wells Fargo's motion to exclude the testimony of Barbara Mueller

The Court will hold an in-person status conference on August 22, 2025, at 10:00 a.m. in Courtroom 12D of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007.  The parties should be prepared to discuss any remaining issues regarding their proffered expert testimony as discussed above, a trial date, and related trial logistics.

The Clerk of Court is respectfully directed to close Docket Numbers 78, 79, 83, 86, 88, 91, and 95.

SO ORDERED.

Dated: August 4, 2025
New York, New York

_____
JOHN P. CRONAN
United States District Judge

71