UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
WELLS FARGO BANK, N.A.,                                                :
                                                                       :
                                   Plaintiff.                          :
                                                                       :
                   -v-                                                 :        22 Civ. 8606 (JPC)
                                                                       :
THE UNITED STATES LIFE INSURANCE                                       :        OPINION AND ORDER
COMPANY IN THE CITY OF NEW YORK,                                       :
                                                                       :
                                   Defendant.                          :
                                                                       :
-----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Trial in this case is set to begin June 16, 2026. *See* Dkt. 139. Before the Court are nine

motions *in limine*. The parties have also asked the Court to resolve pretrial, rather than at the mid-

trial charge conference, who bears the burden of proof on the two questions teed up for trial: (1)

whether Catherine Cohen misstated her age in the life insurance policy (the "Policy") Defendant

The United States Life Insurance Company in the City of New York ("US Life") issued her; and

(2) if so, how the Policy's "Misstatement of Age or Sex" provision (the "Misstatement of Age

Provision") applies to the facts of this case.

## I. Background

The Court assumes familiarity with this case's facts and procedural history, detailed in this

Court's August 4, 2025 Opinion and Order ("Summary Judgment/*Daubert* Opinion") resolving

the parties' motions for summary judgment and to exclude certain testimony of the other party's

proffered experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See*

*Wells Fargo Bank, N.A. v. U.S. Life Ins. Co. in City of N.Y.* ("*Wells Fargo*"), No. 22 Civ. 8606

(JPC), 2025 WL 2220948 (S.D.N.Y. Aug. 4, 2025). After that decision, the Court ordered the

parties to file the joint proposed pretrial order and all other required pretrial filings, including

motions *in limine*, by April 13, 2026.  Dkt. 136.  On April 13, the parties filed the joint proposed pretrial order, Dkt. 145 ("Pretrial Order"), and nine motions *in limine*, Dkts. 150 ("Joslyn Motion"), 155 ("Unilateral Intent Motion"), 157 ("Sarathy Motion"), 159 ("Ownership/Acquisition Motion"), 162 ("Judicial Notice Motion"), 163 ("Historical Records Motion"), 166 ("Shelley Motion"), 169 ("Miscellaneous Motion"), 172 ("Warner/Marinoff Motion").  The parties filed oppositions to those motions on April 27, 2026.  Dkts. 177 ("Warner/Marinoff Opposition"), 178 ("Shelley Opposition"), 179 ("Miscellaneous Opposition"), 180 ("Judicial Notice Opposition"), 181 ("Joslyn Opposition"), 183 ("Unilateral Intent Opposition"), 185 ("Sarathy Opposition"), 187 ("Ownership/Acquisition Opposition"), 188 ("Historical Records Opposition").  Replies were filed on May 6, 2026.  Dkts. 191 ("Unilateral Intent Reply"), 192 ("Historical Records Reply"), 193 ("Joslyn Reply"), 194 ("Ownership/Acquisition Reply"), 195 ("Sarathy Reply"), 196 ("Judicial Notice Reply"), 198 ("Shelley Reply"), 199 ("Miscellaneous Reply"), 201 ("Warner/Marinoff Reply").[1]

Meanwhile, the parties notified the Court of their "fundamental disagreement as to which party bears the burden of proof on issues the jury will be deciding at trial," and "agree[d] that limited pretrial briefing would assist the Court" to have "these threshold burden issues decided before trial rather than during the charging conference."  Dkt. 142.  On April 14, 2026, the Court granted the parties' request, ordering them to submit opening briefs on May 11, 2026, and opposition briefs on May 20, 2026.  Dkt. 174.  On May 11, the parties filed their opening briefs. Dkts. 203 ("Wells Fargo Burden Br."), 204 ("US Life Burden Br.").  On May 20, they filed their oppositions.  Dkts. 208 ("Wells Fargo Burden Opp."), 209 ("US Life Burden Opp.").

---

[1] On May 19, 2026, US Life also moved to preclude under *Daubert* certain opinions from a forensic analysis of Catherine Cohen's delayed birth certificate conducted by Wells Fargo's expert, John Osborn.  Dkt. 205.  That motion is scheduled to be fully briefed by May 29, 2026. Dkt. 175.  The Court will resolve that motion separately.

## II. Burden of Proof

Wells Fargo argues that it has satisfied its *prima facie* entitlement to the Policy's death benefit of $9,800,000, such that US Life bears the burden to establish whether and how the Misstatement of Age Provision operates to reduce that amount, including "proving, by a preponderance of the evidence, that Ms. Cohen's age was misstated, what her correct age was, and what adjusted death benefit results under the Policy's Misstatement of Age Provision." Wells Fargo Burden Opp. at 4; *see* Wells Fargo Burden Br. at 1-2 ("U.S. Life has the burden of establishing a defense based on the Policy's Misstatement of Age Provision, including establishing all elements of such defense."). US Life, on the other hand, argues that "to establish breach and damages" for Wells Fargo's contractual claim, which are "two components of [Wells Fargo's] *prima facie* case," Wells Fargo bears the burden to "prove Ms. Cohen's true age" and "the adjusted death benefit amount" under the Misstatement of Age Provision. US Life Burden Opp. at 1; *see* US Life Burden Br. at 1-2. The Court agrees with Wells Fargo.

Under the Policy, "[t]he death benefit less debt will be paid to the beneficiary upon receipt of due proof of the death of the insured before the maturity date." Dkt. 93, Exh. 1 ("Policy") at WF_000535 ("Payment of Proceeds Clause"). The Policy's maturity date is November 8, 2021, Policy at WF_000530, and the death benefit is defined as the "greater of (a) the specified amount or (b) the corridor death benefit," Policy at WF_000535 (death benefit clause). The specified amount, in turn, is $9,800,000. Policy at WF_000530. Because the parties agree that the corridor death benefit is inapplicable, the death benefit is $9,800,000.[2] Under the Misstatement of Age Provision, the Policy provides that "[i]f the insured's age . . . has been misstated, [US Life] will

---

[2] The parties further agree that: "(1) Plaintiff owned and is the beneficiary of the Policy; (2) Plaintiff timely paid all premiums on the Policy; (3) Ms. Cohen died before the Policy's express maturity date; (4) Plaintiff submitted a claim for the Policy's death benefit after Ms. Cohen's death; and (5) Defendant determined that no death benefit was owed." Pretrial Order at 4.

adjust the death benefit to reflect the amount at risk that would have been provided by the most recent monthly deduction made and the most recent cost of insurance rate for the insured's correct age . . . ." Policy at WF_000540 ("Misstatement of Age Provision").

The burden question turns on the relationship between the Payment of Proceeds Clause and the Misstatement of Age Provision. In isolation, "under the Policy's Payment of Proceeds [Clause], Plaintiff established its entitlement to payment of the Policy's specified $9,800,00 death benefit." Wells Fargo Burden Opp. at 4. That is because there is no dispute that Catherine Cohen died before the Policy's maturity date. *See* Pretrial Order at 4. But US Life has raised as "its . . . defense . . . the application of the Policy's Misstatement of Age Provision," which "explicitly calls for an adjustment" to the death benefit. *Wells Fargo*, 2025 WL 2220948, at *4 & 17 n.10; *see also id.* at *3 ("[W]hether US Life may adjust the death benefit to $0 under the Misstatement of Age Provision is an issue for the jury to resolve."). US Life, in short, asserts that Catherine Cohen misstated her age, and thus its position would initially seem to fall under "[t]he general rule . . . that the burden [of proof] is on the party asserting the affirmative of an issue." *Grossman v. Rankin*, 373 N.E.2d 267, 271 (N.Y. 1977); *accord Heinemann v. Heard*, 62 N.Y. 448, 455 (N.Y. 1875) ("[T]he burden of maintaining the affirmative of the issue involved in the action is upon the party alleging the fact which constitutes the issue, and this burden remains throughout the trial."); *Murray v. N.Y. Life Ins. Co.*, 85 N.Y. 236, 238-40 (N.Y. 1881) (same for insurance policies). Because US Life's position is that "the insured bears the burden of disproving the insurer's invocation of" a misstatement-of-age provision, Wells Fargo Burden Opp. at 5, and "all else . . . being equal, courts should avoid requiring a party to shoulder the more difficult task of proving a

negative," *Nat'l Commc'ns Ass'n, Inc. v. AT&T Corp.*, 238 F.3d 124, 131 (2d Cir. 2001), US Life starts behind the eight ball.[3]

It is little wonder, then, that in the insurance context a corollary of this "fundamental principle," 17A Couch on Insurance § 254:97, is that "[t]he burden of proving a misstatement of age by the insured rests upon the insurer," 6 Couch on Insurance § 86:7 (3d ed. 2025) (explaining that a "basis for the burden being on the insurer is that the insurer" is "the party asserting the fact" of misstatement). *Accord* 69 N.Y. Jur. 2d Insurance § 1256 (2d ed. 2026) ("The burden of proving a misstatement of age by the insured rests upon the insurer."); *Wells Fargo Bank, N.A. v. Lincoln Benefit Life Co.*, No. 1:13-CV-2890-TWT, 2017 WL 781508, at *3 (N.D. Ga. Mar. 1, 2017) ("[T]he courts that have addressed the issue require an insurer prove a misstatement of age by the insured as a defense to paying the full death benefit." (collecting cases)); *Insurance: Incorrect Statement of Age*, 160 A.L.R. 295 ("[T]he burden of proving a misstatement by [the] insured of his age rests with the insurer." (collecting cases)). As a "challenge[ to] coverage because of a misstatement by the insured of his age" is an "affirmative defense," the "general rule" is that "the burden of proof is upon the insurer." *Koch v. Prudential Ins. Co. of Am.*, 447 P.2d 825, 828 (Kan. 1968).

US Life argues that New York courts diverge from this general rule, but the primary case it cites for that argument merely reflects a widely acknowledged exception to the rule which does

---

[3] US Life argues that a "misstatement of age adjustment would not be considered a 'defense'" if "an insured successfully sued due to an overstated age in the policy." US Life Burden Opp. at 13 n.9; *accord* US Life Burden Br. at 14. That is exactly right, but it is nonresponsive to the "fundamental principle . . . that the burden of proof in any case rests upon the party who, as determined by the pleadings or the nature of the case, asserts the affirmative of the issue." 17A Couch on Insurance § 254:97 (3d ed. 2025). In US Life's scenario, the insured would be asserting the affirmative of the issue that she is entitled to a greater death benefit based on a misstatement of age. Not so here. *See* Wells Fargo Burden Opp. at 5 n.2 ("[W]hether a provision functions as a defense depends on how the provision is invoked in the particular case. Here, U.S. Life invokes the provision to reduce or eliminate the amount otherwise payable under the Policy.").

not apply here.  *See* US Life Burden Br. at 3-5 (discussing *Goell v. U.S. Life Ins. Co. in City of N.Y.* ("*Goell II*"), 55 N.Y.S.2d 732 (1st Dep't 1945)); US Life Burden Opp. at 2-5 (same).  In *Goell II*, New York's Appellate Division, First Department, explained that while the insured enjoyed "a presumption that the age stated in the policy is the true age," the ultimate burden remained with the insured where the policy itself provided that disability coverage would lie only if the insured was disabled before reaching the age of sixty.  *Goell II*, 55 N.Y.S.2d at 732-33 (internal quotation marks omitted); *see Goell v. U.S. Life Ins. Co. in City of N.Y.* ("*Goell I*"), 40 N.Y.S.2d 779, 780 (1st Dep't 1943) (explaining that the issue was whether the insured "had misrepresented his age and that at the time of the disability . . . he was beyond the age of sixty and, therefore, under the policy was not entitled to disability benefits").  In other words, "[u]nder policies which make the insured's age a condition precedent to the receipt of specific benefits," the "insurer's defense that the insured was born at an earlier date than that stated in the application and policy and that [the insured] had passed the age of 60 before the onset of disability[] cannot be considered an affirmative one."  17A Couch on Insurance § 254:97.  That is because in such cases it is the insured's burden to "establish[] age as part of the *prima facie* case for recovery of those specified benefits."  *Id.*

In contrast to cases like *Goell II* where "the right to recover under the policy depends on the insured or beneficiary being a certain age" such that "the party seeking recovery has the burden of establishing the true age as part of the burden of showing that the requisites to recovery have been met," 6 Couch on Insurance § 86:7, Wells Fargo's "*prima facie* entitlement to payment does not depend on proving Ms. Cohen's age," Wells Fargo Burden Opp. at 8.  This conclusion is evident from "the language of the polic[y]."  *Consol. Edison Co. of N.Y., Inc. v. Allstate Ins Co.*, 774 N.E.2d 687, 690 (N.Y. 2002) (relying on policy language to resolve a question of the burden of proof in an insurance dispute).  The Payment of Proceeds Clause says absolutely nothing about

Catherine Cohen's age: instead, it promises to pay to the beneficiary the "death benefit less debt" so long as US Life received "due proof of the death of the insured before the maturity date." Payment of Proceeds Clause. Those are the requisites to the beneficiary's—*i.e.*, Wells Fargo's—recovery. The Misstatement of Age Provision, by contrast, speaks to US Life's role once the Payment of Proceeds Clause's preconditions are met, asserting that *US Life* "will adjust the death benefit to reflect . . . the most recent cost of insurance rate for the insured's correct age" should "the insured's age . . . be[] misstated." Misstatement of Age Provision. While US Life tries to characterize the Misstatement of Age Provision as a "coverage-defining provision" simply because it "seeks to adjust the death benefit within the confines of [the] policy," US Life Burden Opp. at 9, 12-14, New York courts are more discerning than that. *See Carles v. Travelers Ins. Co.*, 263 N.Y.S. 29, 31-32 (1st Dep't 1933) (finding that the burden was on the insured to prove "that the elevator at the time of the accident was being operated by a person of legal age" because the relevant provision was "found in the main body of the policy distinctly related to coverage" and "was not one of the conditions listed in the policy exculpating the defendant from liability," as "[i]t distinctly provided that the agreement did not apply to injuries caused by any elevator while in charge of any person under the age fixed by law"); *cf.* 17A Couch on Insurance § 254:97 (likening the situation in *Carles* to the exception to the general misstatement-of-age rule).[4]

In sum, based on the "general rule" that "the burden is on the party asserting the affirmative of an issue," *Grossman*, 373 N.E. 2d at 271, and the application of that rule to misstatement-of-age provisions, *e.g.*, 6 Couch on Insurance § 86:7, the Court holds that US Life bears the burden to establish that Catherine Cohen misstated her age. Further, from "the language of the"

---

[4] While US Life relies on a recent unpublished decision from the Eastern District of New York, *see* US Life Burden Br. at 4-5 (discussing *Wilmington Tr. v. Segal*, No. 21 Civ. 1540 (PKC) (E.D.N.Y.)), that decision discussed neither the general rule on misstatement-of-age provisions nor the rule's exception, *see id.*, Exh. 1 (trial transcript) at 539:11-542:25. *See* Wells Fargo Burden Opp. at 9-10 (explaining that "the court did not address th[is] critical distinction").

Misstatement of Age Provision, *Consolidated Edison Co. of N.Y.*, 774 N.E.2d at 690, it follows that US Life must establish Catherine Cohen's "correct age" and the appropriate "adjust[ment of] the death benefit" reflecting "the most recent cost of insurance rate" for that correct age, Misstatement of Age Provision. *See Wells Fargo*, 2025 WL 2220948, at *8 ("US Life's ability to prevail on its defense[] of . . . the application of the Misstatement of Age Provision hinges on establishing that Catherine was born on January 29, 1920, or otherwise on some other date which would have resulted in an attained age of 100 years or older upon her death."). This conclusion is bolstered not only by the principle that "courts should avoid requiring a party to shoulder the more difficult task of proving a negative," but also the principle that "the burden is better placed on the party with easier access to relevant information." *Nat'l Commc'ns Ass'n*, 238 F.3d at 130-31; *accord Consolidated Edison Co. of N.Y.*, 774 N.E.2d at 692 (noting that it is "appropriate[]" to "place[] the burden of proof on the party having the better and earlier access to the actual facts" (internal quotations omitted)). As Wells Fargo explains, "U.S. Life's position would effectively require beneficiaries to prove the insurer's own alternative payment calculation—including disputed birth dates and actuarial methodologies advanced solely by the insurer—in order to recover under their policies. Neither the Policy nor New York law imposes such a burden." Wells Fargo Burden Opp. at 15; *accord* Wells Fargo Burden Br. at 12 n.6. This Court agrees.

### III. Motions *In Limine*

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 257 (S.D.N.Y. 2015) (citation omitted). "Evidence should not be excluded on a motion *in limine* unless such evidence is clearly inadmissible on all potential grounds." *Id.* at 257 (internal quotation marks omitted). Courts considering a motion *in limine*

8

may reserve judgment until trial so that the motion is placed in the appropriate factual context. *See id.* at 258. And a ruling on a motion *in limine* "is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the [party's] proffer." *Luce v. United States*, 469 U.S. 38, 41 (1984).

The Court addresses each motion *in limine* in the order in which it was filed.

**A.      Joslyn Motion**

Wells Fargo makes two requests to exclude certain testimony of US Life's genealogical expert, Roger Joslyn. First, it seeks to preclude Joslyn "from testifying as to any document reflecting specific details concerning Catherine Cohen or her family, including any testimony that such documents were properly executed." Joslyn Motion at 1. This request is related to the Court's holding in its Summary Judgment/*Daubert* Opinion that Joslyn could not "opin[e] on the reliability and consistency of documents presented by the parties in support of their respective views as to Catherine's date of birth," as such "testimony would usurp the fact-finding function of the jury." *Wells Fargo*, 2025 WL 2220948, at \*23; *see also id.* at \*24 (excluding "testimony regarding Mr. Joslyn's review and assessment of various pieces of evidence reflecting Catherine's date of birth, including his opinion as to the reliability of those pieces of evidence"). The Court did, however, permit Joslyn to "provid[e] the jury with historical context and background for specific kinds of documents." *Id.* at \*24-25. The Court emphasized that Joslyn's "testimony in this regard must be limited to historical context and background, and may not veer to opining on the reliability of any of those records or offering his conclusion as to Catherine's date of birth." *Id.* at \*25.

In response, US Life promises to "abide by those limits" but urges that "[w]here [background] context would help the jury to interpret a particular document in evidence, Mr. Joslyn may refer to that document during his testimony." Joslyn Opposition at 1-3. Of course, Joslyn should not be prevented from literally mentioning Catherine Cohen's name or, say, that

there was a delayed birth certificate issued in her name, so long as he is doing so to "lay a foundation that necessarily requires restating facts in evidence." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. Apr. 15, 2016); *see* Joslyn Reply at 2 (acknowledging that in *Scott* "the expert was permitted to recount the facts (*i.e.*, the record evidence) that supported their opinions"). After all, even Wells Fargo agrees that Joslyn should be permitted to testify that Pennsylvania's delayed birth certificate law "contained different provisions, some of which applied to people born before Pennsylvania began requiring contemporaneous birth certificates in 1906 and other people who, like Catherine, were born later." Joslyn Motion, Exh. 1 ("Joslyn Report") ¶ 47 (highlighting the paragraph to indicate it contains testimony that should be allowed). So the Court denies Wells Fargo's request to the extent it seeks to preclude any mention of Catherine Cohen or the record evidence whatsoever. But it agrees with Wells Fargo that Joslyn should not be permitted to testify as to the specifics of the case beyond what is necessary to lay the foundation for the only testimony permissible: historical context and background, *Wells Fargo*, 2025 WL 2220948, at *24-25. *See In re Foxamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (acknowledging that while an expert's "commentary on any documents and exhibits in evidence will be limited to explaining the regulatory context in which they were created," she would "not be permitted to merely read, selectively quote from, or regurgitate the evidence" (internal quotation marks omitted)). So in that respect, the Court grants Wells Fargo's request to the extent US Life's representations have not mooted it.[5]

---

[5] Wells Fargo is especially concerned that Joslyn would be "permitted to opine whether Cohen's delayed birth certificate was properly issued." Joslyn Motion at 6; *accord* Joslyn Reply at 4-5. But US Life represents that Joslyn will not "opine that Ms. Cohen's delayed birth certificate was properly issued," and instead "will testify about the framework that applied to the application process, . . . offer[ing] no opinion about whether Pennsylvania's Bureau of Vital Statistics complied with those requirements when issuing Ms. Cohen's delayed birth certificate." Joslyn Opposition at 5 (internal quotation marks omitted). US Life also assures that Joslyn "will not read hearsay documents into the record," that Joslyn "will only testify about the contents of documents

Second, Wells Fargo seeks to "[l]imit[] Joslyn's testimony to the historical context and background included in his report," and specifically "to the opinions in his report that are highlighted in yellow in the attached Exhibit 1." Joslyn Motion at 1; *see* Joslyn Report. This request is rooted in Federal Rule of Civil Procedure 26(a)(2), which governs the disclosure of expert testimony. Joslyn Motion at 8-9; *see* Fed. R. Civ. P. 26(a)(2)(B)(i) (stating that an expert's written "report must contain," *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them"). "Courts . . . routinely preclude an expert from testifying about matters that exceed those topics addressed in his Rule 26 report. . . . This is true even where an expert might otherwise be qualified to testify on the subject." *Tomaselli v. Zimmer Inc.*, No. 14 Civ. 4474 (RA) (SN), 2017 WL 2820065, at *8 (S.D.N.Y. Jan. 20, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 1011492 (S.D.N.Y. Mar. 15, 2017); *accord Camarata v. Experian Info. Sols., Inc.*, No. 16 Civ. 132 (AT) (HBP), 2018 WL 1738335, at *1 (S.D.N.Y. Mar. 5, 2018) ("[A]n expert witness is ordinarily limited to the matter disclosed in his or her report."). The Court agrees with Wells Fargo's request, although not to the highlighted specificity Wells Fargo seeks.

US Life argues that because Joslyn's report disclosed that he considered "*documents*" like "birth certificates, delayed birth certificates, sacramental records, census records, and Social Security records," and that because "Wells Fargo questioned him at length regarding these same types of documents" at his deposition, then the Court "should not exclude Mr. Joslyn's testimony based on any purported non-disclosure." Joslyn Opposition at 5-6 (emphasis added). But there is a difference between the documents themselves, which Joslyn cannot testify about (subject to the narrow caveat above), and the historical context behind those documents, to which he can. And

---

that have been admitted into evidence," and that US Life "will not publish to the jury during his testimony documents not in evidence." *Id.*; *compare id., with* Joslyn Motion at 5.

all US Life has told Wells Fargo is that Joslyn will testify about the "[h]istorical context and background for various documents" without actually identifying what specific historical context Joslyn intends on providing. Joslyn Motion, Exh. 3 (email from US Life's counsel setting forth anticipated areas of expert testimony). So while it is undoubtedly true—as this Court already observed at the conference following its Summary Judgment/*Daubert* Opinion—that Joslyn "doesn't have to testify word for word from his report or his deposition," Dkt. 140 at 13:2-5; *accord* Joslyn Reply at 6, he still needed to at least disclose what historical context for those documents he would be giving ahead of time. Indeed, Joslyn's report *does* disclose specifics on the historical background for, say, birth certificates and delayed birth certificates. *See, e.g.*, Joslyn Report ¶¶ 25 ("As described below, statewide recording of births was not implemented in Pennsylvania until 1906, and it was not uncommon in the early part of the 20th century, even after that date, for births to go unrecorded contemporaneously."), 47-50 (describing historical operation of Pennsylvania's delayed birth certificate system). So Joslyn's testimony is limited to the historical context that has already been disclosed.

That said, the Court disagrees that Joslyn is limited to testifying to only his opinions which Wells Fargo has highlighted. For instance, Joslyn's report mentions that the "instructions for the 1920 [federal] census directed census enumerators not to include any children on the census who were born after January 1, 1920, even if such a child was present in the household at the time the census enumerator visited a family." *Id.* ¶ 24 n.8 (not highlighted); *accord* Dkt. 182, Exh. 1 (Joslyn deposition transcript) at 215:7-216:19. So the Court grants Wells Fargo's request to limit Joslyn's testimony to the historical context actually provided in his report and deposition, but it does not accept Wells Fargo's highlights wholesale. Instead, the Court trusts the parties to adhere to its ruling regarding the permissible scope of Joslyn's expert testimony and to make any further individual objections on disclosure grounds only if necessary.

12

**B.      Unilateral Intent Motion**

      **1.      US Life's Medalist Premier Documents**

Wells Fargo seeks to "[p]reclude[] U.S. Life from introducing into evidence . . . documents concerning the Medalist Premier product that U.S. Life did not provide to Ms. Cohen," namely DX 43 (US Life's Medalist Premier Agent Brochure), DX 44 (US Life's Medalist Premier Agent Guide), DX 45 (US Life's Medalist Premier Product Flyer), and DX 46 (US Life's Medalist Premier Product Specification). Unilateral Intent Motion at 1-2. The Court grants this request with one acknowledged exception for DX 46, the "Product Specification."

As explained in the Summary Judgment/*Daubert* Opinion, "in examining whether the parties' proffered extrinsic evidence is 'admissible,' a court considers whether it would carry any probative force in resolving the provision's ambiguity." *Wells Fargo*, 2025 WL 2220948, at *18 (citing *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 396 (2d Cir. 2023)). To resolve ambiguity, extrinsic evidence "must go to a 'determination of the intent of the [contracting] parties'" at the "time" of the contract's "execution." *Id.* (quoting *Hartford Accident & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973)). But to answer the ultimate question of intent, "[t]he undisclosed unilateral intent of one party is not relevant." *Altruis Grp., LLC v. ProSight Specialty Mgmt. Co.*, No. 21 Civ. 10757 (MKV), 2023 WL 4784233, at *3 (S.D.N.Y. July 26, 2023); *accord Dreni v. PrinterOn Am. Corp.*, No. 18 Civ. 12017 (MKV), 2021 WL 4066635, at *9 (S.D.N.Y. Sept. 3, 2021) ("[W]hen considering extrinsic evidence to determine the intended meaning contracting parties assigned to ambiguous language, evidence of a party's unexpressed, or uncommunicated, subjective intent should not be considered."). Because "the objective of contract interpretation is to give effect to the *expressed* intentions of the parties," *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (emphasis added), New York courts require "evidence that the opposing views now advanced were either discussed or

considered by the parties during the process leading up to the execution of the agreement," *Hudson-Port Ewen Assocs. v. Kuo*, 566 N.Y.S.2d 774, 777 (3d Dep't 1991). *See* 2 Couch on Insurance § 22:12 (3d ed. 2025) ("[A]mbiguous language cannot be controlled by the insurer's understanding without proof that this understanding was known to the insured.").

This rule thus forecloses two of US Life's arguments: that evidence of uncommunicated intent is admissible because (1) what matters is the "reasonable understanding of the averaged insured," Unilateral Intent Opposition at 9-11, and (2) the rule applies only to a "party's subjective thoughts that were never communicated to anyone," rather than never to the counterparty, *id.* at 14-15. The first misunderstands the inquiry: of course the touchstone is the reasonable understanding of the averaged insured, but as Wells Fargo points out in reply, that relevant understanding is of the extrinsic material that was *actually communicated to the insured*. *See* Unilateral Intent Reply at 1-2. As for the second, while it is true that the strongest example of the rule is "a unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement," which is "not admissible extrinsic evidence of the parties' mutual intent in entering into their agreement," *Murray Walter, Inc. v. Sarkisian Bros., Inc.*, 589 N.Y.S.2d 613, 616 (3d Dep't 1992), the rule is broader than US Life proposes, as it excludes evidence of intent that was communicated during negotiations but *not* to the contractual counterparty, *see, e.g.*, *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09 Civ. 1410 (KAM) (RLM), 2013 WL 1334271, at *9-12 (E.D.N.Y. Mar. 28, 2013).

To be sure, the rule does not require that Catherine Cohen herself was involved in the Policy's creation, as "courts do not confine this inquiry to the statements of those personally involved in drafting a contested contractual provision, but look more broadly to statements that can be attributed to a party to the contract." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 120-22 (2d Cir. 2014) (Failla, J., dissenting) (collecting cases on the

14

"doctrine of 'unmanifested subjective intent'").  Indeed, the identity of an insurance representative "at the time of the negotiation and agreement . . . informs the analysis of extrinsic evidence because a principal is bound by the actions and knowledge of his agent."  *Merrick Bank Corp. v. Chartis Specialty Ins. Co.*, No. 12 Civ. 7315 (RJS), 2015 WL 14072671, at *7 (S.D.N.Y. Mar. 20, 2015).  And US Life attempts to argue that "[t]he product literature is admissible even though the parties do not have direct evidence indicating whether it was shown to Ms. Cohen" because the literature was "distributed to insurance agents, and under well-settled New York law, an agent's knowledge is imputed to the insured."  Unilateral Intent Opposition at 2; *see also id.* at 12-14.  But as Wells Fargo explains, *see* Unilateral Intent Reply at 3-4, US Life conflates an insurance *broker* with an insurance *agent*.  In New York, there is a "general rule" that "an insurance broker is regarded as agent for the insured."  *Merrick Bank*, 2015 WL 14072671, at *7 (internal quotation marks omitted).  An "insurance agent," by contrast, is an "authorized or acknowledged agent *of an insurer*."  N.Y. Ins. L. § 2101(a) (emphasis added); *compare id.*, *with id.* § 2101(c) (defining "insurance broker" as one who acts "on behalf of an insured").  Here, the evidence shows that the representative who sold the Policy to Catherine Cohen was indeed an agent of US Life and not a broker for Catherine Cohen, *see* Unilateral Intent Reply at 4; *id.*, Exhs. 1-3, so US Life's main assertion—that these "materials were disseminated to Ms. Cohen's agent, thereby imputing to Ms. Cohen the knowledge of their contents," Unilateral Intent Opposition at 12-13—falls flat.  And even taking at face value US Life's argument that its agent had a legal duty to reasonably inform Catherine Cohen of the Policy's features, *see id.* at 13 (citing 11 N.Y. Comp. Codes R. & Regs. Tit. 11 § 224.4), that does not mean that these documents should be admitted wholesale, especially where some were explicitly marked "Not for Dissemination to the Public," Unilateral Intent Motion, Exh. 1 (DX 43 and DX 44).  Because U.S. Life has not suggested that these documents were ever shown to Catherine Cohen (or *her* agent), they "cannot supply the ultimate meaning of

an ambiguous contract." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC* ("*SR Int'l*"), 467 F.3d 107, 125 (2d Cir. 2006).

That is not to say "that such evidence is wholly irrelevant and inadmissible for other purposes," as "a party's [subjective] understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions," *id.* at 125-26, a rule which US Life tries to invoke, Unilateral Intent Opposition 16-18. But that rule applies only "with respect to a negotiated agreement," *SR Int'l*, 467 F.3d at 126, and "U.S. Life cannot show that there were any negotiations with Ms. Cohen," Unilateral Intent Reply at 6. *See Wells Fargo*, 2025 WL 2220948, at *19 ("The parties do not rely on the sort of extrinsic evidence that would be most useful in resolving the Policy's latent ambiguity under *Ezrasons*, namely statements about the contents of negotiating exchanges between US Life and Catherine, which might be relevant to interpreting ambiguities of the Policy." (citation modified)). So any relevance of these materials to the parties' mutual understanding of the Policy is barely relevant, if at all, and would be substantially outweighed by a risk of jury confusion. The Court thus excludes the Medalist Premier documents under Federal Rule of Evidence 402 or, alternatively, Rule 403. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); Fed. R. Evid. 403 (allowing a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues").

One particular document bears further mention: DX 46, which is US Life's Medalist Premier Product Specification. *See* Unilateral Intent Motion, Exh. 1. US Life says the Product Specification is admissible so that Suhas Sarathy, its "expert actuary[,] can refer to it to defend his methodology when describing the process through which an adjusted death benefit is typically calculated pursuant to the misstatement of age provision and if he offers a specific calculation at trial." Unilateral Intent Opposition at 19. In reply, Wells Fargo "does not object" so long as "Sarathy only refers to the mathematical formulas contained in the Product Specification to explain

16

his actual calculation of a potential adjusted death benefit (*i.e.*, his calculation of a potential $7,775,799 adjusted benefit)," as "such testimony would not implicate how to interpret the ambiguity in the Policy's Misstatement of Age Provision." Unilateral Intent Reply at 8-9. But US Life goes further, asserting that the Product Specification, like the other Medalist Premier documents, "is admissible to provide context about other coverage that Ms. Cohen could have purchased—but chose not to—and to show the overall purpose of the Policy." Unilateral Intent Opposition at 21. As for the former justification, there is no context to provide for negotiations that never happened, and the relevance of any rider mentioned in the Product Specification suggesting that US Life intended coverage to end at age 100 is at best marginally relevant to the application of the Misstatement of Age Provision, and at worst "a backdoor attempt to introduce the same points the Court rejected in dismissing U.S. Life's reformation defenses where it sought to change the Policy's maturity date," Unilateral Intent Reply at 9. *See Wells Fargo*, 2025 WL 2220948, at *9-14 (rejecting US Life's defenses to reform the Policy's maturity date which "was calculated based on Catherine's attained age of 100" because "the parties contemplated the remedy for such a situation in the Policy's Misstatement of Age Provision, which provides for adjustment of the death benefit, not alteration of the Maturity Date" (citation modified)). And the latter justification—the overall purpose of the Policy—similarly and impermissibly attempts to "show[] that the Policy was designed to make the death benefit available only to insureds who died before reaching 100 years old," and US Life does not try to explain how one party's unexpressed view of a contract's purpose is any different from the unilateral-intent extrinsic evidence which should not ordinarily be admitted. Unilateral Opposition at 11-12.

The Court thus grants Wells Fargo's motion to exclude from evidence DX 43, DX 44, and DX 45; as for DX 46 (the Product Specification), US Life may offer it so that Sarathy can defend and explain his calculation of a potential adjusted death benefit, but for no other purpose.

17

2.      **US Life's Cost of Insurance Rate Tables**

Wells Fargo seeks to "preclude[] any testimony or argument that the fact" that US Life's internal Cost of Insurance Rate Tables (DX 91) do "not go past age 99 means that U.S. Life is permitted to reduce the Policy's death benefit to $0 since the tables are not permissible extrinsic evidence . . . for resolving the ambiguity in the Misstatement of Age Provision," but seeks to admit the tables "for the limited purpose of explaining how U.S. Life could calculate an adjusted death benefit based on the rates in those tables." Unilateral Intent Motion at 2. The Court denies this request in large part.

Wells Fargo "acknowledges that even though" the tables "were never shown to Ms. Cohen, they may be shown to the jury for the limited purpose of calculating an adjustment of the Policy's death benefit," and "simply seeks to preclude U.S. Life's witnesses (Suhas Sarathy and Eric Tarnow) from offering any testimony, and U.S. Life's counsel from making argument, to the effect that since the tables do not go past age 99, this somehow means that U.S. Life can adjust the death benefit to $0 rather than determining an appropriate cost of insurance rate to use for performing an adjustment." Unilateral Intent Reply at 7-8. The Court has already held that Sarathy may not "opine[] on the proper application" of the Misstatement of Age Provision or "attempt[] to explain" how the Provision "is supposed to be applied under the Policy" as "[t]hat issue is for the jury to determine," *Wells Fargo*, 2025 WL 2220948, at *30 (internal quotation marks omitted), and "U.S. Life represents that Sarathy does not intend to offer such testimony," Unilateral Intent Reply at 8 (citing Sarathy Opposition at 15). So the Court denies without prejudice Wells Fargo's request that Sarathy be precluded from relying on the tables to opine on the proper application of the Misstatement of Age Provision as moot. And because "U.S. Life's opposition does not provide any argument as to why its other witness, Tarnow, should be able to offer such testimony, either," *id.*, the Court grants Wells Fargo's request as to Tarnow to the extent that US Life's representations

18

thus far have not mooted it.

Wells Fargo, however, goes too far in trying to preclude US Life from even *arguing* about the inference the jury should draw from the absence of rates past age 99 in the tables.  As this Court already explained, "US Life's internal cost of insurance rates table" is a "piece of extrinsic evidence" which "by the Misstatement of Age Provision's own terms[ ]speaks to the parties' intent when contracting," as it was the "referent used in the Policy's terms."  *Wells Fargo*, 2025 WL 2220948, at *19.  The Court thus credited US Life's argument that such evidence could "speak[] to the contracting parties' intent favoring its interpretation."  *Id.*  So while US Life's witnesses may not rely on the tables "merely to tell the jury what result to reach," *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (citation modified), that prohibition does not extend to the arguments US Life's attorneys can make to the jury.  *Cf. United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004) (*en banc*) ("[T]estimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

So the Court denies Wells Fargo's request to exclude Sarathy's testimony as to the tables without prejudice as moot and denies its motion to preclude US Life from arguing that the tables mean the Policy's death benefit should be reduced to $0.  If Wells Fargo's request to exclude Tarnow's testimony is not moot in light of US Life's representations, the Court grants that aspect of the request.

### 3.    Unilateral Intent and Parol Evidence Testimony

Finally, Wells Fargo seeks to "[p]reclude U.S. Life from offering any witness testimony regarding (a) its unilateral intent with respect to the Policy or Medalist Premier product and/or (b) regarding provisions of the Policy that the Court did not find ambiguous."  Unilateral Intent Motion at 2.  For the reasons mentioned above, as with documents concerning US Life's unilateral intent, testimony bearing on the same is excluded.  *See supra* III.B.1.  As for the latter part of this request,

which concerns provisions the Court found unambiguous, Wells Fargo wants to preclude US Life from introducing testimony "that the Policy should have matured earlier than its unambiguous Maturity Date or otherwise read an exclusion into the Policy for insureds that reach age 100 before Policy maturity, even though the Court already rejected those attempts on summary judgment." Unilateral Intent Motion at 10-11. US Life does not mention this aspect of the motion in its opposition, and Wells Fargo mentions it on reply only insofar as the Product Specification constitutes "improper parol evidence given that the Court has already rejected U.S. Life's defenses based on its assertion that the Policy was intended to terminate at age 100 rather than on its unambiguous Maturity Date." Unilateral Intent Reply at 9. So also for the above reasons, *see supra* III.B.1, this part of the request is granted as well.

## C.    Sarathy Motion

### 1.    Unilateral Intent Testimony

Wells Fargo similarly seeks, "[c]onsistent with" its Unilateral Intent Motion, to "preclud[e] Sarathy (as either a fact or expert witness) from offering testimony regarding (a) U.S. Life's unilateral intent with respect to the Policy or Medalist Premier product and/or (b) regarding provisions of the Policy that the Court did not find ambiguous." Sarathy Motion at 1-2. The Court grants Wells Fargo's request for the same reasons it grants the relevant aspects of Wells Fargo's Unilateral Intent Motion, *see supra* III.B, although two subjects of Sarathy's anticipated testimony warrant further mention.

First, Wells Fargo "agrees that Sarathy can refer to the actual rates in the [cost of insurance] table[s] in explaining to the jury how he calculates a $7,775,799 adjusted death benefit as one option for an adjusted death benefit," Sarathy Reply at 6, so for the same reason Sarathy can testify about the formulas in the Product Specification, *see supra* III.B.1, he can refer to the rates in the tables.

Second, US Life argues that Sarathy can testify about maturity extension riders, which testimony US Life claims is "relevant to resolving the latent ambiguity" as it "reflects the parties' understanding as to what coverage would be available and how cost of insurance would be priced once Ms. Cohen exceeded age 100" and "speaks to the overall purpose of the agreement." Sarathy Opposition at 16-18. As discussed above, such testimony is at best marginally relevant to the application of the Misstatement of Age Provision, and at worst a disguised version of the already rejected reformation defense; it is thus excluded on Rule 402 and Rule 403 grounds. *See supra* III.B.1, 3. But because a maturity extension rider "is a part of the Policy," Wells Fargo "does not seek to preclude the jury from seeing a copy of the Maturity Extension Rider that was actually attached to and a part of the Policy," and instead seeks to exclude "documents discussing maturity extension riders . . . *that were not shown to Ms. Cohen*" and "testimony regarding U.S. Life's intentions or practices with respect to setting maturity dates, or selling of maturity extension riders, including testimony that U.S. Life intended coverage under its policies to terminate at age 100 unless a specific maturity extension rider was purchased." Sarathy Reply at 8. Although such testimony is excluded, the Court clarifies that the maturity extension rider actually attached to the Policy is not.

### 2.    Misstatement of Age Provision Testimony

Wells Fargo seeks to "[p]reclud[e] Sarathy from circumventing the Court's *Daubert* decision by offering any opinion that applying the Policy's Misstatement of Age Provision should result in reducing the death benefit to $0, including by testifying that other methods of adjusting the death benefit would be improper." Sarathy Motion at 1; *see Wells Fargo*, 2025 WL 2220948, at *30 (ruling that Sarathy cannot "opine[] on the proper application of the Policy's misstatement of age provision[] or attempt[] to explain how the misstatement of age provision is supposed to be applied under the Policy" (internal quotation marks omitted)). But as Wells Fargo recognizes in

its reply, "U.S. Life assures the Court and Plaintiff that not only will Sarathy not testify regarding the 'correct application' of the Misstatement of Age Provision, but that he will also not testify that 'the alternative ways of applying the Misstatement of Age Provision are all improper' or that 'all methods other than Method A [*i.e.*, US Life's preferred method of applying the Misstatement of Age Provision] are incorrect.'"  Sarathy Reply at 2 (quoting Sarathy Opposition at 9).  So the Court denies this request without prejudice as moot.

### 3.    Custom-and-Practice Testimony

Wells Fargo seeks to "[p]reclud[e] Sarathy from opining that it would be improper to extrapolate or otherwise come up with a cost of insurance rate for age 100 or older for purposes of applying the Misstatement of Age Provision since he has conceded he is not aware of any relevant custom and practice regarding this issue."  Sarathy Motion at 1.  The Court agrees that such testimony is inadmissible.

In the Summary Judgment/*Daubert* Opinion, this Court explained that "to offer testimony on industry custom and practice to resolve the latent ambiguity, a party would have to show that the trade usage offered by their expert is 'so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.'"  *Wells Fargo*, 2025 WL 2220948, at \*19 (quoting *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003)).  The Court noted that "the parties may face some difficulty establishing that testimony from these experts," including Sarathy, "satisfies this test," but "if they are able to, the experts' testimony would be relevant to resolving the latent ambiguity in the Misstatement of Age Provision."  *Id.*  So the Court left open whether US Life could "seek[] to have Mr. Sarathy's testimony establish industry custom and practice for purposes of persuading the jury to adopt a particular interpretation of the Misstatement of Age Provision."  *Id.* at \*31.

"Whether a usage exists is a question of fact, to be determined by the trier of fact," but "[a]s is the case with all factual questions, . . . the evidence of the existence of a custom and usage can be insufficient to warrant submission of the question to the jury." *SR Int'l*, 467 F.3d at 134 (internal quotation marks omitted). "[T]o raise a genuine issue of fact as to the existence of a particular custom and usage, the party seeking to establish that custom and usage must establish, by competent evidence, that the practice is fixed and invariable." *Id.* at 135. So "[w]here one party submits evidence that a particular custom or usage exists, and where the other party—the party to be charged with actual or constructive knowledge of that custom—puts forth evidence to the contrary, the question should be submitted to a jury unless no reasonable factfinder could find that such a custom existed." *Id.* This is the standard "to create a *prima facie* case for the admission of evidence of custom and usage," and where it is not met, a motion to exclude such trade usage evidence should be granted. *Cerveceria Modelo de Mexico v. C.B. Brand Strategies, LLC*, No. 21 Civ. 1317 (LAK), 2023 WL 2185899, at *2-3 (S.D.N.Y. Feb. 23, 2023), *aff'd*, No. 23-180-cv, 2024 WL 1253593 (2d Cir. Mar. 25, 2024) (summary order).

Sarathy's testimony falls well below this standard. As US Life concedes, "Sarathy will not be testifying at all about how other insurers confronted with this fact pattern (a misstatement of age that makes the insured older than the maximum cost of insurance) typically address it." Sarathy Opposition at 12 (disavowing that Sarathy would "opine that, as a matter of industry custom and practice, insurers faced with this scenario would reduce the death benefit to $0"). Instead, "Sarathy intends to testify at trial that as a matter of industry custom and practice and settled actuarial principles, cost of insurance rates are not imputed or extrapolated where they do not exist for an insurance product." *Id.* at 15. But there are two problems with this proffered testimony. First, "the admission of custom or usage evidence requires more precision than" that, as it must shed light on the latent ambiguity at issue. *Wells Fargo*, 2025 WL 2220948, at *28

23

(internal quotation marks omitted); *see also id.* ("A party offering such evidence must use it to illuminate the meaning of a specific, potentially ambiguous contractual term." (internal quotation marks omitted)).   And second, Sarathy "has already admitted that he has never encountered a scenario *where U.S. Life did not have a cost of insurance rate for the insured's correct age* and had to determine what cost of insurance rate, if any, to use in performing the misstatement of age adjustment called for by the Misstatement of Age Provision."  Sarathy Reply at 5 (emphasis in original); *see id.*, Exh. A ("Sarathy Dep. Tr.") at 131:1-23 ("Have I dealt with a misstatement of age calculation other than the one for this policy?  No, I haven't.").  And Sarathy conceded that he was "not aware of anything" like "any life insurer other than U.S. Life taking the position that a misstatement of age provision can result in adjusting a death benefit to $0."  Sarathy Dep. Tr. at 154:24-155:6.  Testimony of even a "general understanding in the insurance industry" would "appear insufficient, on its own, to establish a fixed and invariable custom."  *SR Int'l*, 467 F.3d at 136 (internal quotation marks omitted).  Testimony of an unheard-of situation falls far short of sending industry custom-and-practice evidence from that witness to the jury.  *See Cerveceria Modelo*, 2023 WL 2185899, at *2-3; *Columbia Artists Mgmt., LLC v. Swenson & Burnakus, Inc.*, No. 05 Civ. 7314 (LBS), 2010 WL 1379737, at *2 (S.D.N.Y. Mar. 3, 2010); *cf. In re Arbitration Between P.M.I Trading Ltd. v. Farstad Oil, Inc.*, No. 00 Civ. 7120 (RLC), 2001 WL 38282, at *2-3 (S.D.N.Y. Jan. 16, 2001) (finding "industry practice to be inapplicable" given a "unique" contract).  The Court thus grants Wells Fargo's request to preclude Sarathy's custom-and-practice testimony.

D.    **Ownership/Acquisition Motion**

Wells Fargo seeks to preclude US Life "from introducing evidence or argument concerning Plaintiff's ownership or acquisition of the life insurance policy at issue . . . in a manner designed to portray the Policy as a 'wager,' a 'bet' on the insured's life, or otherwise morally improper."

24

Ownership/Acquisition Motion at 1.  Wells Fargo argues that "evidence and argument concerning the secondary market for life insurance policies, the circumstances under which Plaintiff became the Policy's owner and beneficiary, and analyses of Ms. Cohen's life expectancy" is "irrelevant and invites impermissible moral judgment, creating substantial prejudice and jury confusion." *Id.* at 1-2.  US Life, for its part, "does not intend to elicit any testimony or evidence for any of the purposes Wells Fargo proposes" and accordingly "does not oppose that portion of the motion." Ownership/Acquisition Opposition at 1 & n.1.  So the Court denies this aspect of Wells Fargo's motion without prejudice as moot.

US Life does, however, object to a broader exclusion of evidence or argument "concerning the identity of the Policy's current owner or beneficiary" on two grounds: first, to attack the two principals of Jade Mountain—the investment manager of the Policy's ultimate owner, *see* Ownership/Acquisition Reply at 3—for having a financial interest should they testify, and second, to establish "that the doctrine of *contra proferentem* does not apply here" because Jade Mountain is a sophisticated actor.  Ownership/Acquisition Opposition at 1 (citation modified); *see also id.* at 2 ("The challenged evidence is offered for those limited, permissible purposes—not to invite moral judgment or to question the lawfulness of the Policy's transfer.").

As for bias, and for reasons explained later in this Opinion and Order, the Court grants US Life's motion to preclude testimony from Jade Mountain's principals, *see infra* III.I, so that reason to allow evidence on the Policy's ownership is largely moot.  *See* Ownership/Acquisition Opposition at 3 ("US Life has separately moved *in limine* to prevent Wells Fargo from calling either witness, but if either is permitted to testify, US Life must be permitted to introduce evidence concerning those witnesses' (and Jade Mountain's) financial interest in the Policy to establish bias.").  "US Life still intends to call" Kevin Warner of Jade Mountain "to authenticate documents," however, and it asserts that it should "be permitted to question Mr. Warner

concerning his financial interest in the case to establish bias" "[e]ven if [he] is being called for the limited purpose of authentication." *Id.* at 4 n.3. But the Court fails to see the probative value, if any, of US Life attacking Warner's credibility when he is merely authenticating documents *US Life* seeks to introduce, and finds that any such attack's relevance would be substantially outweighed by a risk of juror confusion and wasted time. *See* Fed. R. Evid. 403.

As for sophistication, US Life argues that "*contra proferentem* does not apply where the policyholder is sophisticated," and that this holds true even "where the party attempting to invoke the doctrine is a successor or purchaser, rather than the original contractual counterparty." Ownership/Acquisition Opposition at 4-6. But US Life overreads the cases on which it relies. In one case, for example, the original insured was a hospital—hardly an unsophisticated party—and the dispute involved two excess liability insurers. *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 570, 574 (2d Cir. 1991) (indicating on the one hand "that the touchstone for applying *contra proferentem* is *the insured's* lack of sophistication," and on the other hand explaining that "[w]here the dispute is between two insurance companies, both parties are sophisticated business entities, familiar with the market in which they deal and armed with relatively equivalent bargaining power . . . the *contra* insurer rule serves little purpose" (emphasis added)). In another case, the court found that the provision at issue was not ambiguous, so there was no "need [to] reach plaintiffs' *contra proferentem* argument," even though the court suggested that the doctrine was "inapplicable to sophisticated parties such as [the] plaintiffs." *W. & S. Life Ins. Co. v. U.S. Bank N.A.*, 173 N.Y.S.3d 543, 549-50 (1st Dep't 2022). And indeed, the Second Circuit has indicated that the relevant question for *contra proferentem* purposes is whether the *original insured* negotiated the contract, regardless of that party's sophistication. *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 279-80 (2d Cir. 2000) ("It is unsettled in New York whether *contra proferentem* applies if the policyholder is a sophisticated entity that negotiated contract

terms. . . .  But we need not decide this issue because Morgan Stanley (although sophisticated) did not negotiate its coverage terms."); *see DBC Real Est. Mgmt., LLC v. Marsh USA Inc.*, No. 16 Civ. 4892 (PGG), 2019 WL 8301701, at \*10 & n.11 (S.D.N.Y. Sept. 29, 2019) (applying *contra proferentem* where there was "no evidence that [the plaintiff] played any role in drafting the [contract], which appears to be [the defendant's] standard form"); *Baker v. Nationwide Mut. Ins. Co.*, 551 N.Y.S.2d 387, 390 (3d Dep't 1990) (similar, where the insured "did not personally contract with defendant for the policy").

Here, Catherine Cohen was neither a sophisticated actor for purposes of entering the contract, nor had she negotiated the terms of the Policy, so *contra proferentem* is likely applicable should the extrinsic evidence not prove decisive to the jury.  This conclusion accords with "the underlying adhesion contract rationale for the doctrine."  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983) (further explaining that the doctrine is "inapposite" in "cases involving bargained-for contracts, negotiated by sophisticated parties"); *accord Brabender v. N. Assur. Co. of Am.*, 65 F.3d 269, 273 (2d Cir. 1995) ("This rule is particularly applicable where . . . the insured had little or no input into the terms of the agreement." (internal citation omitted)); 2 Couch on Insurance § 22:24 (3d ed. 2025) ("While insurance contracts are usually offered to the insured on a take-it-or-leave-it basis and as such are termed contracts of adhesion, justifying a construction against the insurer, this rationale is inapplicable in many circumstances, especially those involving . . . sophisticated parties *who fully negotiated the insurance contract*." (emphasis added) (footnotes omitted)).

In any event, there is no need for the jury to hear evidence concerning Jade Mountain's sophistication since the parties do not dispute the only two axes on which the doctrine of *contra proferentem* may turn: sophistication and negotiation.  So US Life does not "need[] to be able to elicit relevant testimony and present evidence" to show sophistication, including three documents

27

(DX 4, DX 37, and DX 87) that US Life claims "directly address Jade Mountain's level of sophistication." *Contra* Ownership/Acquisition Opposition at 6-7. While the Court will address the propriety of a *contra proferentem* instruction at the charge conference, evidence bearing on Jade Mountain's sophistication is irrelevant or, alternatively, confusing and wasteful in a way that substantially outweighs any marginal probative value. *See* Fed. R. Evid. 402; Fed. R. Evid. 403. The Court thus precludes US Life from introducing evidence as to Jade Mountain's sophistication.

**E.    Historical Records Motion**

Wells Fargo seeks to exclude two groups of documents: those related to Catherine Cohen's delayed birth certificate, and those related to her certificate of baptism and other records of the orphanage at which she was raised. The Court takes each in turn, and ultimately concludes that deferring on this motion until trial is proper.

**1.    Catherine Cohen's Delayed Birth Certificate and Related Documents**

Wells Fargo challenges DX 15 (Catherine Cohen's February 9, 1943 Delayed Birth Certificate), DX 50 (Pennsylvania State Archives' Index of 1920 Births), and DX 14 (Catherine Cohen's October 30, 2023 Certification of Birth). *See* Historical Records Motion at 1 n.2, 11-12. Wells Fargo claims that these documents cannot be authenticated and that they and their contents are inadmissible hearsay. *Id.* at 3-8. While these documents can be authenticated, the Court defers ruling on their admissibility.

As for authentication, "US Life has obtained a certified version" of the delayed birth certificate "that is self-authenticating," Historical Records Opposition at 1 (citing Fed. R. Evid. 902(4)), and explains that the 2023 Certification of Birth and the index of 1920 births are "self-authenticating as a sealed and signed public record and a government publication, respectively," *id.* at 2 (citing Fed. R. Evid. 902(1), 902(5)). In its reply brief, Wells Fargo does not dispute that these documents are self-authenticating. *See* Historical Records Reply at 1 ("Plaintiff does not

28

dispute that certification may establish that an exhibit is a true copy of a record maintained in a government archive."); *id.* at 6-7 (challenging the 2023 Certification of Birth and the index of 1920 births on admissibility grounds, not for lack of authentication).

Turning to the admissibility of the delayed birth certificate, Wells Fargo argues that the certificate itself does not qualify as an ancient record under Federal Rules of Evidence 901(b)(8) and 803(16).  *Id.* at 2-3; *see* Fed. R. Evid. 901(b)(8) (providing for authentication of "a document or data compilation" that "(A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered."); Fed. R. Evid. 803(16) (providing a hearsay exception for "[a] statement in a document that was prepared before January 1, 1998, and whose authenticity is established").  The Second Circuit has indicated that a document authenticated on other grounds must still meet the authentication requirements of Rule 901(b)(8) in order to be admissible under Rule 803(16)'s ancient-records hearsay exception.  *See Fagiola v. Nat'l Gypsum Co.*, 906 F.2d 53, 58 (2d Cir. 1990).

The requirement that Wells Fargo focuses on is that the ancient record must be "in a condition that creates no suspicion about its authenticity," Fed. R. Evid. 901(b)(8)(A), and Wells Fargo argues that the delayed birth certificate cannot meet this requirement because it is undisputed that "the critical entry on DX 15—the alleged date of birth—is clearly overwritten," Historical Records Reply at 2.  *See also* Historical Records Opposition at 4 ("[I]t appears that a different birthday in May was at one point written on the document.").  "Although Rule 901(b)(8) requires that the documents be free of suspicion, that suspicion goes not to the content of the document, but rather to whether the document is what it purports to be." *United States v. Mandycz*, 447 F.3d 951, 966 (6th Cir. 2006) (citation omitted) ("The authenticity inquiry, then, turns on whether the document is what it purports to be, not its veracity." (internal quotation marks omitted)).  So while

"matters intrinsic to the item" like "changes in handwriting" are relevant, "[t]he focus . . . is not on whether there is reason to believe that the contents of the document or data compilation make untrustworthy assertions of facts." 31 Charles Allen Wright *et al.*, Federal Practice and Procedure Evidence § 7113 (2d ed. 2026). Here, Wells Fargo disputes whether the assertion of Catherine Cohen's birthdate is trustworthy, not whether the document itself is a delayed birth certificate certified by the Pennsylvania State Archives. *See* Historical Records Reply at 2 (objecting that "the central entry has been visibly altered without explanation" and that it is unclear "whether the January 1920 entry is the one the applicant actually wrote"). Because Wells Fargo "does not argue, much less prove," that the delayed birth certificate is not "what it purports to be," Wells Fargo's challenge of the document "goes to its weight and is a matter for the trier of fact." *Mandycz*, 447 F.3d at 966 (internal quotation marks omitted). So Catherine Cohen's delayed birth certificate itself is admissible.[6]

As Wells Fargo correctly presses, "[e]ven if the document were deemed admissible under Rule[s] 901(b)(8) and 803(16), that would not render each statement within it admissible for the truth." Historical Records Reply at 3; *see* Historical Records Opposition at 14 (not disputing that US Life must satisfy hearsay exceptions for the statements contained in the delayed birth certificate). The parties primarily dispute one statement in the document:[7] that Catherine Cohen

---

[6] Because the Court concludes that the delayed birth certificate is admissible as an ancient record, it need not consider US Life's argument that "[e]ven if the delayed birth certificate were not an ancient document, it is a record of vital statistics or, alternatively a record containing 'factual findings from a legally authorized investigation' by the Pennsylvania Department of Vital Records, admissible pursuant to Rules 803(8)(A)(iii) and 803(9)." Historical Records Opposition at 12-14; *see also* Historical Records Reply at 3-4 (arguing that the certificate is not admissible under these Rules).

[7] US Life argues that "[t]he balance of the information included in the delayed birth certificate all relates to the Commonwealth of Pennsylvania's legally authorized factual findings, per Rule 803(8)(A)," Historical Records Opposition at 8, 14, an argument which Wells Fargo does not appear to dispute, *see* Historical Records Reply at 4 ("U.S. Life relies on Rule 803(8)'s

"was born on January 29, 1920," which US Life claims "is admissible both as a statement by a party-opponent, per Rule 801(d)(2), and a statement about her birth, per Rule 804(b)(4)(A)." Historical Records Opposition at 8. But both hearsay rules turn on whether *Catherine Cohen herself* made that statement, a fact which US Life would have to prove by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration."); *United States v. Brinson*, 772 F.3d 1314, 1320 (10th Cir. 2014) ("Proponents of the evidence need only show by a preponderance of the evidence that the opposing party had made the statement."); Fed. R. Evid. 104(a). And as Wells Fargo also argues, "U.S. Life has not shown that the January 1920 entry is hers." Historical Records Reply at 4-5. Indeed, it is unclear whether Catherine Cohen wrote the January 1920 entry, the May 1921 entry, both, or neither. So the Court defers ruling on this aspect of Wells Fargo's request unless and until US Life explains how a preponderance of the evidence shows that Catherine Cohen herself stated in the delayed birth certificate that she was born on January 29, 1920.[8]

The Court also defers ruling on the admissibility of the 2023 Certification of Birth and the

---

presumption of admissibility for public records. But that presumption extends only to the agency's own findings—not to unverified third-party statements embedded in the record.").

[8] The Court does, however, disagree with Wells Fargo's argument that the party-opponent hearsay exception is unavailable to US Life because Wells Fargo "is a downstream intermediary, not Ms. Cohen's legal successor." Historical Records Reply at 5 (citing *Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.*, No. 19 Civ. 217 (SIL), 2023 WL 4564879, at *2-3 (E.D.N.Y. July 17, 2023)). The case on which Wells Fargo relies "held that Evidence Rule 801(d)(2) did not permit [a] 'privity' theory of admissibility," but the Supreme Court has since "amended Evidence Rule 801(d)(2)" to "allow[] a litigant to introduce an out-of-court statement against an opposing party that had obtained a claim derivatively from another entity if the rule would have allowed the statement's use against that other entity." *Insight Terminal Sols., LLC v. Cecelia Fin. Mgmt.*, 148 F.4th 869, 880-81 (6th Cir. 2025); *see Saugatuck*, 2023 WL 4564879, at *2-3 (rejecting the since-adopted privity theory).

index of 1920 births. US Life argues that those documents' statements that Catherine Cohen was born on January 29, 1920 are admissible under Federal Rules of Evidence 803(8) and 803(9) as a public agency's "factual finding[]," Fed. R. Evid. 803(8), or a public record of vital statistics, Fed. R. Evid. 803(9). *See* Historical Records Opposition at 15-16. But those Rules do not extend to "unverified third-party statements embedded in the record." Historical Records Reply at 4 (citing *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991)); *see* Fed. R. Evid. 805. And such a third-party statement, in turn, is hearsay and admissible only if US Life can prove by a preponderance of the evidence that Catherine Cohen herself made it. *See United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 464 (S.D.N.Y. 2017) ("Even if the investigative reports are admissible under Rule 803(8)—an analysis that need not be undertaken at this point—the underlying bank records must find an independent basis for their admissibility. Here, the Government improperly conflates the admissibility of the investigative reports with the admissibility of the records cited in such reports under the guise that the reports 'incorporate' the records." (internal citations omitted)). US Life further argues that these documents "would still be admissible for a non-hearsay purpose," namely to "confirm that the delayed birth certificate records the date as January 29, 1920, but not for the truth that Ms. Cohen was born on that date." Historical Records Opposition at 15-16. Yet "the mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice," *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994), with such prejudice being significant when the statement goes "directly to an important disputed issue in the case," *United States v. Kaiser*, 609 F.3d 556, 572-73 (2d Cir. 2010) (internal quotation marks omitted). The Court agrees with Wells Fargo that "a certified birth record and an official-looking index listing January 29, 1920" will likely "be understood by the jury as proof of that birthdate," Historical Records Reply at 7, one of two core

32

issues in this case. So the Court will wait until it becomes clear whether US Life can establish that the original statement for which these records are offered—whether or not for the truth of the matter asserted—was made by Catherine Cohen.

### 2. Orphanage Records

Wells Fargo also challenges DX 81 (Saint Faustina Kowalska Parish Baptism Register), DX 12 (Catherine Cohen's June 11, 1986 Certificate of Baptism), DX 13 (Catherine Cohen's November 11, 2022 Certificate of Baptism), and DX 24 (Child's Physical Records for Catherine Cohen). Historical Records Motion at 1 n.2, 12. Its challenge to those documents is similarly based on authentication and hearsay grounds. *Id.* at 3-10. The Court first addresses the Baptism Register and the two Certificates of Baptism (the "Baptismal Records"), before turning to Catherine Cohen's physical records from her childhood.

First, the Baptismal Records can be authenticated. Like with the delayed birth certificate, Wells Fargo argues that the Baptism Register cannot be authenticated under Rule 901(b)(8) because it "reflects a birth year entry that appears to have been altered from '1922' to '1920,' again with no explanation as to who made the change, when or why," thus "creat[ing] obvious 'suspicion' as to authenticity." *Id.* at 4-5; *see id.*, Exh. 9 (DX 81). But as with the delayed birth certificate, Wells Fargo disputes whether the assertion of Catherine Cohen's birth year is trustworthy, not whether the document itself is a Baptism Register issued by Saint Stanislaus Parish. *See supra* III.E.1. Wells Fargo further argues that Reverend Brian Van Fossen, who is affiliated with Saint Faustina Kowalska Parish, a "successor" of Saint Stanislaus Parish, "cannot supply personal knowledge of recordkeeping practices of long-defunct institutions or bridge decades of discontinuity in custody." Historical Records Motion at 5-6. But "it is not necessary to show a chain of custody for ancient documents. Rule 901(b)(8) merely requires that the document be found in a place where, if authentic, it would likely be." *United States v. Kairys*, 782

F.2d 1374, 1379 (7th Cir. 1986); *see United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998) ("Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence."). US Life represents that Reverend Van Fossen "will provide testimony laying the foundation for the register's status as an ancient document—*i.e.*, that the register is more than 20 years old and the circumstances surrounding his storage and retrieval of the register." Historical Records Opposition at 17. So long as he is able to do so, the Baptism Register can be authenticated and admitted as an ancient record. *See* Fed. R. Evid. 901(b)(8); Fed. R. Evid. 803(16). The "discrepanc[y]" in the Baptism Register "go[es] to the weight to be given the document[], not [its] admissibility." *Wilmington Tr., N.A. v. Segal*, No. 21 Civ. 1540 (PKC) (TAM), 2025 WL 2841618, at *4 (E.D.N.Y. Sept. 9, 2025). US Life further argues, and Wells Fargo does not dispute, that the 1986 and 2022 certificates of baptism can be authenticated: the former was obtained by Catherine Cohen's daughter, Marie Levitt, "to help with her mother's application for Social Security benefits" and "has already been authenticated through Ms. Levitt's deposition testimony, which will be introduced at trial," and "Rev. Van Fossen can authenticate the [latter], which he signed in his capacity as the parish's pastor." Historical Records Opposition at 19-20. So the Court rejects Wells Fargo's challenges to the Baptismal Records' authenticity.

As for admissibility, US Life argues that the Baptism Register's "statement that Ms. Cohen was born on January 29, 1920 is likewise admissible for its truth" under Federal Rule of Evidence 803(11), *id.* at 18, which excepts from hearsay "statement[s] of birth . . . contained in a regularly kept record of a religious organization," Fed. R. Evid. 803(11). The "case law is sparse" regarding this hearsay exception, *United States v. Jasso*, 568 F. Supp. 3d 742, 754 (S.D. Tex. 2021), but Wells Fargo appears to be incorrect that baptismal records "are not competent evidence of the date of birth," *contra* Historical Records Motion at 8-9; Historical Records Reply at 9. Rather, "Rule 803(11) is designed to *avoid* th[at] result[]," and is "intended to permit the introduction" of

34

"statements of persons other than religious officials" like "an annotation as to the birth date of a child supplied by the child's parent," given "the unlikelihood that false information would be furnished on occasions of this kind, *i.e.*, solemn religious occasions."  30B Charles Allen Wright *et al.*, Federal Practice and Procedure Evidence § 6913 (2026 ed.) (emphasis added) (internal quotation marks omitted) (citing Fed. R. Evid. 803(11) advisory committee's note).  Wells Fargo is, however, correct that "Rule 803(11) cannot be used as a shortcut to admit an unknown person's untested assertion simply because it was written in a religious record," Historical Records Reply at 9, because "to be admissible under Rule 803(11), a record of personal or family history must generally be based on the personal knowledge of the person who reported the information," 5 Weinstein's Federal Evidence § 803.13 (2026) (citing Fed. R. Evid. 803 advisory committee's note).  While Wells Fargo argues that "U.S. Life offers no evidence that the source" of the birthdate in the Baptism Register "had personal knowledge," Historical Records Reply at 9, the Court defers ruling on the statement's admissibility in the event US Life can provide such evidence.  *See* Fed. R. Evid. 803 advisory committee's note (explaining that firsthand knowledge "may appear from [the declarant's] statement or be inferable from circumstances"); *see also supra* III.E.1 (taking a similar approach with the delayed birth certificate).  And as with the 2023 Certification of Birth and index of 1920 births, the Court will wait until it becomes clear whether US Life can establish that the original statement for which the other two Baptismal Records are offered—whether or not for the truth of the matter asserted—is admissible, notwithstanding US Life's contention that it seeks to "introduce the [1986 and 2022] baptism certificates—not to establish that Ms. Cohen's true date of birth was January 29, 1920—but to verify that the parish considers that to be the date recorded in its baptism register," Historical Records Opposition at 19.

The Court takes the same approach with DX 24, Catherine Cohen's physical records.  On authentication, Wells Fargo again complains that the records cannot be authenticated as ancient

documents because they "contain internally inconsistent birthdates" and Reverend Van Fossen "lacks knowledge of how the records were created or maintained." Historical Records Reply at 10; *see* Historical Records Motion, Exh. 7 (DX 24). But as already explained, the Court finds those grounds insufficient to exclude the physical records for lack of authentication, provided that—as proffered—Reverend "Van Fossen will be able to lay the foundation to authenticate and admit these documents as ancient records," Historical Records Opposition at 20. And as with the statements of Catherine Cohen's purported birthdate in the delayed birth certificate and the Baptism Register, the Court defers ruling on whether the statements of her birthdate in the physical records avoid the hearsay bar, in this instance either as a party-opponent statement under Rule 801(d)(2) or alternatively as an exception under Rule 803(4) for statements "made for[] and . . . reasonably pertinent to[] medical diagnosis or treatment," Fed. R. Evid. 803(4). As Wells Fargo points out, "[n]othing in DX 24 identifies who supplied Ms. Cohen's birthdate, whether that person had personal knowledge, or whether the information was provided for purposes of diagnosis or treatment rather than copied from prior records." Historical Records Reply at 10-11; *see* 5 Weinstein's Federal Evidence § 803.06 (2026) ("To fall within the [medical treatment and diagnosis] exception, the statement must be obtained from the person seeking treatment, or from someone with a special relationship to the person seeking treatment, such as a parent."). The Court, however, will give US Life further opportunity to show why the requirements for admissibility are met.

### F.    Judicial Notice Motion

US Life asks this Court to take "judicial notice of: (i) the dates on which the U.S. Social Security Administration [(the 'SSA')] determined Catherine Cohen was born and eligible for retirement benefits, (ii) the date on which the U.S. Centers for Medicare and Medicaid Services [(the 'CMS')] determined that Ms. Cohen was entitled to Medicare Part A coverage, and (iii) the

36

age-related criteria required for a person to be entitled to those benefits." Judicial Notice Motion at 4. The Court grants this motion in part and denies it in part.

The determinations of the SSA and the CMS that an individual is entitled to retirement and Medicare benefits turn on the operation of federal law. In its Judicial Notice Motion, US Life describes this "statutory and regulatory framework," *id.* at 3-5, and Wells Fargo does not challenge US Life's description. *See* Judicial Notice Reply (correctly observing that "Wells Fargo does not contest" the "interpretation" of "statutes and regulations cited in US Life's opening brief"); *see generally* Judicial Notice Opposition. That framework boils down to the following: (1) for individuals like Catherine Cohen who were born before 1938, one's early retirement age for purposes of Social Security old-age insurance benefits is 62, and one's full retirement age is 65, 42 U.S.C. §§ 402(a), 416(*l*)(1)(A), (*l*)(2); (2) those who apply for old-age insurance benefits after hitting the early retirement age of 62 but before hitting the full retirement age of 65 are entitled only to reduced benefits, *id.* § 402(q)(1), (q)(9), while those who apply for benefits after hitting the full retirement age of 65 may receive retroactive benefits for up to the six months preceding their application, so long as those six months occurred after they turned 65, *id.* § 402(j)(1)(B), (j)(4)(A); and (3) a person becomes automatically entitled to Medicare Part A coverage if she is at least 65 years old and has become entitled to Social Security's old-age insurance benefits, *id.* § 426(a); 42 C.F.R. § 406.6(b)(3). Finally, the SSA "will ask for evidence of age which shows [an old-age benefits applicant's] date of birth," 20 C.F.R. § 404.715, a requirement that US Life claims—and Wells Fargo does not dispute—has been in place from 1978 onwards, *see* Judicial Notice Motion at 3.

The SSA provided US Life with "Payment Record Screen Shots and Translation Re: Catherine Cohen." Dkt. 164 ("Judicial Notice Decl."), Exh. 2 ("SSA Database"). That screenshot indicates that Catherine Cohen "filed [an] application for benefits" on "5/15/1986," the "[m]onth

37

and year of [her] first month of entitlement" was "11/1985," and her "Full Retire Age" was tied to the date "01/1985." *Id.* The screenshot also indicates that her "Date of Birth = 1/29/1920." *Id.* In another response to US Life, the SSA indicated that it "ha[s] Ms. Cohen's date of birth listed as 01/29/1920" and that the SSA's "records indicate [it] established her date of birth but do not indicate what evidence was used." Judicial Notice Decl., Exh. 1 ("SSA Letter"). Finally, US Life has produced two copies of "Medicare Health Insurance" cards in Catherine Cohen's name indicating that the "Part A" "Effective Date" was "11-01-1985." Judicial Notice Decl., Exh. 3 ("Medicare Cards").

"Based on the applicable statutes" and regulations, US Life asserts that "the Court (and the jury) can draw several conclusions" from the SSA's and the CMS's "determination of [Catherine Cohen's] entitlement to benefits." Judicial Notice Motion at 4-5. "First, given that the SSA concluded that Ms. Cohen reached her full retirement age in January 1985, the SSA therefore determined that Ms. Cohen reached the age of 65 in that month." *Id.* at 4. "Second, given that the SSA received Ms. Cohen's application in May 1986, yet determined that she was entitled to benefits as of November 1985, the SSA determined that Ms. Cohen was entitled to six months of retroactive benefits based on the date of birth she provided." *Id.* And third, "Ms. Cohen became entitled to Medicare Part A coverage as of the same month that she became entitled to Social Security old-age insurance benefits: November 1985," meaning that the CMS determined "she was at least 65 years old" at that time. *Id.* at 5. From these conclusions, US Life argues that the Court must take judicial notice, under Federal Rule of Evidence 201, of four facts:

(1) The SSA determined that Catherine Cohen was born on January 29, 1920, in connection with the SSA's determination of her application for old-age insurance benefits ("Fact One");

(2) The SSA determined that Catherine Cohen reached her full retirement age in January 1985, meaning that the SSA determined that Catherine Cohen turned 65 years old during that month ("Fact Two");

(3) Because of the SSA's determination that Catherine Cohen was born on January 29, 1920, the SSA awarded her six months of retroactive old-age insurance benefits, starting as of November 1985 ("Fact Three"); and

(4) The CMS determined that Catherine Cohen was entitled to Medicare Part A hospital insurance benefits as of November 1985, meaning that the CMS determined that Catherine Cohen was at least 65 years old during that month ("Fact Four").

Judicial Notice Motion at 1-2; *see* Dkt. 151 at 33 (US Life's proposed jury instructions instructing the jury to "accept [these facts] as true").

"Under Federal Rule of Evidence 201(b), a court may take judicial notice of 'a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *CITGO Petro. Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 387 (2d Cir. 2025) (quoting Fed. R. Evid. 201(b)). As "a general matter, . . . reports of administrative bodies" are "sources whose accuracy cannot reasonably be questioned." *Id.* at 388-89 & n.8 (internal quotation marks omitted). But "[b]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Id.* at 387-88 (citation omitted). So even if a fact comes from a "source[] whose accuracy cannot reasonably be questioned, [the] fact must itself meet a 'high degree of indisputability' to be judicially noticeable." *Id.* at 379-80 (quoting Fed. R. Evid. 201 advisory committee's notes); *see also id.* at 389 (approving a district court taking "pains to distinguish between statements appropriate for judicial notice and those that were not" "rather than taking judicial notice of *every* fact contained in the challenged documents simply because the documents themselves were reliable"). When a party requests that a fact be judicially noticed and "supplie[s]" the Court "with the necessary information" to determine that the fact meets this standard, the Court "must take judicial notice" of it and "instruct the jury to accept the noticed fact as conclusive." Fed. R. Evid. 201(c)(2), (f).

1.      **The Court Takes Judicial Notice of the SSA's and the CMS's Determinations About When Catherine Cohen Turned 65.**

Facts Two and Four are judicially noticeable. First, these facts come from sources—the SSA Database and Medicare Cards—whose accuracy cannot reasonably be questioned. "Courts may take judicial notice of some public records, including the records and reports of administrative bodies." *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (internal quotation marks omitted); *accord CITGO Petro.*, 158 F.4th at 388-89 & n.8. While Wells Fargo challenges the SSA Database as "merely a printout from [the] SSA," Judicial Notice Opposition at 9, the Database was certified by a records custodian from the SSA as "Social Security Administration Records" which were "kept in the course of a regularly conducted business activity" and "made by the regularly conducted business activity as a regular practice," SSA Database, a certification which suffices under Federal Rules of Evidence 803(6) and 902(11), *United States v. Conde*, 134 F.4th 82, 85-92 (2d Cir. 2025). And although Wells Fargo claims that there "are no official CMS public records," it fails to dispute that these are indeed "cop[ies] of Ms. Cohen's Medicare cards," Judicial Notice Opposition at 10, and that a Medicare card is "issued to an individual who is entitled to benefits under [Medicare] part A," 42 U.S.C. § 405(c)(2)(C)(xiii).

Next, the following premises on which Facts Two and Four are based are indisputable: (a) "the SSA determined that Ms. Cohen reached her full retirement age in January 1985," (b) the SSA "awarded her old-age insurance benefits starting as of November 1985," (c) "the CMS determined that Ms. Cohen became eligible for Medicare Part A benefits in November 1985," and (d) based on the applicable legal framework, this meant that both agencies determined that Catherine Cohen was sixty-five years old by those points in time. Judicial Notice Reply at 4-5. Wells Fargo does not and cannot dispute the first three premises. *See* Judicial Notice Opposition at 8 (disputing Catherine Cohen's birthdate on the Medicare Cards and the authentication of such evidence, but not that they reflect she was entitled to Medicare Part A benefits as of November 1985), 9

40

(acknowledging that the SSA database "indicates when Ms. Cohen applied for and received SSA benefits"). And the fourth premise is indisputable as well, based on the statutory and regulatory framework on which the parties agree. *See* 21B Charles Allen Wright *et al.*, Federal Practice & Procedure Evidence § 5103.3 (2d ed. 2026) ("[T]here are instances when 'law' is used as a 'fact' of the case, as when it is part of a chain of circumstantial evidence to prove a 'fact' in the case. . . . If . . . the court uses judicial notice to take the 'fact' away from the jury, then notice of law should comply with Rule 201."). As US Life points out, "the average juror likely will not understand the intricate statutory and regulatory scheme governing a person's full retirement age or the age at which a person becomes eligible for Medicare benefits," so "[b]y providing judicial notice, the Court will have performed its function of interpreting that law for the jury, [and] they will understand the import of the evidence US Life has presented." Judicial Notice Reply at 10. This accords with the overall purpose of Rule 201, which is to "promote judicial convenience and economy" and avoid the "obvious cost" in "time, energy and money[] of establishing adjudicative facts in an adversarial proceeding," thus "dispensing with formal proof when a matter is not really disputable." 1 Weinstein's Federal Evidence § 201.02 (2026).

Finally, Wells Fargo's footnote assertion of prejudice fails to persuade, *see* Judicial Notice Opposition at 11 n.4, as US Life concedes that "Wells Fargo remains free to present evidence that . . . these determinations were inaccurate, . . . that Ms. Cohen should not have been awarded benefits at these times," and of course that she was ultimately "born on May 10, 1921," Judicial Notice Reply at 5. So "[t]he Court takes judicial notice of the [SSA's and the CMS's] determination[s]—it is not disputable that [the] SSA [and the CMS] made th[ose] determination[s]." *Chimis v. Peoples Gas Light & Coke Co.*, No. 16 CV 9275, 2018 WL 3619370, at *4 n.10 (N.D. Ill. July 30, 2018) (taking judicial notice of the fact that the SSA determined the plaintiff was disabled). And it should go without saying that these judicially noticed

determinations do not make Catherine Cohen's birthdate "an indisputable fact for purposes of this litigation." *Id.* (making that point as to the plaintiff's disability). *Contra* Judicial Notice Opposition at 8 ("[T]he reality is U.S. Life is seeking judicial notice of a disputed fact—when Ms. Cohen was born.").[9]

### 2.    The Court Does Not Take Judicial Notice of the Fact That the SSA Determined Catherine Cohen Was Born on January 29, 1920.

The Court, however, finds that Facts One and Three—which both include the declaration that the "SSA determined that Ms. Cohen was born on January 29, 1920," Judicial Notice Motion at 1—fail to meet the "high degree of indisputability to be judicially noticeable." *CITGO Petro.*, 158 F.4th at 379 (internal quotation marks omitted). The parties argue about whether the fact of the "SSA's determination" of Catherine Cohen's January 29, 1920 birthdate is "subject to reasonable dispute" by debating the finer points of the SSA's "Numident" database, which purportedly "reflects that Ms. Cohen was born on May 10, 1921," Judicial Notice Opposition at 8, and its "Master Beneficiary Record," which purportedly lists that Catherine Cohen was born on January 29, 1920, Judicial Notice Reply at 2-4. But this debate is besides the point, because the SSA *itself* has undercut the assertion that it determined Catherine Cohen was born on January 29, 1920, even in connection with her application for old-age benefits. Indeed, the SSA made the

---

[9] While Wells Fargo asserts the Court "should also take notice of similar facts that are evident from the face of various other public records," all of those facts are assertions that "Ms. Cohen was born on May 10, 1921." Judicial Notice Opposition at 12-13; *see* Judicial Notice Reply at 10 ("The records about which Wells Fargo seeks judicial notice also differ from US Life's records because they clearly identify Ms. Cohen's supposed date of birth, without the need for any interpretation by the Court through judicial notice."). As discussed below, *see infra* III.F.2, the Court will not take judicial notice of the fact that the SSA determined that Ms. Cohen was born on January 29, 1920, so it will not take judicial notice of Wells Fargo's facts, either. To the extent, however, that any of Wells Fargo's facts fit the parameters of this Opinion and Order, Wells Fargo may seek judicial notice of them, too. *See* Fed. R. Evid. 201. And the parties of course are free to stipulate to the facts as they see fit. *See* 1 Weinstein's Federal Evidence § 201.35 (2026) (explaining that a stipulation is a "[p]rocedure[] other than judicial notice [which] may be used to establish matters of fact as indisputable").

tentative remark that its "records indicate [it] established her date of birth but do not indicate what evidence was used." SSA Letter. So US Life's assertion that the SSA determined that Catherine Cohen was born on the specific date of January 29, 1920, in connection with the SSA's consideration of her application for old-age insurance benefits, does not meet "the high degree of indisputability to be judicially noticeable." *CITGO Petro.*, 158 F.4th at 379 (internal quotation marks omitted). It is thus inappropriate to "deprive" Wells Fargo of "the opportunity to use rebuttal evidence, cross-examination, and argument" to challenge whether the SSA in fact determined that Catherine Cohen was born on January 29, 1920. *CITGO Petro.*, 158 F.4th at 387-88 (internal quotation marks omitted); *see* 1 Weinstein's Federal Evidence § 201.10 (2026) ("[J]udicial notice is not appropriate unless the matter is beyond reasonable controversy. Only in clear cases is it fair to dispense with the traditional methods of proof—rebuttal evidence, cross-examination, [etc.]." (footnote omitted)). Indeed, the Second Circuit has warned that "district courts should be hesitant to utilize Rule 201 to 'fill in the blanks' for a case that rests on highly specific details," *United States v. Bryant*, 402 F. App'x 543, 545 (2d Cir. 2010) (summary order), like Catherine Cohen's "*exact date*" of birth, Judicial Notice Reply at 10 (emphasis in original). Just so here. Of course, US Life remains free to present this evidence and argue to the jury that the SSA made this determination. But whether the SSA in fact made the determination (and of course the reliability of such a determination) is a question the jury must decide.[10]

---

[10] While the Court takes issue with Fact Three's language that the SSA awarded Catherine Cohen six months of retroactive old-age benefits as of November 1985 "[b]ecause of the SSA's determination that Ms. Cohen was born on January 29, 1920," Judicial Notice Motion at 1, it observes that US Life could reformulate that fact in a way that would render it judicially noticeable like Facts Two and Four. *See* 42 U.S.C. § 402(j)(1)(B), (j)(4)(A) (allowing for six months of retroactive benefits so long as the applicant was at least sixty-five years of age during those six months). What is more, US Life's logic for taking judicial notice of Facts Two and Four but not Wells Fargo's governmental records—that the "average juror likely will not understand the intricate statutory and regulatory scheme governing a person's full retirement age or the age at which a person becomes eligible for Medicare benefits," Judicial Notice Reply at 10—does not

G.      **Shelley Motion**

    1.      **Legislative Purpose Testimony**

US Life "seeks to exclude testimony by" Wells Fargo's expert, Stanley Shelley, "concerning the supposed regulatory or legislative purpose of misstatement-of-age provisions, including testimony characterizing such provisions as designed to prevent 'forfeitures' or to mandate a particular outcome in this case." Shelley Motion at 2. The Court agrees with US Life.

"It is well-settled in this Circuit that expert opinions as to the interpretation and application of domestic law are inadmissible." *Thomsen v. Kefalas*, No. 15 Civ. 2688 (BCM), 2018 WL 1508735, at *18 (S.D.N.Y. Mar. 26, 2018). That includes—as this Court has previously held—"testimony on . . . the policies behind the enactment of . . . statutes." *Graterol-Garrido v. Vega*, No. 20 Civ. 4209 (JPC), 2021 WL 1541455, at *3 (S.D.N.Y. Apr. 20, 2021); *accord FTC v. Quincy Bioscience Holding Co.*, 646 F. Supp. 3d 518, 529 (S.D.N.Y. 2022) ("The experts may also not opine on . . . Congress' intent in passing certain laws."); *United States v. Hausa*, No. 12 Cr. 134 (BMC), 2017 WL 354197, at *2 n.2 (E.D.N.Y. Jan. 24, 2017) ("[D]ivining the intent of Congress would not be a proper subject for testimony by an expert, whereas statutory interpretation is a proper task for the Court."); *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 501-02 (S.D.N.Y. 2009) ("[P]roposed testimony concerning Congress and the EPA's intent or motives is inadmissible.").

To be sure, while "the proper province for the expert's testimony is not legal opinion or interpretation or application of the law," "[e]xpert testimony can also be of assistance to the court when the case involves understanding a complex regulatory structure or scheme." *In re Golden*, No. 16-40809-ess, 2022 WL 362913, at *13 (Bankr. E.D.N.Y. Feb. 4, 2022). And indeed, in the

---

apply to taking judicial notice of the fact that the SSA determined Catherine Cohen's exact birthdate, as "the date of birth" contained in the SSA Database "is apparent on its face," *id.*

Summary Judgment/*Daubert* Opinion, the Court held that Shelley could "identif[y] the regulatory background for misstatement of age provisions and how those provisions typically operate," because such testimony was "appropriate as providing legal context for an unfamiliar document." *Wells Fargo*, 2025 WL 2220948, at *31. Wells Fargo gloms onto this language to suggest that the Court already held this exact testimony was admissible and that US Life's request is a disguised reconsideration motion. Shelley Opposition at 3-5. But the Court's holding was subject to the caveat that Shelley's testimony must be "limited to the historical context and background of documents" and may not "opin[e] on legal issues or offer[] legal interpretations." *Wells Fargo*, 2025 WL 2220948, at *25, *31. Indeed, the Court also excluded "Shelley's interpretation of New York insurance law," *id.* at *31, and, as US Life observes, the Court "did not define regulatory background in a manner that would permit Mr. Shelley to testify that misstatement of age provisions are intended to 'protect policyholders from unfair forfeitures' or that they typically 'include making a fair adjustment to the death benefit rather than eliminating it entirely,'" Shelley Reply at 1-2 (alterations adopted).

Such testimony about legislative intent is not Shelley's place to offer as an expert witness, and would be irrelevant and confusing to boot. As US Life argues, Shelley is "suggesting that [Wells Fargo's] result is mandated by statute," running a risk that "by framing his testimony in terms of legal requirements and statutory intent, the jury will mistakenly treat his testimony as an authoritative statement of what the law requires." *Id.* at 5-6.[11] The issue is not whether US Life's interpretation of the Policy is in line with a misstatement-of-age statute, but simply what the parties intended when the Policy was agreed to. *See Wells Fargo*, 2025 WL 2220948, at *11 n.8 (rejecting

---

[11] And such a risk is heightened given that this would be expert testimony. *See Daubert*, 509 U.S. at 595 ("Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." (internal quotation marks omitted)).

"the flawed premise that the precise language in the Misstatement of Age Provision is required by statute" and explaining that "the provision here is agreed-upon" such that the parties' "intent is manifested by [the provision's] writing").   While Wells Fargo cites a case in which the New York Court of Appeals discussed the historical background of a certain exclusion that had once been required by state law, Shelley Opposition at 6, that court held only that the particular language in the exclusion was ambiguous without resolving that ambiguity through extrinsic evidence, let alone relying on the purpose of the state law to do so.   *See Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15 (N.Y. 2003).   The "basic tenets of contract interpretation" prioritize "the parties' intent," not the legislature's.   *Ministers & Missionaries Ben. Bd. v. Snow*, 45 N.E.3d 917, 922-23 (N.Y. 2015); *cf. Faulkner v. Nat'l Geo. Soc'y*, 452 F. Supp. 2d 369, 376 (S.D.N.Y. 2006) ("[L]egislative history generally is irrelevant to contract interpretation where [the] court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." (internal quotation marks omitted)).

US Life concedes that Shelley may "explain[] that (i) life insurance policies always (or often) include [misstatement-of-age provisions], (ii) most or all states have insurance laws requiring such provisions, (iii) New York's Insurance Law includes a specific misstatement of age statute, and (iv) misstatement of age provisions generally operate to adjust the death benefit, either higher or lower, to account for the true cost of insurance for the insured's correct age."   Shelley Reply at 2.   Such testimony would be helpful by explaining what a misstatement-of-age provision *is*.   Shelley may generally testify within those bounds, so long as he avoids "testimony about regulatory purpose that seeks to tell the jury what result to reach."   *Id.*   The Court thus grants US Life's request.

### 2.   Universal Requirement Testimony

While US Life also "seeks to exclude testimony asserting 'universal requirements' of

46

misstatement-of-age provisions," Shelley Motion at 2, Wells Fargo has since clarified that Shelley will merely state that "misstatement of age provisions are universally required" without testifying "regarding the specific requirements of particular statutes," Shelley Opposition at 11. US Life has indicated that it agrees such testimony would be appropriate. *See* Shelley Reply at 2 (suggesting that testimony that "most or all states have insurance laws requiring such provisions," including that New York "includes a specific misstatement of age statute," is "helpful"). So the Court denies this request without prejudice as moot.

### 3.    Fair Adjustment Testimony

US Life "seeks to preclude testimony [from Shelley] suggesting that misstatement-of-age provisions universally require a 'fair' adjustment or categorically prohibit a zero-dollar adjustment." Shelley Motion at 2. Wells Fargo, for its part, asserts that testimony that "the way misstatement of age provisions typically operate is to make a fair adjustment of the death benefit rather than entirely eliminating it" is "the precise testimony that the Court held Mr. Shelley is permitted to offer in its *Daubert* ruling." Shelley Opposition at 8 n.2. But all this Court said on the matter is that how such "provisions typically operate" is appropriate "legal context," *Wells Fargo*, 2025 WL 2220948, at *31, and US Life's motion reflects its understanding of that holding, *see* Shelley Motion at 13 ("Mr. Shelley may be permitted to testify regarding the mechanical process of typical misstatement of age adjustments made in the ordinary course."). But the Court certainly did not permit any testimony that such provisions usually result in fair adjustments rather than eliminations. Such testimony would "opine[] on the proper application of the Policy's misstatement of age provision [and] attempt[] to explain how the misstatement of age provision is supposed to be applied under the Policy," which is an "impermissible area" for an expert like Shelley to wade into. *Wells Fargo*, 2025 WL 2220948, at *30 (internal quotation marks omitted). And still more, it is unhelpful: as US Life puts it, "[t]he mechanics of how a misstatement of age

47

adjustment works are not a question of fairness, but of contractual terms." Shelley Motion at 13. The Court thus grants US Life's request.

### 4.      Custom-and-Practice Testimony

US Life "seeks to exclude Mr. Shelley's proposed industry custom-and-practice testimony concerning how insurers allegedly would apply a misstatement-of-age provision when no cost-of-insurance rate exists for the insured's correct age." Shelley Motion at 2. The Court grants this request for the same reasons it grants Wells Fargo's request to exclude Sarathy's custom-and-practice testimony. *See supra* III.C.3.

US Life wanted Sarathy to "testify at trial that as a matter of industry custom and practice and settled actuarial principles, cost of insurance rates are not imputed or extrapolated where they do not exist for an insurance product," Sarathy Opposition at 15, but as explained, "the admission of custom or usage evidence requires more precision than" that, *Wells Fargo*, 2025 WL 2220948, at \*28 (internal quotation marks omitted). *See supra* III.C.3. Wells Fargo wants Shelley to testify to the flip side: that "it has become an accepted practice to, where a cost of insurance rate or premiums does not otherwise exist for the insured's correct age, perform an extrapolation of the cost of insurance rate in order to make a fair adjustment of the death benefit." Shelley Opposition at 15. While Wells Fargo complains that faulting Shelley for not being "personally . . . involved in the specific situation where the insured's 'correct age' was over 100 and the insurer claimed not to have a rate for such age . . . tak[es] an overly-narrow view of the relevant custom and practice," *id.* at 14, it fails to explain why this view results in excluding Sarathy's testimony but not Shelley's.

Indeed, like Sarathy, Shelley admits to lacking any knowledge of an independent custom and practice in these circumstances. *See, e.g.*, Dkt. 167, Exh. 4 (Shelley deposition transcript) at 199:7-200:7 (A:  Custom and practice is we follow the contract and . . . what the law says. . . . Q:  Okay.  So I want to be very clear.  Your opinion is that the custom and practice in the life

insurance industry is to follow what the state law and contract require as it relates to misstatements of age?  A:  That would be correct.  That is what it is.").  While Wells Fargo tries to point to a conclusory line from Shelley that "custom and practice in the industry" dictates "that the misstatement of age adjustment does not yield a zero dollar death benefit," Shelley Opposition at 16, Shelley's own immediately following testimony confirms that this was based on his view that companies follow the contract and the law, and not because he was aware of other industry practice in like circumstances.  *Id.*, Exh. 3 (Shelley deposition transcript) at 283:8-284:16 ("A:  I have not hit the situation, but I can't think of the logic in . . . it is not custom and practice throughout the industry that they owe no money.  That is exactly why they have regulations or why they have policies that have information in the contract.  So you need to adhere to those rules.  Q:  Okay.  So just to . . . unpack that, you have not encountered a situation personally, and you are not aware of a situation where a misstatement of age provision adjustment would need to be made and the insured is over age 100.  Is that yes or no?  A:  The answer is yes.  I am not aware of one.").  So like Sarathy, Shelley's testimony cannot meet the requisite custom-or-practice threshold to submit such testimony to the jury, *see supra* III.C.3, especially when considering that his "forfeiture" testimony, *see supra* III.G.1, comes close to resurrecting the rejected legal argument "that the death benefit cannot be reduced to zero because New York law requires exclusions from coverage to be clear and unmistakable in a policy," *Wells Fargo*, 2025 WL 2220948, at *17.

Ultimately, neither Sarathy nor Shelley can offer custom-and-practice testimony "[g]iven the *sui generis* nature of this fact pattern."  Shelley Motion at 19.  The Court already indicated that "the parties may face some difficulty establishing that testimony from these experts satisfies th[e] test" for industry custom and practice.  *Wells Fargo*, 2025 WL 2220948, at *19.  The experts failed that test, so the Court grants US Life's request.

49

**H.      Miscellaneous Motion**

In US Life's motion to preclude Wells Fargo "from admitting into evidence various exhibits identified on its exhibit list, deposition testimony, and any related evidence or argument," Miscellaneous Motion at 1, US Life raises a hodgepodge of evidentiary challenges.  The Court considers each in turn.

**1.      Marie Levitt's Deposition Testimony on Documents**

US Life seeks to exclude "[d]eposition testimony during which Ms. Cohen's adult daughter, Marie Levitt, read into the record various documents that she had never seen and about which she had no personal knowledge."  Miscellaneous Motion at 1.  There is no dispute that during Levitt's deposition, Wells Fargo had her testify about various documents to which she lacked personal knowledge in order to establish that "the date given by [Catherine Cohen] [was] not a surprise to [Levitt]."  *E.g.*, Dkt. 170 ("Miscellaneous Decl."), Exh. 1 ("Levitt Dep. Tr.") at 31:20-32:8.  Wells Fargo claims that Levitt's testimony will "corroborate that the various records include the date of birth that [] Levitt understood her mother used throughout her life," and that Levitt "has personal knowledge" of her mother's "consistent usage of the May 10, 1921 birthdate."  Miscellaneous Opposition at 6.  But "US Life has not sought to exclude Ms. Levitt's testimony, separate from these documents, that Ms. Cohen told Ms. Levitt and others that her birthday was May 10, 1921," and "Ms. Levitt can provide that testimony" so long as she does not "testify about the contents of documents about which she has no personal knowledge."  Miscellaneous Reply at 3.  To the extent Wells Fargo does not seek to have Levitt testify about those documents' contents, US Life's request is denied without prejudice as moot.

But if Wells Fargo does seek to have Levitt so testify, whether through live trial testimony or her deposition, the Court agrees with US Life and thus grants its request.  A witness may not read exhibits into the record in a way that serves "as a third-party corroborator of hotly contested

50

facts of which he had no personal knowledge." *Grant v. Lockett*, No. 19-469, 2021 WL 5816245, at *3 (2d Cir. Dec. 8, 2021) (summary order); *see, e.g.*, *Picard v. Rar Entrepreneurial Fund, Ltd.*, No. 20 Civ. 1029 (JMF), 2021 WL 827195, at *9 (S.D.N.Y. Mar. 3, 2021) ("Without a proper foundation from a witness with personal knowledge, the Court cannot and will not consider the document."). As US Life explains, "[i]f any of these documents themselves are authentic and otherwise admissible, then Wells Fargo can attempt to move them into evidence through other means." Miscellaneous Motion at 3.[12]

### 2.    Passport Records, Joseph Mozala's Affidavit, and Carol Cohen's Declaration

On that score, US Life seeks to exclude various "[d]ecades-old documents that," it argues, "neither Ms. Levitt nor any other trial witness can authenticate." *Id.* at 1. There are three groups of records at issue: (1) Catherine Cohen's passport records (PX 3); (2) a March 1943 affidavit from Catherine Cohen's brother, Joseph Mozala (PX 10); and (3) a 2024 declaration from one of Catherine Cohen's daughters, Carol Cohen (PX 16). *See id.* at 4. The Court takes each in turn.

First, as to the passport documents, US Life acknowledges that Walls Fargo may "call a representative from the Department of State to testify at trial if it wishes to introduce these documents." Miscellaneous Reply at 1; *see* Miscellaneous Opposition at 1-2 & n.2 ("To the extent the Court requires such certification or testimony, Plaintiff will present a Department of State custodian at trial to establish authenticity. Plaintiff has revised its witness list to include a custodian from the U.S. Department of State to authenticate these records at trial if necessary."). The Court thus denies this aspect of the request without prejudice as moot, and Wells Fargo should

---

[12] Wells Fargo argues that "U.S. Life's designation of [] Levitt's testimony concerning [a] baptismal certificate enables Plaintiff to designate similar testimony concerning other records related to [Catherine] Cohen." Miscellaneous Opposition at 8 (citing Fed. R. Civ. P. 32(a)(6); Fed. R. Evid. 106). But Levitt testified that she obtained that baptismal certificate herself, so she has personal knowledge of it. *See* Levitt Dep. Tr. at 50:5-16 ("I recall getting [a baptismal certificate] through the church, St. Stanislaus."); Miscellaneous Reply at 3 n.1. Because it makes a false equivalence, Wells Fargo's argument fails.

properly authenticate at trial any passport records it seeks to offer.

Second, while Mozala's affidavit can be authenticated, its admissibility is unclear. As for authentication, Wells Fargo argues that because the affidavit was notarized, it is self-authenticating under Federal Rule of Evidence 902(8), Miscellaneous Opposition at 3, which authenticates a document "accompanied by a certificate of acknowledgement that is *lawfully executed* by a notary public," Fed. R. Evid. 902(8) (emphasis added). US Life responds that the notarized document was not lawfully executed because it lacked stock language that the notary personally knew the signatory or verified his identity. Miscellaneous Reply at 1-2; *compare* Dkt. 200, Exh. 1, § 7(1) ("An officer taking the acknowledgment shall endorse thereon or attach thereto a certificate substantially in one of the following forms: . . . [Name], known to me (or satisfactorily proven) to be the person whose name [is] subscribed to the within instrument . . . ."), *with* Miscellaneous Decl., Exh. 3 (PX 10) (lacking this language). Even if that is the case, however, the affidavit can be authenticated under Federal Rule of Evidence 901, as the document itself is "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); *see* Fed. R. Evid. 901(b)(4) ("The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."). The notarization, even if not technically to the letter, "show[s] that the document is what it purports to be, with no evidence in the record suggesting otherwise." *Ohio Cas. Ins. Co. v. Beall*, No. 3:23-cv-00060-TES, 2024 WL 3993851, at *6 (M.D. Ga. Aug. 29, 2024) (internal quotation marks omitted) (finding that the "light burden of authentication under Federal Rule of Evidence 901" was met even if the document at issue was "not self-authenticating under Federal Rule of Evidence 902(8)"); *see United States v. Gonzalez*, 144 F.4th 396, 406 (2d Cir. 2025) (emphasizing that Rule 901 "does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence," and further explaining that "a document may be authenticated by distinctive characteristics of the document

52

itself" (internal quotation marks omitted)).

But even if Mozala's affidavit can be authenticated, the parties dispute whether it is admissible as an ancient document. *Compare* Miscellaneous Opposition at 3 n.3 ("While Rule 902(8) addresses authentication only, Mr. Mozala's 1943 affidavit is independently admissible under the ancient documents exception to the hearsay rule."), *with* Miscellaneous Reply at 2 ("Even if [Mozala's] purported affidavit was self-authenticating, it is still inadmissible as hearsay without a sponsoring witness."). And indeed, the Second Circuit has indicated that even where documents were "authenticated under Rule 901(b)(3) [and] (4), that ruling did not bring the contents of the documents within an exception to the hearsay rule" unless the evidence could also be "authenticated as ancient documents under Rule 901(b)(8), in which case they [would] automatically fall within the ancient document exception to the hearsay rule, Rule 803(16)." *Fagiola*, 906 F.2d at 58. Such a finding, in turn, requires "evidence as to where the documents were found," *id.*, because Rule 901(b)(8)(B) calls for evidence that the document "was in a place where, if authentic, it would likely be," Fed. R. Evid. 901(b)(8)(B). US Life asserts that "Wells Fargo does not have a sponsoring witness to provide the information required by Rule 901(b)(8)," so the "affidavit must be excluded as hearsay," Miscellaneous Reply at 2, but because the motion *in limine* focused on authenticating this document, not on whether it should be excluded on hearsay grounds, the Court will allow Wells Fargo the opportunity to put forward a sponsoring witness before excluding Mozala's affidavit as hearsay. *But see* Miscellaneous Motion at 6 n.4 (suggesting that Mozala's "purported affidavit was produced to the parties by Ms. Levitt's sister, Carol Cohen, who has not been identified by either party as a trial witness"). Because Mozala's affidavit can be authenticated, the Court denies this part of the request, but US Life may renew its objection to admitting the affidavit should Wells Fargo not satisfy a hearsay exception. *Cf. Luce*, 469 U.S. at 41 (explaining that a ruling on a motion *in limine* "is subject to change when the case unfolds,

particularly if the actual testimony differs from what was contained in the [party's] proffer").

Third, and finally, while US Life mentions Carol Cohen's declaration in passing, *see* Miscellaneous Motion at 4, it offers no actual argument for why that declaration should be excluded as unable to be authenticated. For good reason: it is a declaration *from this very litigation*. "A document is considered 'self-authenticating' and does not need additional evidence to support its identity if it is 'a declaration that satisfies 28 U.S.C. § 1746,'" *Lumoa v. Potter*, 351 F. Supp. 2d 426, 430 (M.D.N.C. 2004) (quoting Fed. R. Evid. 902 advisory committee's note), which Carol Cohen's declaration did, *see* Miscellaneous Decl., Exh. 4 (PX 16) at 3 ("Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."). So the Court denies this part of the request, too.[13]

### 3.    Marie Levitt's Testimony About Catherine Cohen's Upbringing and Education

US Life seeks to exclude Levitt's deposition testimony in which she commented on Catherine Cohen's "purported lack of education and poor treatment at the orphanage." Miscellaneous Motion at 1. The parties agree that "Levitt's testimony about Ms. Cohen's level of education and alleged mental capacity issues, even if based on her personal observation, are irrelevant to interpreting the policy at issue in this case," as "Cohen's subjective interpretation of the policy is irrelevant." *Id.* at 7; Miscellaneous Opposition at 8-9 ("Neither Ms. Cohen's nor U.S. Life's subjective understanding (or unilateral intent) is relevant for purposes of interpreting the Policy."); *see supra* III.B. But there are three points of disagreement: first, whether such testimony "is relevant to the determination of Ms. Cohen's age," Miscellaneous Opposition at 9; second,

---

[13] Wells Fargo purports that it is seeking to admit Carol Cohen's declaration under the rule of completeness, Miscellaneous Opposition at 4-5, but its "insistence that the declaration must be admitted, pursuant to Rule 106's rule of completeness, would apply only if US Life actually introduces into evidence an affidavit that it obtained from Carol," which remains to be seen, Miscellaneous Reply at 3. The Court thus declines to rule on the declaration's admissibility at this time.

whether such testimony, if relevant, is admissible, *see* Miscellaneous Motion at 9; and third, whether, if relevant and otherwise admissible, its probative value is substantially outweighed by the risk of unfair prejudice, *id.* at 8.  The Court grants this request in part and denies it in part.

As an initial matter, the Court finds the testimony to be relevant.  There are two types of testimony at issue: that concerning the quality of Cohen's upbringing at the orphanage—including her education there—and that concerning her general level of education and cognitive deficiencies later in life.  *See* Miscellaneous Motion at 6; Miscellaneous Opposition at 9.  As for the former, Wells Fargo argues that "Levitt's testimony concerning her mother's upbringing and the conditions at the orphanage is directly relevant to the credibility" of evidence arising from the orphanage.  Miscellaneous Opposition at 9.  The Court has already noted that there are "questions about the reliability of the information reflected in those orphanage records," *Wells Fargo*, 2025 WL 2220948, at *6, so it indeed seems relevant for Wells Fargo to ask the jury to infer that because "the orphanage provided poor care to Ms. Cohen, . . . it must not have cared enough about her to know her true date of birth," *contra* Miscellaneous Reply at 3.  *See* Levitt Dep. Tr. at 123:25-124:4 ("Q:  What's the basis for your statement that the orphanage didn't know how old your mother was?  A:  Because they just took these kids in and they didn't even want them because they weren't the right nationality and religion.").  As for the latter, Wells Fargo argues that "[t]he jury should hear Ms. Levitt's testimony concerning her mother's literacy level, which meant she was uninvolved with processes like applying for [the] social security benefits" on which US Life relies, and "Levitt testified that she and her father were involved with obtaining benefits for Ms. Cohen as well as the supporting evidence necessary to obtain those benefits."  Miscellaneous Opposition at 9-10.  US Life responds that this information is irrelevant because Catherine Cohen applied for social security in the 1980s while she only signaled cognitive decline in the 2000s, *see* Miscellaneous Reply at 4-5, but this response ignores Wells Fargo's point about her education

levels.  And Cohen's cognitive abilities would be relevant to rebut "evidence from later in Ms. Cohen's life that reflects a January 29, 1920 date of birth," like "medical records from 2017." Miscellaneous Opposition at 10.  So Levitt's testimony easily clears the low bar for relevance.  *See* Fed. R. Evid. 401.

Regardless of relevance, US Life argues that "testimony about the quality of Ms. Cohen's upbringing is inadmissible hearsay; it is Ms. Levitt testifying about what Ms. Cohen supposedly told her."  Miscellaneous Reply at 4; *see* Levitt Dep. Tr. 17:16-22, 124:9-15.  The Court agrees with US Life.  At issue are Federal Rules of Evidence 803(19) and 804(b)(4): Rule 803(19) excludes from hearsay "[a] reputation among a person's family . . . concerning the person's birth, adoption, legitimacy, ancestry, marriage, divorce, death, relationship by blood, adoption, or marriage, *or similar facts of personal or family history*," Fed. R. Evid. 803(19) (emphasis added), and Rule 804(b)(4) similarly excludes from hearsay statements (assuming the declarant's unavailability) about a family member's "birth, adoption, legitimacy, ancestry, marriage, divorce, relationship by blood, adoption, or marriage, *or similar facts of personal or family history*," Fed. R. Evid. 804(b)(4) (emphasis added).

The Second Circuit has taken a relatively narrow view of these italicized catch-all clauses, reasoning that "the scope of 'similar facts of personal or family history'" is defined by whether "the circumstances named in the statement [were] such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would be likely to be based on fairly accurate knowledge and to be sincerely uttered[.]"  *Porter v. Quarantillo*, 722 F.3d 94, 98 (2d Cir. 2013) (internal quotation marks omitted).  So there must be a showing that the item "was sufficiently significant or interesting or unusual such that it . . . became . . . a subject of presumptively accurate family lore."  *Id.*  That is why the Second Circuit held that a district court did not abuse its discretion in finding inadmissible an affidavit swearing

that the declarant moved to a country when she was between one and two years old, as the Second Circuit did "not believe that family members would ordinarily be so interested in [the declarant's] exact age at relocation as to afford [her] imprecisely described but definitely bounded statement the level of inherent reliability required by Rule 804." *Id.* at 98-99 (observing that "the district court was properly skeptical that generalized discussions of family history would include statements of age [that] precise"). And because of the rules' "narrow focus on a particular subset of facts of personal or family history" such that it "is not enough that a fact is personal or that it is important," "a person's blood type, *work history*, criminal alias, *or educational background and qualifications* do not qualify for admission." 30B Charles Allen Wright *et al.*, Federal Practice and Procedure Evidence § 7013 (2026 ed.) (internal quotation marks omitted) (emphases added). Just so here. Indeed, Wells Fargo characterizes the education testimony as "a generic statement made by a mom to her daughter concerning her education as a child," Miscellaneous Opposition at 11, revealing it cannot show that the testimony concerns "such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would be likely to be based on fairly accurate knowledge and to be sincerely uttered." *Porter*, 722 F.3d at 98 (internal quotation marks omitted). And while Wells Fargo tries to characterize statements that the orphanage mistreated Catherine Cohen for being a Pole as that "concerning the declarant's ancestry," Miscellaneous Opposition at 11, those statements are not really about Catherine Cohen *being Polish*. So the Court excludes Levitt's hearsay testimony about Catherine Cohen's treatment and education at the orphanage.[14]

[14] By contrast, "Levitt's testimony that one of Ms. Cohen's older siblings invented her birthdate of May 10, 1921, to correspond to a holiday, fits squarely within Rule[s] 803(19) and 804(b)(4)." Miscellaneous Reply at 4 n.2. *Contra* U.S. Life Miscellaneous Opposition at 11 n.6 ("To the extent the Court disagrees, then testimony concerning the origin of Cohen's May 10 birthday is likewise inadmissible hearsay and should be excluded."). The Rules "plainly contemplate[] that members of a family may testify with regard to the common understanding as

That leaves Levitt's non-hearsay testimony about Catherine Cohen's general education, literacy levels, and cognitive capacity. *See* Levitt Dep. Tr. at 52:3-6 ("My mother had, at best, a 3rd grade education, was partially illiterate, and she did not take care of anything financial, legal, administratively, or in any way."); *id.* at 58:20-60:5 (referring to Catherine Cohen's "diminished cognitive ability"). Such testimony is relevant, as explained above, and not unduly prejudicial. Indeed, in its reply, US Life focuses on the prejudice from Wells Fargo "improperly impugn[ing] the credibility of the orphanage in the jury's eyes," rather than the prejudice or sympathy arising from Catherine Cohen's mental capacity or literacy level. Miscellaneous Reply at 3-4. Because the Court excludes hearsay testimony about Catherine Cohen's upbringing at the orphanage, the risk of prejudice from that testimony is neutralized, and any risk of sympathy or prejudice towards Catherine Cohen from the allowed testimony can be mitigated by a jury instruction.

### 4.    Pennsylvania Department of Health Letters

US Life seeks to exclude "[n]inety-year-old letters . . . from the Pennsylvania Department of Health to the orphanage where Ms. Cohen was raised," purportedly because those letters contain "hearsay-within-hearsay." Miscellaneous Motion at 1. The Court disagrees with US Life and thus denies this request.

The parties do not dispute that the letters from the Pennsylvania Department of Health, Miscellaneous Decl., Exhs. 6-9, satisfy the public-records hearsay exception, Fed. R. Evid. 803(8)(A). *See* Miscellaneous Opposition at 13 ("The Department's statements are admissible under the public records exception."); Miscellaneous Reply at 5 n.3 ("Wells Fargo's contention that the letters are findings of a public agency under Rule 803(8), even if true, addresses only the first level of hearsay."). Instead, US Life argues that these letters contain hearsay-within-hearsay,

---

to the birth of another family member." *United States v. Jean-Baptiste*, 166 F.3d 102, 110 (2d Cir. 1999).

namely a statement from the orphanage that it asked the Department to look for a birth certificate for Catherine Cohen. The letters, however "do not quote or rely on any substantive assertion by the orphanage," let alone include any statements of the orphanage that are "offered for [their] truth." Miscellaneous Opposition at 14. US Life's real concern centers on the inferences the jury may draw from these letters. *See* Miscellaneous Motion at 12 ("Wells Fargo intends to argue that the orphanage requested a birth certificate because it did not know Ms. Cohen's date of birth. . . . But it is at least equally possible that the orphanage, despite having received Ms. Cohen's date of birth from a reliable source, desired an official government record further documenting that date of birth." (internal citation omitted)). "But the hearsay rule does not bar admission of the statements used circumstantially, since, when so used the primary focus of the inquiry is whatever inferences can be drawn from the fact that the words were spoken and not the truth of what was said." *Scholle v. Cuban-Venezuelan Oil Voting Tr.*, 285 F.2d 318, 321 (2d Cir. 1960); *see also United States v. Canieso*, 470 F.2d 1224, 1232 (2d Cir. 1972) (distinguishing between hearsay and utterances giving rise to "indirect inferences . . . not as assertions to prove the matter asserted" (internal quotation marks omitted)). Here, any reference in the letters to the orphanage's prior correspondence is not offered for the underlying correspondence's truth, "but only to show that a communication occurred and prompted the Department's response." Miscellaneous Opposition at 14; *see* Fed R. Evid. 801(c) advisory committee's note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). As Wells Fargo concludes, "[t]he possibility that the jury may draw competing inferences from the letters does not warrant exclusion; it is the jury's role to assess the evidence and determine what weight to assign it." Miscellaneous Opposition at 14. So the Court denies the request.

5.    **US Life's Claims Handling**

US Life seeks to exclude "[e]vidence or argument related to US Life's handling or investigation of Wells Fargo's claim seeking the death benefit, including US Life's claims handling manual and correspondence." Miscellaneous Motion at 1. The Court grants this request in part and denies it in part.

To the extent that Wells Fargo seeks to introduce evidence about US Life's claims handling as it bears on the application of the Misstatement of Age Provision, US Life is correct that such evidence is irrelevant here. *See Wells Fargo*, 2025 WL 2220948, at *28 (explaining that testimony "about how claims manuals operate in the customs and practice of the insurance industry" would "not be permissible custom and practice testimony because it would not go to the interpretation of a specific ambiguous term in the Policy"); Miscellaneous Motion at 15 ("In rejecting Wells Fargo's proposed expert testimony on the topic of claims handling, the Court has already concluded that evidence related to claims handling is irrelevant to the interpretation of the policy."). The Court thus grants this aspect of the request.

The real fight, instead, is whether US Life's claims handling manual and correspondence with Wells Fargo can be introduced on the threshold issue: whether Catherine Cohen misstated her age. As Wells Fargo explains, "prior to this dispute arising, U.S. Life specifically contemplated [in its manual and correspondence] the issue of what records would be deemed reliable and acceptable for establishing an insured's date of birth when there was a discrepancy between various records and what records would not be deemed reliable and acceptable," expressing that "it would only accept a passport or actual birth certificate to establish Ms. Cohen's date of birth" and discounting delayed birth certificates created more than 10 years after the insured's date of birth. Miscellaneous Opposition at 15-16. It is undisputed that such evidence—classic party-opponent statements, as they were made by US Life—poses no hearsay problem. *See* Miscellaneous Reply

60

at 5 ("US Life never argued that these materials are inadmissible because they are hearsay."). Rather, US Life challenges the relevance of these statements, arguing that "[t]he Court has already held that assessing reliability of specific pieces of evidence is the exclusive role of the jury." *Id.* at 5-6. But this misunderstands the Summary Judgment/*Daubert* Opinion, in which the Court explained that the "only way" the parties' *expert testimony* on claims handling could "possibly speak[] to disputed facts would be to point out a disjunction between the reliability assigned to certain documents in the claims handling manual and US Life's position as to the reliability of those documents in this case." *Wells Fargo*, 2025 WL 2220948, at *29. "Expert testimony in this vein . . . would not aid the jury's ability to assess and weigh the evidence" because "any such tension could be readily appreciated by a lay juror." *Id.* Simply put, the Court excluded expert testimony on how the claims handling manual treated documents' reliability on expert admissibility grounds, not relevance—and indeed, that holding was based on the premise that the disjunction expressed in the manual was relevant. So there is nothing "unfairly prejudicial" about excluding expert testimony about the claims handling manual (and about US Life's correspondence with Wells Fargo) but not that evidence itself, *contra* Miscellaneous Reply at 6, especially where "U.S. Life will have the opportunity to explain to the jury what it meant by what it stated in its claims manual and to Plaintiff," Miscellaneous Opposition at 16 n.7. The Court thus denies this aspect of the request.

### 6. New York Department of Financial Services Reports

US Life seeks to exclude "[r]eports by the New York Department of Financial Services [('NYDFS')], identifying purported deficiencies in US Life's claims handling process not involving Ms. Cohen's policy." Miscellaneous Motion at 2. In response, Wells Fargo "confirms that it is not seeking to introduce evidence from these reports regarding the violations of New York law by U.S. Life that NYDFS identified." Miscellaneous Opposition at 19. So the Court denies

this aspect of the request without prejudice as moot.

Wells Fargo, however, seeks instead to introduce the reports to the extent that "they reflect that the NYDFS considers the Social Security Administration's master death index a reliable source for confirming data regarding insureds like Ms. Cohen." *Id.* US Life argues that "the information from the reports that Wells Fargo wants to use is inadmissible hearsay," and Wells Fargo has not pointed to any applicable hearsay exception. Miscellaneous Reply at 6-7 (arguing that the public-records hearsay exception, Fed. R. Evid. 803(8)(A)(iii), is inapplicable). The Court thus grants this aspect of the request, but may revisit its ruling should Wells Fargo explain how the report satisfies a hearsay exception.

### 7.    Mentions of US Life's Rejected Defenses and Catherine Cohen's Intent

US Life seeks to exclude "[a]ny mention of US Life's now-irrelevant dismissed defense of reformation, such as reformation based on fraudulently induced unilateral mistake, including Ms. Levitt's testimony that Ms. Cohen never intended to deceive anyone about her date of birth." Miscellaneous Motion at 2. The Court denies the first part of this request as moot: Wells Fargo "agrees that it should not be necessary to inform the jury that U.S. Life unsuccessfully sought to reform the Policy's unambiguous Maturity Date, and the Court rejected those attempts," and would only seek to "explain to the jury that U.S. Life sought to change the Policy's Maturity Date and had such defenses rejected by the Court" should U.S. Life be able to introduce parol evidence that functions as a reformation argument—evidence this Court has already excluded, *see supra* III.B. Miscellaneous Opposition at 20; *accord* Miscellaneous Reply at 7.

Wells Fargo argues that testimony that Catherine Cohen never intended to deceive anyone about her birthdate is "relevant to the jury's consideration of the conflicting records regarding her date of birth and what weight to give her own statements," as her "honesty and integrity are important factors for the jury to consider." Miscellaneous Opposition at 20-21. But as US Life

62

points out, and Wells Fargo does not dispute, "the misstatement of age provision contains no mental state requirement," meaning that this testimony is largely irrelevant. Miscellaneous Motion at 20; *accord* Miscellaneous Reply at 7. Alternatively, Wells Fargo claims that "the absence of a fraud-based defense does not mean that U.S. Life now has free rein to attack Ms. Cohen's credibility and Plaintiff must stay silent," as "[Federal Rule of Evidence] 608 expressly permits Plaintiff to rehabilitate Ms. Cohen's credibility after U.S. Life attacks it." Miscellaneous Opposition at 7-8. That argument fails, however, because under Rule 608 "evidence of truthful character is admissible only after the witness's *character for truthfulness* has been attacked," Fed. R. Evid. 608(a) (emphasis added), and US Life represents that it "will not admit at trial any evidence about Ms. Cohen's character for truthfulness; it will merely introduce evidence that tends to show her use of a May 10, 1921, birthdate was inaccurate, without speaking to her intent or state of mind," Miscellaneous Reply at 7-8. Because "[n]ot every attack on credibility provides a basis for the admission of evidence of truthful character," "evidence of truthful character would not be admissible where, for example, credibility was attacked by a showing that the witness misperceived events, suffered a memory lapse, or was otherwise honestly mistaken." 28 Charles Allen Wright *et al.*, Federal Practice & Procedure Evidence § 6116 (2d ed. 2026). Just so here. The Court thus concludes that evidence regarding Catherine Cohen's lack of intent to deceive is irrelevant and falls outside the ambit of Rule 608, so it grants US Life's request to exclude such evidence.

### 8.    Premiums Paid

US Life seeks to exclude "[a]ny documents, testimony, or argument related to the total amount of premiums paid on the policy." Miscellaneous Motion at 2. The Court grants this request.

As Wells Fargo agrees, the purpose of this trial is to weigh "relevant evidence extrinsic to

the insurance policy bearing on the intention of the contracting parties *at the time of its execution*." *Wells Fargo*, 2025 WL 2220948, at \*18 (citation modified) (emphasis added); Unilateral Intent Motion at 4 (reciting this language from the Summary Judgment/*Daubert* Opinion).  US Life correctly asserts that evidence of the total amount of premiums paid "makes no sense here, where Wells Fargo seeks to introduce evidence concerning the aggregate amount of premiums (a number that would be unknown when the parties entered into the agreement)."  Miscellaneous Reply at 9 n.2.  Perhaps the decisions Wells Fargo cites are correct that "the amount of premiums charged for an insurance policy impacts the insured's reasonable expectations regarding the coverage provided for the policy" when that amount is known *ex ante*.  Miscellaneous Opposition at 22 (citing *Herzog v. Nat'l Am. Ins. Co.*, 465 P.2d 841 (Cal. 1970); *Ohio Cas. Ins. Co. v. Stanfield*, 581 S.W.2d 555 (Ky. 1979)).  But Wells Fargo seeks to introduce "an amount that ultimately exceeded the entire $9,800,000 death benefit," *id.*, without explaining how that amount could possibly have been known to Catherine Cohen and US Life "at the time they executed the Policy," *Wells Fargo*, 2025 WL 2220948, at \*18.  Any relevance of that amount, if any, would thus be substantially outweighed by this evidence's "improperly prejudicial purpose: to argue that because Wells Fargo has paid a large sum of money, the jury should award it a large verdict."  Miscellaneous Reply at 9.  So the Court excludes this evidence as irrelevant or, alternatively, substantially outweighed by a risk of unfair prejudice and confusion.  Fed. R. Evid. 402; Fed. R. Evid. 403.

### 9. Evidence of Other Policies Insuring Catherine Cohen's Life

US Life seeks to exclude testimony or evidence "that other insurers have paid the full death benefit on other policies insuring Ms. Cohen's life."  Miscellaneous Motion at 2.  In response, Wells Fargo explains that "if U.S. Life does not introduce evidence related to other policies insuring Ms. Cohen's life, Plaintiff will not either.  But if U.S. Life is permitted to introduce any evidence related to the other policies, Plaintiff should be permitted to do so as well so that the jury

64

is presented with a complete record and Plaintiff is not prejudiced." Miscellaneous Opposition at 23. US Life, in turn, "expects to introduce at trial a statement by Ms. Cohen's daughter Carol, made to Principal Life Insurance Company ('Principal'), that Ms. Cohen was born on January 29, 1920." Miscellaneous Reply at 9. "US Life does not dispute that, if it admits this evidence at trial, Wells Fargo may introduce evidence that Carol Cohen later told Principal that her mother was born on May 10, 1921." *Id.* US Life's concession neutralizes "any misleading of the jury and prejudice to Plaintiff related to the Principal Life claim," Miscellaneous Opposition at 25, and as US Life explains, "[w]hether the death benefit was paid [by Principal] is a separate issue from Carol's statements about her mother's birth, and it has no relevance to whether US Life owes the full death benefit on its policy," Miscellaneous Reply at 9. So the Court denies this request without prejudice as moot, provided that the parties limit their mentions of other policies as proposed.

### 10. 2017 Rate Table

U.S. Life seeks to exclude an "exhibit containing cost of insurance rates that . . . do not apply to the policy," Miscellaneous Motion at 2, which is a rate table published in 2017 by the National Association of Insurance Commissioners ("NAIC"), Miscellaneous Opposition at 25-26. Wells Fargo would seek to introduce NAIC's table, which includes insurance rates up to age 120, "in the event Sarathy is permitted to offer" testimony "that it would be improper or impossible for U.S. Life to extrapolate a rate for ages 100 or older." *Id.* at 26. But because the Court excludes such testimony from Sarathy, *see supra* III.C.3, Wells Fargo will not seek to introduce the table, so this request is denied without prejudice as moot.

### I. Warner/Marinoff Motion

Finally, US Life seeks to exclude Kevin Warner and David Marinoff, both of Jade Mountain Partners, under Federal Rules of Civil Procedure 26 and 37. Warner/Marinoff Motion at 4-6. It also seeks to exclude their testimony on evidentiary grounds. *Id.* at 6-10. The Court

65

agrees that these previously undisclosed witnesses should be excluded under Rule 37(c)(1), and further explains why, in the alternative, their testimony would be largely excluded.

### 1.      Failure to Disclose Witnesses

US Life seeks to exclude Warner's and Marinoff's testimony as undisclosed witnesses. Rule 37(c)(1) instructs that "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party" may not "use that . . . witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 26, in turn, requires a party to "provide to the other parties . . . each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims," Fed. R. Civ. P. 26(a)(1)(A), and to "supplement or correct" that disclosure "in a timely manner if the party learns that . . . the disclosure . . . is incomplete . . . and . . . the additional . . . information has not otherwise been made known to the other parties," Fed. R. Civ. P. 26(e)(1). Wells Fargo did not identify Warner or Marinoff in its Rule 26 disclosures. Dkt. 173, Exh. 3. And while Wells Fargo argues that "U.S. Life cannot claim surprise as to Jade Mountain's involvement" because Marinoff and Warner "both appeared as Plaintiff's corporate representatives" at a prior settlement conference and "U.S. Life obtained documents during discovery reflecting that materials had been provided to []Warner," Warner/Marinoff Opposition at 3, "[t]he law is clear that a party's mere knowledge of the existence of a witness does not satisfy the Rule 26(a)(1)(A) disclosure obligation; that obligation is fulfilled only if the disclosing party informed the opposing party that it might call the witness," *N. Am. Photon Infotech, Ltd. v. ZoomInfo LLC* ("*ZoomInfo*"), No. 20 Civ. 2180 (JPC), 2022 WL 4132941, at *3-4 (S.D.N.Y. Sept. 7, 2022) (citation omitted) (explaining that "a passing reference, such as a mere mention of a name in a deposition or interrogatory response, fails to" suffice (internal quotation marks omitted)), *aff'd in part, vacated in part on other grounds*, Nos. 22-1979 (L), 22-2074 (XAP), 2024 WL 4799843 (2d Cir. Nov. 15, 2024) (summary order).

To exclude undisclosed witnesses, courts apply a four-factor test: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commnc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997).  On the first factor, Wells Fargo has not explained why it omitted Warner and Marinoff in its prior disclosures, and "does not even claim that its nondisclosure was inadvertent." *ZoomInfo*, 2022 WL 4132941, at *5.  Instead, Wells Fargo merely claims that US Life "seeks to impose a disclosure standard it did not itself follow" for Eric Tarnow, a representative of US Life's parent.  Warner/Marinoff Opposition at 1-2.  But as US Life points out, "Wells Fargo has never challenged the sufficiency of US Life's disclosure, and does not do so now," "[n]or does Wells Fargo challenge Mr. Tarnow's ability to testify at trial."  Warner/Marinoff Reply at 5 n.2.  As for the importance of Warner's and Marinoff's testimony, Warner's testimony is likely inadmissible and Marinoff's is likely irrelevant—as discussed below.  *See infra* III.I.2-3; *cf. Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988) ("Because the evidence of these witnesses was so important, only extreme misconduct on the part of the plaintiff or extreme prejudice suffered by the defendants would justify the extraordinary sanction of preclusion in this case.").  Besides, Wells Fargo plans on calling another witness, Tanisha Harris, to offer "[t]estimony concerning the Policy, claims process, and Defendant's claims manual," thus mitigating any prejudice that would arise from excluding these witnesses.  Pretrial Order at 7.

As for prejudice towards US Life, Wells Fargo argues that US Life should have known about Warner and Marinoff's involvement in the case based on things like their participation in the settlement conference and mention in certain exchanged documents.  Warner/Marinoff Opposition at 3.  But US Life's point is not that it "was unaware that Jade Mountain existed[,] . . .

[i]t is that US Life did not know, until Wells Fargo's pre-trial disclosure, that there was even the slightest possibility that Wells Fargo would call the two Jade Mountain witnesses." Warner/Marinoff Reply at 3-4. That point is correct. *See ZoomInfo*, 2022 WL 4132941, at \*3-4. US Life explains that "[h]ad Wells Fargo disclosed these witnesses and their areas of supposed personal knowledge, US Life undoubtedly would have sought to depose them." Warner/Marinoff Reply at 4; *accord* Warner/Marinoff Motion at 5-6. And in any event, the "failure to disclose a witness until the eve of trial causes obvious prejudice to an adversary preparing its own trial proof, and allowing such testimony would give the offending party an unfair tactical advantage" which could require the reopening of discovery, depositions, and rebuttal evidence. *ZoomInfo*, 2022 WL 4132941, at \*5. Finally, with trial scheduled to commence in fewer than three weeks, and having been scheduled over nine months ago, *see* Dkt. 136, a continuance is not a realistic option. *See* Warner/Marinoff Motion at 5-6. While this Court has "discretion to impose other, less drastic sanctions, . . . the parties suggest no alternative to exclusion and none would be appropriate at this stage." *ZoomInfo*, 2022 WL 4132941, at \*5 (citation modified). So the Court excludes Warner's and Marinoff's testimony in their entirety.

### 2. Warner's Improper Expert Testimony

US Life also seeks to exclude Warner's testimony "because it constitutes improper expert testimony by a lay witness." Warner/Marinoff Motion at 1. The Court agrees and would grant this request in the alternative.

"Under Federal Rule of Evidence 701, lay opinion must be the product of reasoning processes familiar to the average person in everyday life," a rule which "prevents a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements." *United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013) (citation

68

modified); *see* Fed. R. Evid. 701 (allowing lay opinion testimony if it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). So "[i]f the opinion of a witness rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." *Haynes*, 729 F.3d at 195 (internal quotation marks omitted). Otherwise, the witness is simply "an expert in lay witness clothing." *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (quoting Fed. R. Evid. 701 advisory committee's note). As the Second Circuit has explained, the line depends on how a witness's specialized knowledge is deployed: "[a] witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' so long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise," while testimony that is "not a product of [one's] investigation, but rather reflected his specialized knowledge . . . [is] impermissible expert testimony." *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (citation modified).

Here, Wells Fargo wants Warner to "testify regarding the Policy at issue and its features, including but not limited to premiums, cost of insurance rates, and misstatement of age adjustments, and illustrations and annual reports related to the Policy." Pretrial Order at 7. To the extent this testimony is about those topics generally, rather than the specific Policy at issue, it is plainly based on Warner's specialized knowledge and thus expert testimony. Perhaps recognizing this, Wells Fargo pivots, explaining that Warner's testimony would "be limited to the policy and related documents," which is "based on his involvement with the account." Warner/Marinoff Opposition at 5. While that limited testimony would likely be permissible, it runs into the witness-disclosure problem above, *see supra* III.I.1. And besides, as already mentioned, *see id.*, Wells

69

Fargo plans to call another unchallenged witness, Harris, to offer "[t]estimony concerning the Policy," Pretrial Order at 7, rendering further testimony from Warner regarding the Policy needlessly cumulative. So the Court would exclude Warner's proffered testimony, even if not precluded under Rule 37(c)(1).

### 3.    Marinoff's Irrelevant and Improper Lay Testimony

Finally, US Life alternatively seeks to exclude Marinoff's testimony "as irrelevant and because he lacks personal knowledge," since claims handling is not at issue and he "lacks personal knowledge of the historical records on which Wells Fargo relies and may not serve as a conduit to present documentary evidence on which Wells Fargo relies." Warner/Marinoff Motion at 2. As with Warner's testimony, the Court would largely grant this request even if it excused Marinoff's nondisclosure.

Marinoff is "[e]xpected to testify regarding Plaintiff's satisfaction of the obligations under the Policy, the claims process, [and] U.S. Life's claims denial." Pretrial Order at 7. As for the first, "US Life agrees, and does not contest, that Wells Fargo owned the policy, timely paid all premiums due under the policy, and timely submitted a claim for benefits." Warner/Marinoff Motion at 8; *see also* Warner/Marinoff Reply at 9 ("Wells Fargo does not acknowledge, much less contest this argument."). Further testimony from Marinoff on this issue would be needlessly cumulative in a manner that would substantially outweigh its added probative value. *See* Fed. R. Evid. 403. As for the latter two, this Court has already rejected claims handling expert testimony, *see Wells Fargo*, 2025 WL 2220948, at *28-29; *see supra* III.H.5, and as US Life argues, "[t]his is not a case about bad-faith claims handling or the sufficiency or details of US Life's claims process and claims determination," Warner/Marinoff Motion at 10. And similar to the satisfaction testimony, "Wells Fargo does not contest US Life's argument that testimony regarding the claim process" and US Life's denial of Wells Fargo's claim is minimally relevant because such issues

70

are not in dispute.  Warner/Marinoff Reply at 8.  Further testimony from Marinoff on the claim denial thus also is excluded under Rule 403.  So the Court would alternatively grant these aspects of US Life's request.

The real dispute is over Marinoff's fourth category of anticipated testimony: "evidence supporting Plaintiff's claim."  Pretrial Order at 7.  Wells Fargo asserts that Marinoff will "describe the steps taken to investigate and address the discrepancy concerning Ms. Cohen's age and date of birth, including Plaintiff's efforts to resolve that issue," testimony which "reflects his own actions and knowledge," not "secondhand narratives or . . . opinions outside his experience." Warner/Marinoff Opposition at 5.  While such testimony is usually appropriate for lay witnesses to give, *see, e.g.*, *Rigas*, 490 F.3d at 224; *Bank of China*, 359 F.3d at 181-82, US Life points out that "Wells Fargo does not explain how" any "aspect of the investigative process" would "be relevant to the issues that need to be resolved at trial," and contends that Marinoff is impermissibly sought "to serve as a conduit for Wells Fargo's preferred evidence regarding Ms. Cohen's date of birth," Warner/Marinoff Reply at 11.  On that score, there is "scant caselaw" which "does not clearly delineate the line between proper lay witness testimony and improper 'narrative gloss.'" *United States v. Nock*, 148 F.4th 607, 616 (8th Cir. 2025).  But the general rule is that while "Rule 701 permits lay witnesses to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived," such testimony must still be "based on first-hand knowledge." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (internal quotation marks omitted); *see United States v. Espino*, 317 F.3d 788, 796-97 (8th Cir. 2003) (explaining that this rule "confines the testimony of a lay witness to concrete facts within his knowledge or observation," such that the witness may not "provide . . . interpretations that an untrained layman could not make if perceiving the same acts or events" (internal quotation marks omitted)).  That is why a witness may not read exhibits into the record in a way that serves "as a

71

third-party corroborator of hotly contested facts of which he had no personal knowledge." *Grant*, 2021 WL 5816245, at \*3; *see supra* III.H.1.  Even Wells Fargo agrees that testimony "where witnesses lacked personal involvement in the underlying events or attempted to present secondhand narratives or expert-like conclusions" should be found inadmissible. Warner/Marinoff Opposition at 6.  So to the extent "Wells Fargo intends to have Mr. Marinoff narrate the evidence that Wells Fargo obtained after this dispute arose," Warner/Marinoff Reply at 9, the Court agrees that such narration is impermissible.  Thus, at bottom, Marinoff's testimony, too, would largely be excluded even if he had been properly disclosed.

## IV.  Conclusion

For these reasons, the Court holds that US Life bears the burden to prove whether Catherine Cohen misstated her age and, if so, how the Misstatement of Age Provision applies to this case. The Court further grants the Joslyn Motion in part and denies it in part, grants the Unilateral Intent Motion in part and denies it in part, grants the Sarathy Motion in part and denies it in part, grants the Ownership/Acquisition Motion in part and denies it in part, grants the Judicial Notice Motion in part and denies it in part, grants the Shelley Motion in part and denies it in part, grants the Miscellaneous Motion in part and denies it in part, and grants the Warner/Marinoff Motion.  The Court defers ruling on the Historical Records Motion.

The Clerk of Court is respectfully directed to close Docket Numbers 149, 154, 156, 158, 160, 161, 165, 168, and 171.

SO ORDERED.

Dated: May 28, 2026
        New York, New York                              JOHN P. CRONAN
                                                    United States District Judge